# EXHIBIT A

1 **ROCKWOOD & NOZISKA, L.L.P.**
NEAL H. ROCKWOOD, ESQ. SB# 106197
2 C. BRANT NOZISKA, ESQ. SB#106117
CHARLES L. FANNING IV, ESQ. SB#248704
3 5060 North Harbor Drive, Suite 255
San Diego, California 92106
4 Phone: (619) 224-7778 Fax (619) 224-7779

5

Attorneys for Plaintiffs
6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9            **FOR THE COUNTY OF SAN DIEGO, CENTRAL DIVISION**

10

11  1800 SOUTH MAPLE STREET, LLC, a        )  CASE NO.
    California Limited Liability Company;   )
12  RALPH J. GIANNELLA, an individual;      )
    GIANNELLA PROPERTIES, INC., a          )
13  California Corporation; WILLIAM G.      )  **FIRST AMENDED COMPLAINT FOR:**
    AYYAD, an individual; WILLIAM G.        )
14  AYYAD, INC., a California Corporation; and )  **BREACH OF THE IMPLIED**
    PREMIER COMMUNITIES, LLC, a            )  **COVENANT OF GOOD FAITH AND**
15  California Limited Liability Company.    )  **FAIR DEALING; DECLARATORY**
                                            )  **RELIEF; FRAUD; CONSPIRACY TO**
16          Plaintiffs,                     )  **COMMIT FRAUD; PROFESSIONAL**
                                            )  **NEGLIGENCE; NEGLIGENT**
17       v.                                 )  **MISREPRESENTATION**
                                            )
18  ALLIED PROPERTY AND CASUALTY           )  **JURY REQUESTED**
    INSURANCE COMPANY, an Iowa             )
19  Corporation; AMCO INSURANCE            )  **[UNLIMITED CIVIL]**
    COMPANY, an Iowa Corporation;          )
20  NATIONWIDE MUTUAL INSURANCE            )
    COMPANY, an Ohio Corporation;          )
21  MICHAEL EHRENFELD COMPANY –            )
    INSURANCE AGENTS AND BROKERS, a        )
22  California Corporation (DOE 1); and DOES 2 )
    through 100, inclusive,                 )
23                                          )
            Defendants.                     )
24  _____

25       1800 SOUTH MAPLE STREET, LLC, a California limited liability company; RALPH

26  J. GIANNELLA, an individual; GIANNELLA PROPERTIES, INC., a California corporation;

27  WILLIAM G. AYYAD, an individual; WILLIAM G. AYYAD, INC., a California corporation;

28  and PREMIER COMMUNITIES, LLC, a California Limited Liability Company, ("Plaintiffs")

    hereby allege as follows:

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

## IDENTIFICATION OF PARTIES

1. Plaintiff, 1800 SOUTH MAPLE STREET, LLC, its members, officers, directors, employees, and partners, hereinafter "SOUTH MAPLE," is and at all times herein mentioned, was a limited liability company operating and existing under the laws of the State of California.

2. Plaintiff, RALPH J. GIANELLA, hereinafter "GIANNELLA," is, and at all times herein mentioned, was an individual residing in the County of San Diego, State of California.

3. Plaintiff, GIANNELLA PROPERTIES, hereinafter "GIANNELLA, PROPERTIES," is, and at all times herein mentioned, was a corporation operating and existing under the laws of the State of California.

4. Plaintiff, WILLIAM G. AYYAD, hereinafter "AYYAD," is, and at all times herein mentioned, was an individual residing in the County of San Diego, State of California and was an officer of AYYAD, INC.

5. Plaintiff, WILLIAM G. AYYAD, INC., hereinafter "AYYAD INC.," is, and at all times herein mentioned, was a corporation operating and existing under the laws of the State of California and a member of SOUTH MAPLE.

6. Plaintiff, PREMIER COMMUNITIES, LLC, its members, officers, directors, employees, and partners, hereinafter "PREMIER," is and at all times herein mentioned, was a limited liability company operating and existing under the laws of the State of California.

7. Plaintiffs allege on information and belief that at all times herein mentioned Defendant ALLIED PROPERTY AND CASUALTY INSURANCE COMPANY ("ALLIED") of Iowa, a wholly owned subsidiary of Defendant NATIONWIDE, was and is a corporation doing business within the State of California, County of San Diego. Plaintiffs further allege on information and belief that ALLIED, is, and at all times mentioned herein, was duly organized and existing under the laws of the State of Iowa.

8. Plaintiffs are informed and believe and thereon allege that at all relevant times, Defendant AMCO INSURANCE COMPANY ("AMCO"), a wholly owned subsidiary of

-2-

**ROCKWOOD & NOZISKA, LLP**
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1    Defendant ALLIED, was and is a corporation doing business within the State of California,

2    County of San Diego. Plaintiffs further allege on information and belief that AMCO is, and at

3    all times mentioned herein, was duly organized and existing under the laws of the State of Iowa.

4         9.    Plaintiffs allege on information and belief that at all times herein mentioned

5    Defendant NATIONWIDE MUTUAL INSURANCE COMPANY ("NATIONWIDE") of Ohio

6    was and is a corporation doing business within the State of California, County of San Diego.

7    Plaintiffs further allege on information and belief that NATIONWIDE, is, and at all times

8    mentioned herein, was duly organized and existing under the laws of the State of Ohio.

9         10.   Plaintiffs hereby name MICHAEL EHRENFELD COMPANY-INSURANCE

10   AGENTS AND BROKERS as DOE 1. Plaintiffs are informed and believe and based thereon

11   allege that at all times herein mentioned MICHAEL EHRENFELD COMPANY-INSURANCE

12   AGENTS AND BROKERS was a corporation organized and existing under the laws of the state

13   of California and operating as a business at 2655 Camino Del Rio North, San Diego, California.

14        11.   Plaintiffs are informed and believe and thereon allege that throughout the

15   issuance of the AMCO Insurance Policy and the claims adjustment period, Defendant AMCO

16   was the insurance carrier under the AMCO Policy; defendants ALLIED, NATIONWIDE, and

17   AMCO conducted the claims adjustment and made the decision to deny coverage; defendants

18   NATIONWIDE and ALLIED managed, controlled, and ratified all conduct of defendant

19   AMCO; and defendants NATIONWIDE, ALLIED, and AMCO all share the same adjustors.

20   Hereinafter NATIONWIDE, ALLIED, and AMCO will be collectively referred to as

21   "INSURERS."

22        12.   Plaintiffs are informed and believe and based thereon allege that at all times

23   herein mentioned MICHAEL EHRENFELD COMPANY-INSURANCE AGENTS AND

24   BROKERS is, and at all times herein mentioned was, an appointed agent of AMCO

25   INSURANCE COMPANY and as such all acts alleged herein were within the course and scope

26   of said agency and imputed to AMCO INSURANCE COMPANY. (Attached as Exhibit "A-1"

27   and incorporated herein by reference is a copy of the Agency Agreement between ALLIED and

28   MICHAEL EHRENFELD COMPANY-INSURANCE AGENTS AND BROKERS).

-3-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

13.    Plaintiffs are presently unaware of the true names and capacities of those defendants sued herein as Does 2 through 100 inclusive.  Plaintiffs will amend this complaint to state their true names and capacities when they are ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously-named defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiffs' damages were proximately caused by such defendants.

14.    Plaintiffs are informed and believe, and thereon allege, that INSURERS, including the fictitious defendants named as Does herein, were the agents and/or employees of the defendants and in doing the things herein mentioned were acting within the scope of such agency and/or employment.

15.    Plaintiffs are informed and believe that venue is properly within the County of San Diego and the Insurer Defendants and Broker Defendant are subject to personal jurisdiction in this County at the time the action is commenced.

16.    The insured property in question, previously known as SOUTH MAPLE and presently known as HIDDEN GLEN CONDOMINIUMS, is located at 1800 South Maple Street, Escondido, California, 92025, and will be commonly referred to as the "SUBJECT PROPERTY."  The SUBJECT PROPERTY consists of thirty residential condominiums and related common areas.

17.    Plaintiffs request a jury in this matter.

### JURISDICTION & VENUE

18.    The causes of action in this complaint arise out of an agreement entered into in the County of San Diego, and some or all of the Defendants are conducting business in the County of San Diego.  Accordingly, venue is proper in San Diego County Superior Court pursuant to Code of Civil Procedure §§ 393 and 395.5.

/ / /

/ / /

-4-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

### GENERAL ALLEGATIONS

19.    Plaintiffs incorporate by reference Paragraphs 1 - 18 of this Complaint and repeat those Paragraphs as though fully set forth herein.

20.    Plaintiff SOUTH MAPLE purchased the SUBJECT PROPERTY on or about April 4, 2002.

21.    Plaintiffs are informed and believe, and thereon allege the SUBJECT PROPERTY was converted to condominiums on or about April 16, 1986; however, the units continued to be rented by the previous owner.

22.    After SOUTH MAPLE purchased SUBJECT PROPERTY, SOUTH MAPLE performed renovations to some of the units in preparation for sale.

23.    Beginning in or about August 2002, Plaintiff SOUTH MAPLE sold units at the SUBJECT PROPERTY.  Escrows for all of the condominiums closed between August 2002 and November 2002.

24.    MICHAEL EHRENFELD COMPANY-INSURANCE AGENTS AND BROKERS (hereinafter referred to as the "Broker Defendant") has been Plaintiffs' insurance broker for some time.  MICHAEL EHRENFELD COMPANY-INSURANCE AGENTS AND BROKERS was an appointed agent of INSURERS and Robyn Kettering was an employee of MICHAEL EHRENFELD COMPANY-INSURANCE AGENTS AND BROKERS during this time period (Ehrenfeld and Kettering collectively referred to as "AMCO Agents").

25.    Each year, AMCO Agents designed and administered a comprehensive "insurance program" for Plaintiffs' insurance needs.

26.    By and through AMCO Agents, Plaintiffs were issued by INSURERS, Insurance Policy No. ACP BPH 7801069841, hereinafter referred to as the "AMCO Policy," for the policy period April 4, 2002 to April 4, 2003.  The AMCO Policy insured 1800 SOUTH MAPLE, LLC, among other insureds.  (Attached as Exhibit "A-2" is a copy of the AMCO Policy and its terms are incorporated herein by this reference).

27.    Under the terms of AMCO Policy, INSURERS undertook to and did agree: 1) to "pay those sums up to the applicable Limit of Insurance that the insured becomes legally

-5-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1  obligated to pay as damages because of "bodily injury" or "property damage" to which this

2  insurance applies"; 2) that INSURERS would have "the right and duty to defend the insured

3  against any "suit" seeking those damages for which there is coverage under this policy"; and 3)

4  that INSURERS may, at its sole discretion, investigate any "occurrence" and settle any claim or

5  "suit" that may result.

6       28.    The terms of the AMCO Policy also offered coverage for the completed

7  operations of a developer/renovator.  The Completed-Operations portion of the AMCO Policy

8  "includes all 'bodily injury' and 'property damage' occurring away from premises you own or

9  rent and arising out of 'your product' or 'your work' except: 1) Products that are still in your

10  physical possession; or 2) Work that has not yet been completed or abandoned."  As listed in the

11  property declarations portion of the AMCO Policy, the Products-Completed Operations

12  aggregate limit of insurance for all occurrences is $4 million.

13       29.    At all times mentioned herein Plaintiffs have performed all the terms and

14  conditions of the AMCO Policy to be performed on their part.

15       30.    Under the AMCO Policy, SOUTH MAPLE is an additional insured as the prior

16  owner of the insured premises during the renovation and subsequent sales and an additional

17  insured by virtue of endorsements.  The remaining Plaintiffs are also insureds by virtue of their

18  positions as members, officers and/or employees of SOUTH MAPLE and/or its members.

19       31.    In a letter dated May 21, 2007 addressed to Plaintiffs' counsel, INSURERS

20  denied Plaintiffs a defense and indemnification under the AMCO Policy, alleging that SOUTH

21  MAPLE, an additionally named insured by virtue of endorsements, was only insured in the

22  capacity of "mortgagee, assignee, and receiver." (Attached as Exhibit "A-3").

23       32.    Plaintiffs are informed and believe, and thereon allege, that occurrences took

24  place during the AMCO Policy period.

25       33.    On or about August 18, 2005, The Hidden Glen Maintenance Corporation

26  commenced action against Plaintiffs herein in the San Diego Superior Court entitled *The Hidden*

27  *Glen Maintenance Corporation v. 1800 South Maple Street, LLC,* case number GIC 852647,

28  hereinafter referred to as the "Third Party Action."  Plaintiffs in the Third Party Action sought

-6-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1    damages based upon negligence, civil conspiracy, breach of the Conditions, Covenants and

2    Restrictions, breach of fiduciary duty, alter ego, negligence per se, violation of Business and

3    Professions Code section 17200. (Attached as Exhibit A-4").

4        34.     Plaintiffs timely tendered a copy of the summons and complaint in the Third

5    Party Action to INSURERS with the request that INSURERS, as required by the AMCO Policy,

6    undertake the defense of this action.

7        35.     Plaintiffs are informed and believe, and thereon allege, that on or about

8    September 29, 2005, a Notice of Commencement of Legal Proceedings pursuant to former Civil

9    Code section 1375 ("Calderon Notice") was sent to SOUTH MAPLE by attorneys representing

10    Hidden Glen Maintenance Corporation claiming property damage as a result of certain defects

11    at The Maple Street Condominiums.

12        36.     Plaintiffs timely tendered the Calderon Notice to INSURERS under the AMCO

13    Policy.

14        37.     Notwithstanding Plaintiffs' requests for coverage, on or about November 10,

15    2005, INSURERS, without full and proper investigation of the claim, denied all liability under

16    the AMCO Policy and refused to undertake the defense of the Third Party Action. (Attached as

17    Exhibit "A-5").

18        38.     Notwithstanding Plaintiffs' requests for coverage, on or about March 3, 2006,

19    INSURERS, again without full and proper investigation of the claim, denied all liability under

20    the AMCO Policy and refused to undertake the defense of the Third Party Action. (Attached as

21    Exhibit "A-6").

22        39.     In addition, in its March 3, 2006 denial letter, without any offer of evidence and

23    without attaching the AMCO Policy application, INSURERS accused its insureds of fraud in the

24    application and threatened an action for rescission of the AMCO Policy insurance contract.

25        40.     Plaintiffs are informed and believe, and thereon allege, that in violation of Cal.

26    Ins. Code § 790.03(h), including but not limited to subsection (3), INSURERS used a similar

27    tactic of accusing its insureds of fraud in the application without investigation against some of

28    the same insureds in the case titled *Avocado Crest Condominiums, LLC, et al. v. Allied Mutual*

*Insurance et. al.* (GIC 857918) (hereinafter "ACC LAWSUIT"). INSURERS did not accept
defense obligations in the ACC LAWSUIT until a year and a half after the underlying lawsuit
was filed and the insureds had sued INSURERS for bad faith.

41.     In the ACC LAWSUIT, INSURERS and their appointed agent knew the insureds
were in the business of renovating and selling condominiums, yet INSURERS still accused
them of fraud in the application. (Attaached Exhibit "A-7" - AMCO E-mail from Dave
Everett).

42.     Plaintiffs are informed and believe, and thereon allege, that INSURERS and their
appointed agent, MICHAEL EHRENFELD COMPANY – INSURANCE AGENTS &
BROKERS, knew Plaintiffs were in the business of renovating and selling condominiums.

43.     Plaintiffs are informed and believe, and thereon allege, that INSURERS have a
pattern and practice of utilizing this tactic of accusing its insureds of fraud in the application so
as to discourage claimants and minimize INSURERS' obligations to their insureds.   No
rescission action was ever filed by INSURERS.

44.     In the March 3, 2006 denial letter INSURERS stated: "On the facts known to
INSURERS, the complaint filed by The Hidden Glen Maintenance Corporation does not allege
any covered claims" (Exhibit "A-6" at 3). INSURERS had a duty to fully and thoroughly
investigate the claim and resolve any doubts in favor of coverage. However, Plaintiffs are
informed and believe, and thereon allege, that INSURERS had done no investigation beyond
reviewing the Third Party Action complaint and wrongfully concluding there was no duty to
defend or potential for coverage alleged. A cursory reading of the Third Party Action complaint
reveals allegations of property damage arising from termite damage, mold, water intrusion,
drywall damage, inadequate plumbing supply, plumbing waste, and defective stairs,
porches/patios, flashing, stucco, asphalt, pool equipment, accessory buildings and landscape in
condominiums purchased, renovated, and sold by SOUTH MAPLE, all giving rise to potentially
covered claims under the completed operations portion of the AMCO Policy.

45.     Plaintiffs are informed and believe, and thereon allege, that INSURERS
conducted no investigation into the nature and scope of the renovations performed by Plaintiffs

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

-8-

and, thus, could not conclude the allegations in the Third Party Action complaint were not covered occurrences.  INSURERS had a duty to defend Plaintiffs if any language of the Third Party Action complaint gave rise to the potential for coverage.  *Delgado v. Interinsurance Exchange of Auto. Club of S. Ca*, (2007) 152 Cal.App.4th 671, 680; *Waller v. Truck Ins Exchange, Inc*, (1995) 11 Cal.4th 1, 19.  INSURERS' complete lack of investigation and subsequent uninformed denial of coverage was wanton and malicious conduct.

46.    Plaintiffs are informed and believe, and thereon allege, that as part of a pattern and practice of rushing to deny insureds assistance as evidenced in the ACC LAWSUIT, INSURERS did not address the potential for coverage under the completed operations provision of the AMCO Policy.  Instead, INSURERS immediately denied the claim and did not attempt to find coverage for the insureds nor give equal consideration to its insureds' interest.

47.    Plaintiffs are informed and believe, and thereon allege, that as part of a pattern and practice, in violation of Cal. Ins. Code § 790.03(h), including but not limited to subsection (3), INSURERS have a practice of not considering coverage under other insurance policies issued by INSURERS, unless specifically tendered by the insureds, in order to avoid coverage obligations.

48.    Plaintiffs persisted in advising INSURERS they had a duty to defend Plaintiffs, to no avail.  In the meantime, Plaintiffs were faced with a multi-million dollar lawsuit, which they had to defend.  Plaintiffs retained counsel to defend themselves in the Third Party Action, and continued attempts to convince INSURERS to defend.

49.    Because of INSURERS' continued denial of the claim, Plaintiffs were each required to retain separate and multiple law firms to advise Plaintiffs of the separate defenses, claims, and interests relating to the Third Party Action.

50.    The Third Party Action settled in three phases for approximately $1,478,003.57 total.

51.    On or about May 7, 2007, Plaintiffs served INSURERS with a demand for reimbursement for investigation and defense costs associated with the Third Party Action in the amount of $1,529,328.87 as required pursuant to the AMCO Policy.  This amount included the

-9-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1   settlement fees, attorney's fees, litigation costs, mediation expenses, expert/consultant fees and

2   costs incurred to investigate and mitigate alleged damages.  Excluded from that amount were

3   costs associated with counsel's efforts to secure insurance coverage for Plaintiffs.

4   52.   On or about May 21, 2007, INSURERS again denied coverage for this claim and

5   refused to reimburse Plaintiffs for fees and costs incurred in defense and settlement of the claim

6   under the AMCO Policy.

7   53.   Plaintiffs purchased insurance from INSURERS for the peace of mind and

8   security that their renovations would be insured and Plaintiffs would be protected from liability

9   arising from their completed operations.  However, INSURERS did not honor their end of the

10   bargain, and have not yet offered to reimburse plaintiffs for defense and indemnity expenses

11   incurred in the underlying third party action.

12

13   **FIRST CAUSE OF ACTION**

14   **(Breach of The Implied Covenant of Good Faith & Fair Dealing Against INSURERS and**

15   **DOES 2-75)**

16   54.   Plaintiffs incorporate by reference Paragraphs 1 - 53 of this Complaint and repeat

17   those Paragraphs as though fully set forth herein.

18   55.   Implied in the AMCO Policy is a covenant by INSURERS, and each of them, to

19   act in good faith and deal fairly with Plaintiffs, and to do nothing to impair or interfere with the

20   rights and benefits of Plaintiffs under the AMCO Policy.

21   56.   Plaintiffs are informed and believe and thereon allege that INSURERS, and each

22   of them, breached the implied covenant of good faith and fair dealing arising out of the AMCO

23   Policy in the following respects:

24   a.   INSURERS, and each of them, unreasonably and without proper cause,

25   failed and refused to conduct a competent and timely investigation into the facts which

26   gave rise to the claims asserted in the Third Party Action;

27   b.   INSURERS, and each of them, unreasonably refused to defend, and

28   without cause, denied coverage to Plaintiffs in the Third Party Action;

-10-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1    c.     INSURERS, and each of them, unreasonably refused to indemnify

2 Plaintiffs, and each of them, from the claims asserted in the Third Party Action;

3    a.     INSURERS, and each of them, unreasonably refused to promptly and

4 fully reimburse Plaintiffs for defense costs, fees and expenses incurred in defending

5 against claims asserted in the Third Party Action;

6    d.     INSURERS, and each of them, unreasonably failed to adjust the claim

7 giving equal consideration to the insureds' interest as to their own.

8    e.     INSURERS have wrongfully denied coverage under the AMCO Policy

9 by failing to conduct a reasonable investigation and failing to give equal consideration to

10 their insureds' interest as they gave to their own in refusing to defend and indemnify

11 Plaintiffs' against the alleged claims in the Third Party Action.

12    57.     Plaintiffs are informed and believe, and thereon allege, that INSURERS have

13 breached their duty of good faith and fair dealing owed to Plaintiffs by other acts or omissions

14 of which Plaintiffs are presently unaware.  Plaintiffs will seek leave of court to amend this

15 complaint at such time as they discover the other acts or omissions of INSURERS constituting

16 such breach.

17    58.     The denial of benefits claimed by Plaintiffs under the AMCO Policy was done by

18 INSURERS without reasonable cause.  INSURERS knew that a duty to defend was owed to

19 Plaintiffs, yet refused to provide such a defense.  As a direct and proximate result of the

20 unreasonable conduct of INSURERS, and each of them, Plaintiffs have been required to retain

21 attorneys to obtain benefits due to them under the AMCO Policy.  As a direct and proximate

22 result of the tortious conduct of the INSURERS and each of them, Plaintiffs were damaged and

23 injured.  Plaintiffs are therefore entitled to recover:

24    a.     Reasonable attorney fees incurred by Plaintiffs in obtaining policy

25 benefits in an amount to be proved at time of trial;

26    b.     Reasonable attorney fees, expert fees, investigative fees, and costs

27 incurred by Plaintiffs in defending the Third Party Action;

28    c.     Compensation for lost opportunities; and

-11-

d.      Out of pocket payments by Plaintiffs, assuming any, to settle claims made against them in the Third Party Action.

59.      The refusal of INSURERS and each of them to carry out their obligations under the AMCO Policy to investigate, defend, indemnify and to promptly communicate their coverage position to Plaintiffs, and the acts of their agents were all done willfully and maliciously and in conscious disregard of the rights of Plaintiffs to receive the benefits due them under the AMCO Policy.  These acts were done with the knowledge and approval and ratification of INSURERS and each of them.  These acts continued even after Plaintiffs protested to INSURERS and Plaintiffs were powerless to obtain from INSURERS compliance with their obligations.

60.      Plaintiffs are informed and believe, and thereon allege, that INSURERS' conduct toward Plaintiffs is part and parcel of a pattern and practice against these same insureds as well as similarly situated insureds.  The bad faith is prevalent throughout these facts and Plaintiffs are therefore entitled to recover punitive damages.

## SECOND CAUSE OF ACTION

### (Declaratory Relief As Against INSURERS and DOES 2-75)

61.      Plaintiffs incorporate by reference Paragraphs 1 – 60 of this Complaint and repeat those Paragraphs as though fully set forth herein.

62.      INSURERS had full knowledge that the Third Party Action had commenced against Plaintiffs.  Plaintiffs timely tendered a copy of the summons and complaint in the Third Party Action to INSURERS with the request that INSURERS undertake the defense of this action.  INSURERS subsequently acknowledged the receipt of the tender of defense.

63.      INSURERS wrongfully denied all liability under the AMCO Policy and refused to undertake the defense of the Third Party Action against Plaintiffs.

64.      INSURERS intended and had reason to foresee that Plaintiffs would rely upon INSURERS' wrongful denial of defense.  Plaintiffs had a right to believe that after INSURERS

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

-12-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1  denied tender, Plaintiffs would be required to engage their own counsel and defend the Third

2  Party Action.

3       65.    Plaintiffs were ignorant of the true state of facts in that Plaintiffs were told that

4  no coverage existed under the AMCO Policy when in fact the duty to defend and indemnify did

5  exist under the AMCO Policy.

6       66.    Plaintiffs reasonably relied on INSURERS' denial of coverage to their detriment,

7  and were compelled to engage counsel on their own.  In doing so, Plaintiffs were injured and

8  incurred substantial costs, fees, and expenses that should have been covered under the AMCO

9  Policy

10       67.    By virtue of the conduct described above and otherwise, Plaintiffs respectfully

11  request the Court rule INSURERS owed Plaintiffs a duty to defend Plaintiffs in the Third Party

12  Action.

13       68.    By virtue of the conduct described above and otherwise, Plaintiffs respectfully

14  request the Court rule INSURERS owed Plaintiffs a duty to indemnify them in the Third Party

15  Action.

16

17  **THIRD CAUSE OF ACTION**

18  **(Fraud As Against INSURERS and DOES 2-75)**

19       69.    Plaintiffs incorporate by reference Paragraphs 1 – 68 of this Complaint and

20  repeat those Paragraphs as though fully set forth herein.

21       70.    Plaintiffs are informed and believe, and thereon allege, that at the time Plaintiffs

22  paid the premium to INSURERS for the AMCO Policy, INSURERS had no intention to perform

23  under the insurance contract.  Nevertheless INSURERS suppressed their intention to refuse

24  performance under the contract and instead accepted the premium with knowledge that the

25  Plaintiffs believed they were insured for the type claims settled as described above.  At no time

26  prior to the submission of the claims did INSURERS disclose their intent to deny performance

27  under the policy.

28

-13-

**FIRST AMENDED COMPLAINT: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING; DECLARATORY RELIEF; FRAUD; CONSPIRACY TO COMMIT FRAUD; PROFESSIONAL NEGLIGENCE; NEGLIGENT MISREPRESENTATION**

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

71.     Plaintiffs are informed and believe, and thereon allege, that INSURERS and its attorneys, Miller Johnson Law, had specific knowledge of a potential for coverage for the SOUTH MAPLE claim because of the identical policies and similar nature of insureds involved in both matters.

72.     Plaintiffs are informed and believe, and thereon allege, that, as part of the pattern and practice evidenced in the ACC LAWSUIT, INSURERS had knowledge the claims submitted by Plaintiffs were insured claims and INSURERS has intentionally misrepresented a lack of coverage in order to minimize its obligations and suppressed their intent to deny performance under the policy.

73.     The refusal of INSURERS and each of them to carry out their obligations under the AMCO Policy to investigate, defend, indemnify and to promptly communicate their coverage position to Plaintiffs, and the acts of their agents were all done fraudulently, willfully and maliciously and in conscious disregard of the rights of Plaintiffs to receive the benefits due them under the AMCO Policy.  These acts were done with the knowledge and approval and ratification of INSURERS and each of them.  Plaintiffs are therefore entitled to recover punitive damages.

## **FOURTH CAUSE OF ACTION**

### **(Conspiracy to Commit Fraud As Against INSURERS and DOES 2-75)**

74.     Plaintiffs incorporate by reference Paragraphs 1 – 73 of this Complaint and repeat those Paragraphs as though fully set forth herein.

75.     Plaintiffs are informed and believe, and thereon allege, that there was a conspiracy between NATIONWIDE, ALLIED, AND AMCO to commit fraud upon Plaintiffs in order to deny Plaintiffs of the benefits under the AMCO Policy.

76.     Plaintiffs are informed and believe, and thereon allege, that after INSURERS initially denied Plaintiffs' claim under the AMCO Policy on November 10, 2005, INSURERS then extended the conspiracy to include their attorneys at the Miller Johnson Law Firm who

1    further perpetuated the fraud as evidenced by the March 3, 2006 denial letter and the May 21,

2    2007 denial letter.

3            77.     The conspiracy of INSURERS and their lawyers to refuse to carry out their

4    obligations under the AMCO Policy to investigate, defend, indemnify and to promptly

5    communicate their coverage position to Plaintiffs, and the acts of their agents were all done

6    willfully and maliciously and in conscious disregard of the rights of Plaintiffs to receive the

7    benefits due them under the AMCO Policy and in furtherance of the conspiracy described

8    above.  These acts were done with the knowledge and approval and ratification of INSURERS

9    and each of them.

10

11    **FIFTH CAUSE OF ACTION**

12    **(Professional Negligence As Against Broker Defendant and DOES 76-100)**

13            78.     Plaintiffs incorporate by reference Paragraphs 1 -77 of this Complaint and repeat

14    those Paragraphs as though fully set forth herein.

15            79.     As Plaintiffs' insurance broker, Broker Defendant held itself out as an expert in

16    the area of insurance and risk management and was responsible for procuring all necessary

17    insurance for Plaintiffs.  Because of the long-term business relationship with Plaintiffs, Broker

18    Defendant knew and understood Plaintiffs' business and undertook to secure appropriate

19    insurance coverage.

20            80.     Broker Defendant owed Plaintiffs a duty of care in procuring its insurance

21    policies and insuring that those policies provided the insurance requested and/or needed and

22    required, and to advise Plaintiffs of the adequacy of their insurance, as well as their insurance

23    needs; that those insurance policies were sufficient to protect Plaintiffs' interests as requested

24    and/or needed; and that the policies issued to Plaintiffs were appropriate and adequate for their

25    operations.

26            81.     Broker Defendant represented to Plaintiffs and others that they were experienced

27    at designing comprehensive insurance programs.  Based thereon, Plaintiffs relied on those

28    representations by allowing said Defendant to design for them their own comprehensive

-15-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1    insurance program during which time Broker Defendant was fully aware of the business in

2    which Plaintiffs were engaged.  Plaintiffs placed their trust in Broker Defendant

3    and fully relied on its expertise to recommend and secure appropriate and adequate insurance

4    coverage.

5        82.    Although Plaintiffs contend that they are insured and coverage is afforded under

6    the insurance policies for the claims alleged in the Third Party Action, in the event there is

7    either a gap and/or insufficient coverage, Plaintiffs allege that said lack of coverage is the

8    proximate result of Broker Defendant's negligence as follows:

9        a.    By failing and/or negligently completing and submitting the insurance

10    applications for the primary and excess policies on behalf of Plaintiffs;

11        b.    By failing to obtain for Plaintiffs the proper scope and amount of

12    coverage;

13        c.    By continuing to insist at all times that Broker Defendant had procured

14    adequate, accurate and appropriate insurance policies and endorsements for Plaintiffs;

15        d.    By failing to properly designate Plaintiffs as named insureds in the

16    insurance applications for primary and excess policies.

17        c.    For failing to properly designate Plaintiffs as additionally named insureds

18    in the AMCO Policy endorsements.

19        d.    For limiting insurance coverage for the additionally named insureds to

20    liability in their capacity as "mortgagee, assignee, and receiver," a limitation explicitly

21    relied upon by INSURERS in denying Plaintiffs a defense and indemnity under the

22    AMCO Policy.

23        83.    As a proximate result of Broker Defendant's breach of their duties, Plaintiffs

24    have been damaged to the extent that the appropriate insurance coverage would have covered

25    the amount of unreimbursed defense costs, fees and indemnity arising out of the underlying

26    Third Party Action.  Plaintiffs have been further damaged by incurring fees and costs as a result

27    of being forced to file this action based on the negligent acts and omissions of Broker

28    Defendant.

-16-

**ROCKWOOD & NOZISKA, LLP**
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

---

**FIRST AMENDED COMPLAINT: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR
DEALING; DECLARATORY RELIEF; FRAUD; CONSPIRACY TO COMMIT FRAUD; PROFESSIONAL
NEGLIGENCE; NEGLIGENT MISREPRESENTATION**

84.     As a direct and proximate result of Broker Defendant's negligence, Plaintiffs have been damaged in an amount according to proof at time of trial.

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation As Against Broker Defendant and Does 76-100)

85.     Plaintiffs incorporate by reference Paragraphs 1 - 84 of this Complaint and repeat those Paragraphs as though fully set forth herein.

86.     Broker Defendant owed Plaintiffs a duty of care in procuring its insurance policies and insuring that those policies provided the insurance requested and/or needed and required, and to advise Plaintiffs of the adequacy of their insurance, as well as their insurance needs; that those insurance policies were sufficient to protect Plaintiffs' interests as requested and/or needed; and that the policies issued to Plaintiffs were appropriate for their operations.

87.     Broker Defendant represented to Plaintiffs and others that it was experienced at designing comprehensive insurance programs.  Based thereon, Plaintiffs relied on those representations by allowing said Defendant to design for them their own comprehensive insurance program during which time Broker Defendant was fully aware of the business in which Plaintiffs were engaged.

88.     Although Plaintiffs contend that they are insured and coverage is afforded under the insurance policies for the claims alleged in the Third Party Action, in the event there is either a gap and/or insufficient insurance coverage Plaintiffs allege that said lack of insurance coverage is the proximate result of Broker Defendant's negligent misrepresentations as follows:

a.     By continuing to insist at all times that Broker Defendant had procured adequate, accurate and appropriate insurance policies and endorsements for Plaintiffs.

89.     Plaintiffs justifiably relied on the representations made by Broker Defendant regarding the scope and amount of insurance coverage procured by Broker Defendant and that it was a competent broker to obtain the correct type and amount of coverage to protect Plaintiffs' interests.

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

-17-

**ROCKWOOD & NOZISKA, LLP**
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

90. According to AMCO, representations made by Broker Defendants were false. Additionally, AMCO contends that the application for the Policy was predicated on misrepresentation of fact.

91. Plaintiffs justifiably relied on these representations made by Broker Defendant regarding the scope and amount of coverage procured by said Defendant for Plaintiffs.

92. Relying on these representations has damaged Plaintiffs in an amount according to proof at time of trial.

93. Broker Defendant's negligent procurement; failure to procure; and, design of comprehensive insurance program has damaged Plaintiffs according to proof.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

### FIRST CAUSE OF ACTION (Breach of The Implied Covenant of Good Faith & Fair Dealing):

1. For special damages in an amount to be proven at the time of trial;

2. For punitive damages in an amount to punish and deter defendants' wrongful conduct;

3. For interest at a maximum legal rate;

4. For attorneys fees and costs of suit herein incurred in obtaining policy benefits; and

5. For such other and further relief as this Court deems just and proper.

### SECOND CAUSE OF ACTION (Declaratory Relief):

1. For such relief as the court may deem just and proper.

2. For the Court to declare that the defendants' have a duty to defend Plaintiffs in the Third Party Action;

3. For the Court to declare that the defendants' owe Plaintiffs a duty to indemnify them in the Third Party Action; and

2. For such other and further relief as this Court deems just and proper.

**FIRST AMENDED COMPLAINT: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING; DECLARATORY RELIEF; FRAUD; CONSPIRACY TO COMMIT FRAUD; PROFESSIONAL NEGLIGENCE; NEGLIGENT MISREPRESENTATION**

**THIRD CAUSE OF ACTION (Fraud):**

1.    For special damages as to each cause of action, according to proof at trial;

2.    For punitive damages in an amount to punish and deter Defendants' wrongful conduct;

3.    For interest, attorneys fees, and costs of suit herein incurred as to each cause of action;

4.    For Plaintiff's expenses incurred in investigating these construction defects as to each cause of action, including, but not limited to, Plaintiff's expert investigation expenses; and

5.    For such other and further relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION (Conspiracy to Commit Fraud):**

1.    For special damages as to each cause of action, according to proof at trial;

2.    For punitive damages in an amount to punish and deter Defendants' wrongful conduct;

3.    For interest, attorneys fees, and costs of suit herein incurred as to each cause of action;

4.    For Plaintiff's expenses incurred in investigating these construction defects as to each cause of action, including, but not limited to, Plaintiff's expert investigation expenses; and

5.    For such other and further relief as this Court deems just and proper.

**FIFTH CAUSE OF ACTION (Professional Negligence):**

1.    For special damages in an amount to be proven at the time of trial;

2.    For interest at a maximum legal rate;

3.    For interest, attorneys fees and costs of suit herein incurred; and

4.    For such other and further relief as this Court deems just and proper.

**SIXTH CAUSE OF ACTION (Negligent Misrepresentation):**

1.    For special damages in an amount to be proven at the time of trial;

2.    For interest at a maximum legal rate;

-19-

ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

3.    For interest, attorneys fees and costs of suit herein incurred; and

4.    For such other and further relief as this Court deems just and proper.

Dated:  January 29, 2008                          ROCKWOOD & NOZISKA, LLP


By: _____
       NEAL H. ROCKWOOD, ESQ.
       C. BRANT NOZISKA, ESQ.
       CHARLES L. FANNING IV
       Attorneys for Plaintiffs

**ROCKWOOD & NOZISKA, LLP**
5060 North Harbor Drive, Suite 255
San Diego, California 92106
(619) 224-7778 FAX (619) 224-7779

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-20-

**FIRST AMENDED COMPLAINT: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING; DECLARATORY RELIEF; FRAUD; CONSPIRACY TO COMMIT FRAUD; PROFESSIONAL NEGLIGENCE; NEGLIGENT MISREPRESENTATION**

# EXHIBIT "A-1"

JAN-10-2005  09:17    MICHAEL EHRENFELD CO.          619 683 9999    P.02

50 (1-6
Everett

**Agency Agreement**

13th

A Nationwide® Insurance Comp

This Agency Agreement ("Agreement") is entered this 1ST day of July 1999, by an between MICHAEL EHRENFELD COMPANY Ins. Agy. Bkr (hereinafter, "Agent") and the undersigned insurance companies (hereinafter, "Company"). The term "Company" a defined and used in the Agreement includes Nationwide Mutual Insurance Company, Nationwide Insurance Company c America, Nationwide Mutual Fire Insurance Company, Nationwide Property and Casualty Insurance Company, AMCC Insurance Company, Depositors Insurance Company, and ALLIED Property and Casualty Insurance Company in thos states where said companies are authorized to do business and agent is authorized to do business, and there is a mutua agreement to appoint.

## WITNESSETH:

In consideration of the mutual covenants herein contained and other good and valuable consideration, the parties hereto agree as follows:

I. ~~Appointment and Authority. Upon the terms and conditions herein set forth, Company hereby appoints Agent as agent in the state(s) in which the Company is authorized to do business and agent is authorized to do business for the purpose of and with authority to solicit applications for insurance and bonds, deliver and receive the same, collect and receipt for premiums thereon, deliver policies, collect premiums for the benefit of Company, and represent and otherwise act for the Company in all application for insurance and in accordance to be or have arisen and in the issuance of authorized such authority to bind Company being subject to such restrictions as may be outlined in the Company manual or otherwise imposed by Company from time to time. Nationwide Mutual Insurance Company has presently merged with ALLIED Mutual Insurance Company and Agent acknowledges and agrees ALLIED Mutual may be reinsured or reorganized during the Company period.~~

Nothing contained herein shall be construed to create the relation of employer and employee between Company and Agent. Agent is free to exercise its own judgment as to persons from whom to solicit insurance or bonds and the time and place of solicitation, but Company may from time to time prescribe underwriting rules and regulations respecting the conduct of the business covered hereby (not interfering with such freedom of action of Agent), which underwriting rules and regulations shall be observed by Agent.

II. **Commissions.** Company agrees to pay Agent commissions on all premiums remitted upon business solicited by Agent at the percentages determined in accordance with the commission schedule of Company in effect at the beginning of the policy period or term as stated in the original policy or in any extension or renewal thereof, or inception date of a Surety Bond, or effective date of annual or three-year premium period of a Fidelity Bond. No reduction in any rate of commission, as specified in the commission schedule, may be made until the Company has had such rate of commission in effect for a period of one year and the Company has given Agent at least 90-days notice of any proposed reduction in such rate of commission. Provided, further, that in the event that Company is ordered (either administratively or judicially), by any entity having appropriate jurisdiction, to refund any premium collected hereunder, then Agent's commission(s) shall be reduced to reflect such refund.

III. **Supplies.** Supplies furnished by Company to Agent for Agent's use in the conduct of his business shall be property of Company and shall at all times be subject to the inspection and control of Company. Company shall not otherwise be liable for any of Agent's expenses other than those which it may expressly agree to assume.

IV. **Remittance of Premiums.** Premiums shall be considered due from Agent on the first day of the month following the month in which the policy or bond, additional premium, or excess audit has been charged to Agent's statement. If an agent has not remitted all such monies to Company within forty-five days from the end of the month in which the business is charged, all unremitted items in the statement shall become delinquent. Any credit given by Agent to an insured shall be at Agent's own risk, and any of the provisions herein contained shall not be construed as an authorization for the extension of credit by Agent to an insured on behalf of Company. Company may, at its option, take over for collection any and all delinquent items in Agent's statement not collected or remitted for by Agent and in such event Agent agrees to waive commission thereon.

Company shall make the necessary audits on policies and bonds written by Agent requiring such audits for the computation of premium. In the event an additional premium is produced by any audit, such additional premium shall be charged to Agent's account, and Agent agrees to collect the additional premium from the insured and remit same to Company less Agent's commission within forty-five days from the end of the month in which such additional premium is charged to Agent's account. In the event Agent is unable to collect such additional premium within the forty-five day period, and within ten days after the expiration of said forty-five day period notifies Company in writing to this effect and requests Company to take over for direct collection such additional premium, Company agrees to assume responsibility for the collection of such additional premium and to credit Agent's account with the amount of such additional premium less commission, and Agent agrees to waive all claims for commission credits thereon. If Agent fails to notify Company of its inability to collect additional premiums as herein provided, Agent agrees to timely pay such additional premiums to Company in accordance with the provisions of this Agreement. In the event any audit produces a return premium due the insured, Agent agrees to pay said return premium in full to the insured and Company will credit Agent's account with the amount of said return premium less Agent's commission, as provided in this Agreement. In the case of bonds which cannot be terminated by written noticed to the obligee, Agent may, by like notice, relieve itself of the responsibility to collect and remit renewal premiums.

**V. Monies Due Agent.** Company agrees to pay all monies due by it to Agent as shown by any monthly statement within forty-five days from the end of the month for which such statement is rendered; provided, however, that Company may accumulate monthly amounts payable if less than ten dollars until they equal or exceed such amount before making payment hereunder.

**VI. Premiums Constitute Trust Fund.** All premiums collected by Agent are at all times the property of Company and held in trust by Agent for and on behalf of Company as a fiduciary trust subject to remittal to Company as hereinbefore stated and shall not be used for any other purpose whatsoever except that permission is granted (until revoked) for Agent to use such portion of trusteed premiums as may be necessary to pay return premiums. The keeping of an account with Agent on Company's books as creditor and debtor account is declared a record memorandum of business transacted, and neither such keeping of account, nor alteration in compensation rate, nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account, shall be held to waive assertion of trust relation as to premiums collected by Agent. The commission which Company agrees to pay Agent shall be considered a debt due by Company to Agent and shall not be construed in any way as giving Agent a lien or claim on said premiums, and in case Company allows Agent, for the purpose of facilitating the handling of its business, to deduct the commission from premiums collected, it shall in no sense be construed as a waiver of the rights of Company to its ownership of the premiums or in any manner affect the trust character of said premiums.

**VII. Cancellation of Policies.** Company shall have at all times the right to reject applications, alter, suspend or cancel any policy or bond (if bond form contains cancellation provision) and direct the return of the unearned premium thereon. Agent agrees to pay such unearned return premium in full to the insured, and Company will credit Agent's account with the amount of said premium returned, less return commission at the percent of commission in effect at the beginning of the policy period or term as stated in the original policy or any extension or renewal thereof, or inception date of a Surety Bond or effective date of an annual or three-year premium period of a Fidelity Bond.

Flat cancellations will not be allowed to Agent on six months or three months auto plan policies, Commercial ALLIED Excess Liability Policies, or filed truck policies unless the policies are returned for cancellation prior to the effective date.

Flat cancellations will be allowed on all other policies or bonds not accepted, delivered or paid for provided such policies or bonds are returned for cancellation within thirty days of the beginning of the policy period or term. However, if Agent permits such policies or bonds to remain outstanding beyond thirty days, Agent shall be charged with and pay the pro rata earned premium commencing at the beginning of the policy period or term as stated in the original policy or any extension or renewal thereof, or inception date of a Surety Bond or effected date of an annual or three-year premium period of a Fidelity Bond.

**VIII. Subagents.** Agent may appoint subagents, subject to approval of Company, and such subagents shall for the purpose of this Agreement be deemed employees of Agent. Agent shall be responsible for all monies collected by or passing through the hands of its employees and shall be responsible for the premiums, commissions, charges or expenses of subagents or other persons from whom Agent may procure business.

**IX. Ownership or Expirations.** Upon termination of this Agreement by either party hereto, if Agent's account is not then delinquent and if Agent shall thereafter remit to Company within forty-five days from end of the month in which

business is charged to Agent, all monies due Company, the records, use and control of expirations shall be deem the property of agent; otherwise the records, use and control of expirations shall be vested in Company.

X.   **Termination.**  Either Company or Agent may terminate this Agreement at any time by notice in writing to the oth effective immediately; provided, however, that if Agent's account with Company is not delinquent or Agent has r otherwise violated the terms of this Agreement and Agent has not requested termination. Company shall give Age not less than ninety days written notice of any such termination.  Upon termination, Agent shall immediately surrend and return to Company its license (subject to applicable Insurance Department requirements) and all policies, suppli or other property of the Company in Agent's possession.  Upon termination of the Agreement by either party hereto, monies and premiums which have been collected by Agent shall become due and payable to Company upon th effective date of the termination of the Agreement.  In the event this Agreement is terminated by Company for violatic of its terms by Agent, Agent relinquishes all right or claim to commission on subsequent, excess or addition premiums developed, and Company shall have the right to collect outstanding premiums if it so elects, and Age agrees to waive or relinquish his right or claim for commission on same.  In the event it becomes necessary fc Company to institute legal proceedings for the recovery of any monies due Company from Agent, Agent agrees to pa all reasonable attorney fees, legal costs of such proceedings, and interest at the legal rate upon such monies from th date upon which they become due and payable to Company.

Effective immediately upon termination, except as otherwise provided hereinafter, the agency relationship existin between Company and Agent by virtue of this Agreement shall cease, and all previous contracts, agreements understanding or arrangements of every kind, whether oral or written, creating or providing for such agency fo Company or authorizing Agent to write or issue policies of insurance or bonds for Company, or to solicit or take applications therefor, shall terminate.  Agent agrees to pay all sums due from Agent to Company on business writter prior to such termination date and all other monies due upon receipt of any monthly statement thereafter.  Agen agrees to report to Company all policies or bonds issued or bound by Agent prior thereto. Agent's liability to accoun to Company for premiums collected and to pay over to it any monies due hereunder shall survive any termination or this Agreement.

XI.  **Limited Agency Following Termination.**  If Agent's account with Company is not delinquent on the effective date of termination of the Agreement and Agent is not otherwise in default under any terms of such Agreement, Company agrees that following any such termination existing business written by Agent will be allowed to run until expiration and Agent shall have limited authority with respect thereto as follows:

1.   Agent may elect to continue outstanding policies and bonds previously written through Agent in force until expiration, subject to cancellation privileges by Company of the policyholder prior to expiration, and in such event Agent agrees to service such policies and bonds, collect premiums due thereon, if any, on the due date thereof and remit the collections promptly to Company. Any unearned commission on return premiums will be charged to Agent's account and Agent agrees to repay the same to Company forthwith on receipt of billing thereof.  In case an audit of outstanding policies or bonds requires an additional premium to be assessed against the policyholder, or obligor, Agent agrees to collect the same on the due date and make prompt remittance thereof to Company.  In the event Agent is not able to collect such premiums within forty-five days from the end of the month in which such premium is charged to his account, Agent may relieve himself of the responsibility to collect and remit such premium by notice to Company within the time and in the manner provided in such cases under "Remittance of Premiums" in the Agreement, and thereupon Company agrees to assume collection thereof, as therein provided.

2.   Company agrees to pay Agent commissions on policies or bonds in force until expiration or cancellation at the same rates as it then pays commissions on like business to existing Agents in Agent's state.

3.   Agent shall have the right to request appropriate endorsements on policies or bonds in force, provided that no such endorsements shall increase or extend Company's liability or extend the term of any policy or bond unless prior written approval of Company shall have been obtained.

4.   Unless sooner canceled, these limited agency provisions shall continue until all policies and bonds written by Agent for Company shall have expired.

50.3

JAN-10-2005  09:18          MICHAEL EHRENFELD CO.                    619 683 9999   P.05

5.  The provisions of the Agreement entitled "Premiums Constitute Trust Fund" shall apply to premiums collected by Agent during the period of limited agency hereunder.  If Agent has not remitted all monies due to Company within forty-five days from the end of the month in which business is charged, Agent agrees that the records, use and control of the expirations shall be vested in Company; otherwise, the records, use and control of the expirations shall be deemed the property of Agent.

XII.  **Indemnification Agreement.**  The Company agrees to defend and indemnify Agent against liability, including the costs of defense and settlements, imposed on Agent by law (including the Fair Credit Reporting Act) for damages caused by acts or omissions of the Company, provided Agent has not caused or contributed to such liability by its own acts or omissions.  Agent agrees, as a condition to such indemnification, to notify the Company promptly of any suit against Agent and to allow the Company to make such investigation, settlement, or defense thereof as the Company deems prudent.

XIII.  **Former Contracts Abrogated.**  The execution of this Agreement by the parties hereto abrogates, terminates and voids all previous agency contracts or agreements made between the parties hereto, except as to commissions on business written under a previous agency contract or agreement provided for in such agency contract or agreement, provided, however, that nothing herein shall be construed to affect or waive any claim of any kind, whether for money or otherwise, of Company against Agent under any previous agency contract or agreement.

XIV.  **Notices.**  Notices under this Agreement may be given by delivering or mailing a copy to the party entitled to notice.  Notice by mail shall be deemed sufficiently given when mailed by ordinary United States Mail, postage prepaid, addressed to Company at 701 5th Ave., Des Moines, IA  50391-2000, or to Agent at the last known address of Agent according to Company records.

XV.  **Agreement Subject to Applicable Laws and Regulations.**  The terms of this Agreement shall be subject to all applicable laws and regulations and in the event of conflict between the terms of this Agreement and any such laws or regulations, the latter shall govern.

XVI.  **Integration.**  There are no promises, agreements, or understandings between Company and Agent other than those contained in this Agreement, and no agent or other representative of Company has any authority to obligate Company by any terms, stipulations or conditions not herein expressed unless the same be in writing and attached to and made a part of the Agreement.

For Agent

*Michael Ehrenfeld Company*
*Insurance Agency . Bkr*

By *Michael Ehrenfeld, Ins*
   (Name)            (Title)

For Company

Nationwide Mutual Insurance Company
Nationwide Insurance Company of America
Nationwide Mutual Fire Insurance Company
Nationwide Property and Casualty Insurance Company
AMGO Insurance Company
Depositors Insurance Company
ALLIED Property and Casualty Insurance Company

By _____ *Art A. Walker*
          Officer of Company

Note
- Partnerships:  This Agreement must be signed by all partners.
- Corporations or concern doing business under a name indicating incorporation:  This Agreement must be signed above in the name of the corporation or concern by proper officers.
- Sole Proprietors. This Agreement must be signed, executed by husband and wife

50.4

# EXHIBIT "A-2"

**Allied**
Insurance
a Nationwide® company
*On Your Side™*

AGENCY - 84 - 51252
MICHAEL EHRENFELD COMPANY INS
SAN DIEGO CA    92108-1633
619-683-9990

POLICY NUMBER

ACP    BPH    78    0    1069841

ACDW PROPERTIES/GIANNELLA PROPERTIES
4-WAY FARMS, A CALIFORNIA CORPORATION
419 19TH STREET
SAN DIEGO, CA    92102

We are pleased to serve your business insurance needs. Our company is committed to providing you high quality insurance protection and superior service.

Allied is a growing organization with more than sixty years of experience in providing insurance services. We are rated "A+" (Superior) for our financial soundness by the A.M. Best Company, an independent insurance rating organization. We provide protection for a full range of personal and commercial insurance needs.

If you should have any questions about your insurance plan or if you wish to make a change to your policy, please contact your Allied agent.

## IMPORTANT INFORMATION ABOUT YOUR POLICY . . . .

Please spend a few minutes to read and understand your policy. Some items to which you should pay special attention are as follows:

- **Special Required State Notices.** These notices, when included, point out specific items concerning your policy. We urge you to read them.

- **Declarations Page.** This shows such information as your name, address, the coverages provided, the policy term, policy limits, list of coverage forms, premium amounts, and other individualized information.

- **Coverage and Endorsement Forms.** This is the section of your policy which provides policy and coverage information. Please read it carefully.

IL7001 (04-98)

DIRECT BILL    LKTA       05287          SS          INSURED COPY        994041219              REPRINT  78    93136

# PREMIER BUSINESSOWNERS POLICY

### PREMIER HABITATIONAL
### STATEMENT OF VALUES

Policy Number: ACP BPH 7801069841

Policy Period:
From 04-04-02 To 04-04-03

The values shown on this Statement of Values reflect the values you have requested or agreed to for each individual item that was included in the Blanket Limit of Insurance shown in the Declarations of your policy.

By your acceptance of this policy in the payment of the premium due, you are acknowledging that the values shown below are correct to the best of your knowledge and belief.

**BLANKET BUILDINGS**

| Loc. Bldg. | Description/Coverage Type | Value | Valuation of Property |
|---|---|---|---|
| 01 01 | BUILDING | 2,000,000 | Replacement cost |

PB 81 S1 (01-01)

DIRECT BILL    LKTA              SS          INSURED COPY                    UID    99    R        78  03137

# PREMIER BUSINESSOWNERS POLICY

## STATEMENT OF VALUES

Policy Number:

| | | | From | Policy Period: To |
|---|---|---|---|---|

| Loc. Bldg. | Description/Coverage Type | | Value | Valuation of Property |
|---|---|---|---|---|

**PB 81 S1 (01-01)**

INSURED COPY

B3138

*Insurance*
a Nationwide® company
*On Your Side™*

AGENCY - 84 - 51252
MICHAEL EHRENFELD COMPANY INS
SAN DIEGO CA    92108-1633
619-683-9990

ACDW PROPERTIES/GIANNELLA PROPERTIES
4-WAY FARMS, A CALIFORNIA CORPORATION
419 19TH STREET
SAN DIEGO, CA    92102

POLICY NUMBER
ACP    BPH   78   0   1069841

We are pleased to serve your business insurance needs. Our company is committed to providing you high quality insurance protection and superior service.

Allied is a growing organization with more than sixty years of experience in providing insurance services. We are rated "A+" (Superior) for our financial soundness by the A.M. Best Company, an independent insurance rating organization. We provide protection for a full range of personal and commercial insurance needs.

If you should have any questions about your insurance plan or if you wish to make a change to your policy, please contact your Allied agent.

## IMPORTANT INFORMATION ABOUT YOUR POLICY . . . .

Please spend a few minutes to read and understand your policy. Some items to which you should pay special attention are as follows:

- **Special Required State Notices.** These notices, when included, point out specific items concerning your policy. We urge you to read them.

- **Declarations Page.** This shows such information as your name, address, the coverages provided, the policy term, policy limits, list of coverage forms, premium amounts, and other individualized information.

- **Coverage and Endorsement Forms.** This is the section of your policy which provides policy and coverage information. Please read it carefully.

JL7001 (04-98)

ECT BILL    LKTA        05287            SS            INSURED COPY        994041219            REPRINT  78        03049

# PREMIER BUSINESSOWNERS POLICY

## PREMIER HABITATIONAL
### STATEMENT OF VALUES

Policy Number:  ACP  BPH  7801069841

Policy Period:
From 04-04-02  To  04-04-03

The values shown on this Statement of Values reflect the values you have requested or agreed to for each individual item that was included in the Blanket Limit of Insurance shown in the Declarations of your policy.

By your acceptance of this policy in the payment of the premium due, you are acknowledging that the values shown below are correct to the best of your knowledge and belief.

**BLANKET BUILDINGS**

| Loc. Bldg. | Description/Coverage Type | Value | Valuation of Property |
|---|---|---|---|
| 01 01 | BUILDING | 2,000,000 | Replacement cost |

PB 81 S1 (01-01)

DIRECT BILL    LKTA            5S        INSURED COPY                    UID    99    R        7B  03050

# PREMIER BUSINESSOWNERS POLICY

## STATEMENT OF VALUES

Policy Number:

From    Policy Period:
        To

| Loc. Bldg. | Description/Coverage Type | Value | Valuation of Property |
|---|---|---|---|

PB 81 S1 (01-01)

INSURED COPY

03051

a Nationwide® company
On Your Side℠

AMCO INSURANCE COMPANY
701 5TH AVE          DES MOINES IA  50391-2000

84  51252
RENEWAL

# PREMIER BUSINESSOWNERS POLICY

### PREMIER HABITATIONAL
### COMMON DECLARATIONS

Policy Number:  **ACP  BPH  7801069841**

Named Insured:  **ACDW PROPERTIES/GIANNELLA PROPERTIES**
**4-WAY FARMS, A CALIFORNIA CORPORATION**
Mailing Address:  **419 19TH STREET**
**SAN DIEGO, CA   92102**
Agency:  **MICHAEL EHRENFELD COMPANY INS**
Address:  **SAN DIEGO CA     92108-1633**
Agency Phone Number:  **(619)683-9990**

Policy Period:  Effective From **04-04-02**   To **04-04-03**
12:01 AM Standard Time at your principal place of business.

Form of your business entity:  **CORPORATION**

Description of your business:  *

IN RETURN FOR THE PAYMENT OF THE PREMIUM AND SUBJECT TO ALL THE TERMS OF THIS POLICY,
WE AGREE TO PROVIDE THE INSURANCE STATED IN THIS POLICY.

**CONTINUATION PROVISION:** If we offer to continue your coverage and you or your representative do not accept, this policy will automatically terminate on the expiration date of the current policy period stated above. Failure to pay the required premium when due shall mean that you have not accepted our offer to continue your coverage. This policy will terminate sooner if any portion of the current policy period premium is not paid when due.

**IMPORTANT INFORMATION FOR CALIFORNIA POLICYHOLDERS:** Companies writing property and casualty insurance in California are required to participate in the California Insurance Guarantee Association. If a company becomes insolvent, the California Insurance Guarantee Association settles unpaid claims and assesses each insurance company for its fair share. California law requires all companies to surcharge policies to recover these assessments. If your policy is surcharged, "CA Surcharge" with an amount will appear on your premium notice.

If you should have any questions or problems with this policy, please first contact your agent or a Company representative. If after doing so, we have failed to produce a satisfactory solution to your problem, you may contact the CALIFORNIA DEPARTMENT OF INSURANCE at 1-800-927-4357 (for TDD, 1-800-482-4833) or write them at:  California Department of Insurance, Consumer Communication Bureau, 300 South Spring Street, South Tower, Los Angeles, CA  90013.

RECEIVED

OCT 2 4 2005

PREMIUM FOR CERTIFIED ACTS OF TERRORISM     $          0.00

TOTAL POLICY PREMIUM $      3,576.00

| Previous Policy Number | | | |
|---|---|---|---|
| NONE | ENTRY DATE | 05-08-02 | |
| | | Countersignature | Date |

These Common Policy Declarations, together with the Common Policy Conditions, Coverage Form Declarations, Coverage Forms and any endorsements issued to form a part thereof, complete the Policy numbered above.

PB 81 00 (01-01)

DIRECT BILL    LKTA          SS          INSURED COPY              UID    89    REPRINT   78  03052

Page 1 of 2

# PREMIER BUSINESSOWNERS POLICY

### PREMIER HABITATIONAL
### SCHEDULE OF NAMED INSUREDS

Policy Number: ACP  BPH  7801069841

Policy Period:
From 04-04-02    To 04-04-03

Named Insured:

**ACDW PROPERTIES/GIANNELLA PROPERTIES
4-WAY FARMS, A CALIFORNIA CORPORATION**

PB 81 00 (01-01)

INSURED COPY

Page 2 of 2

7B  03063

## AMCO INSURANCE COMPANY

IN WITNESS WHEREOF the Company has caused this policy to be signed by its president and secretary and countersigned on the declarations page by a duly authorized representative of the company.

SECRETARY

PRESIDENT

SP0002 (01-01)

ACP BPH 7801059841

INSURED COPY

7B    03054

# PREMIER BUSINESSOWNERS POLICY

### PREMIER HABITATIONAL
### PROPERTY DECLARATIONS

Policy Number:  ACP BPH 7801069841

Policy Period:
From **04-04-02** To **04-04-03**

Description of Premises Number:  **001**    Building Number:  **001**    Construction: **FRAME**
Premises Address  **1800 SOUTH MAPLE**                              **ESCONDIDO         CA**
Occupancy  **OO**    Classification: **APT - MULTIPLE 5+ UNIT BLDGS**
Described as:  **5 BLDGS/6 UNITS PER BLDG/30 UNITS TOTAL/$400,000 PER BLDG.**

---

**WE PROVIDE INSURANCE ONLY FOR THOSE COVERAGES INDICATED BY A LIMIT OR BY "INCLUDED".**

The Property Coverage provided at this premises is subject to a  **$ 1,000** Deductible, unless otherwise stated.

**COVERAGES**                                                           **LIMITS OF INSURANCE**
Building - Blanket Limit - Replacement cost
Business Personal Property -                                             **$2,000,000**

**ADDITIONAL COVERAGES - the Coverage Form includes other Additional Coverages not shown.**
Business Income - Actual Loss Sustained - 12 Months - No Deductible - 60 Day Ordinary Payroll Limit
Extra Expense - Actual Loss Sustained - 12 Months - No Deductible                     **INCLUDED**
Equipment Breakdown                                                                    **INCLUDED**
Automatic Increase in Insurance - Building                                             **INCLUDED**
Automatic Increase in Insurance - Business Personal Property                           **4%**
Back Up of Sewer and Drain Water (limit shown per Building, subject to $25,000 policy aggregate)   **2.9%**
Appurtenant Structures - 10% of Building Limit of Insurance - maximum $50,000 any one structure   **$5,000**
Increased Cost of Construction                                                         **INCLUDED**

| OPTIONAL INCREASED LIMITS | Included Limit | Additional Limit |
|---|---|---|
| Account Receivable |  | $10,000 |
| Valuable Papers and Records (At the Described Premises) | $10,000 | $10,000 |
| Forgery and Alteration | $10,000 | $10,000 |
| Money and Securities - Inside the Premises | $2,500 | $2,500 |
| Outside the Premises (Limited) | $10,000 | $10,000 |
| Outdoor Signs | $10,000 | $10,000 |
| Outdoor Trees, Shrubs, Trees and Lawns | $2,500 | $2,500 |
| Equipment Breakdown - sub limit for Computers | $10,000 | $10,000 |
| Tenant Glass - The deductible for this coverage is $250 | $50,000 | $50,000 |
| Business Personal Property Away From Premises | $1,000 | $1,000 |
| Business Personal Property Away From Premises - Transit | $15,000 | $15,000 |
| | $15,000 | $15,000 |

**OPTIONAL COVERAGES - Other frequently purchased coverage options.**
Employee Dishonesty                                                                   **NOT PROVIDED**
Ordinance or Law - 1 - Loss to Undamaged Portion                                      **NOT PROVIDED**
            2 - Demolition Cost and Broadened Increased Cost of Construction          **NOT PROVIDED**

**PROTECTIVE SAFEGUARDS**
This premise has one or more PROTECTIVE SAFEGUARDS identified by symbols herein. Insurance at this premise will be suspended if you do not notify us immediately if any of these safeguards are impaired. See PB 04 30 for a description of each symbol. APPLICABLE SYMBOLS:  **NOT APPLICABLE**

**PB 81 01 (01-01)**

DIRECT BILL    LKTA              SS          INSURED COPY                    UID    99    REPRINT    7B  03055

# PREMIER BUSINESSOWNERS POLICY

## PREMIER HABITATIONAL
## LIABILITY DECLARATIONS

Policy Number: ACP  BPH  7801069841

From 04-04-02    To  04-04-03    Policy Period:

WE PROVIDE INSURANCE ONLY FOR THOSE COVERAGES INDICATED BY A LIMIT OR BY "INCLUDED".

### COVERAGES

| | | LIMITS OF INSURANCE |
|---|---|---|
| Liability and Medical Payments | Per Occurrence | |
| Medical Payments Coverage Sub Limit | Per Person | $2,000,000 |
| Tenants Property Damage Legal Liability Sub Limit | Per Covered Loss | $5,000 |
| Personal and Advertising Injury | Per Person Or Organization | $300,000 |
| Products – Completed Operations Aggregate | All Occurrences | $2,000,000 |
| General Aggregate | All Occurrences | $4,000,000 |
| (Other than Products – Completed Operations) | | $4,000,000 |

### AUTOMATIC ADDITIONAL INSUREDS STATUS

The following persons or organizations are automatically insureds when you and they have agreed in a written contract or agreement that such person or organization be added as an additional insured on your policy.

| | |
|---|---|
| Co-Owners of Insured Premises | Included in Liability & Medical Payments Limit |
| Controlling Interest | Included in Liability & Medical Payments Limit |
| Grantor of Franchise or License | Included in Liability & Medical Payments Limit |
| Lessors of Leased Equipment | Included in Liability & Medical Payments Limit |
| Managers or Lessors of Leased Premises | Included in Liability & Medical Payments Limit |
| Mortgagee, Assignee or Receiver | Included in Liability & Medical Payments Limit |
| Owners or Other Interest from Whom Land has been Leased | Included in Liability & Medical Payments Limit |
| State or Political Subdivisions - Permits Relating to Premises | Included in Liability & Medical Payments Limit |

### PROPERTY DAMAGE DEDUCTIBLE

NONE

### OPTIONAL COVERAGES

NONE PROVIDED

PB 81 03 (01-01)

DIRECT BILL    LKTA        SS        INSURED COPY        UID    99    REPRINT    7B  03056

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

BUSINESSOWNERS
PB AI 09 (01-01)

# ACKNOWLEDGEMENT OF ADDITIONAL INSURED STATUS
## MORTGAGEE, ASSIGNEE OR RECEIVER

Person or Organization Designated as an Additional Insured:

SOUTH MAPLE STREET, LLC, A CA LTD. LIAB. CO.
419 19TH ST, SAN DIEGO, CA 92102

Designated Premises:

1800 SOUTH MAPLE
ESCONDIDO        CA 920250000

This form has been sent to you to acknowledge your status as an additional insured under our, meaning the issuing Company stated below, insurance policy issued to the Named Insured shown below.

Under our Premier Businessowners Liability Coverage Form, Section II. WHO IS AN INSURED provides as follows:

Any of the following persons or organizations are automatically insureds when you [i.e. the Named Insured stated below] and such person or organization have agreed in a written contract or agreement that such person or organization be added as an additional insured on your policy providing general liability coverage.

Mortgagee, Assignee or Receiver

Any person or organization who has status as mortgagee, assignee or receiver of your property is an additional insured, but only with respect to their liability as mortgagee, assignee or receiver arising out of your ownership, maintenance, or use of such premises, subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to structural alterations, new construction or demolition operations performed by or for such person or organization.

HOWEVER, their status as additional insured under this policy ends when their status as mortgagee, assignee or receiver ends.

The policy language set forth above is subject to all of the terms and conditions of the policy issued to the Named Insured shown below. For your information, our Named Insured, the Policy Number, Policy Term and Limits of Insurance are stated below.

Named Insured      **ACDW PROPERTIES/GIANNELLA PROPERTIES**

| | | |
|---|---|---|
| Issuing Company: | **AMCO INSURANCE COMPANY** | |
| Policy Number: | **ACP BPH 7801069841** | |
| Policy Term: | **04-04-02 To 04-04-03** | |
| Limits of Insurance: | Per Occurrence | $2,000,000 |
| | All Occurrences | $4,000,000 |

PB AI 09 (01-01)

ACP BPH 7801069841

INSURED COPY

7B    03125

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

BUSINESSOWNERS
PB AI 02 (01-01)

# ACKNOWLEDGEMENT OF ADDITIONAL INSURED STATUS MANAGERS OR LESSORS OF LEASED PREMISES

Person or Organization Designated as an Additional Insured:

Designated Premises (Part Leased to the Named Insured):

This form has been sent to you to acknowledge your status as an additional insured under our, meaning the issuing Company stated below, insurance policy issued to the Named Insured shown below.

Under our Premier Businessowners Liability Coverage Form, Section II. WHO IS AN INSURED provides as follows:

Any of the following persons or organizations are automatically insureds when you [i.e. the Named Insured stated below] and such person or organization have agreed in a written contract or agreement that such person or organization be added as an additional insured on your policy providing general liability coverage.

### Managers or Lessors of Leased Premises

Any person or organization from whom you lease premises is an additional insured, but only with respect to their liability arising out of your use of that part of the premises leased to you, subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to structural alterations, new construction or demolition operations performed by or for such person or organization.

HOWEVER, their status as additional insured under this policy ends when you cease to be a tenant of such premises.

The policy language set forth above is subject to all of the terms and conditions of the policy issued to the Named Insured shown below. For your information, our Named Insured, the Policy Number, Policy Term and Limits of Insurance are stated below.

Named Insured     **ACDW PROPERTIES/GIANNELLA PROPERTIES**

Issuing Company:     **AMCO INSURANCE COMPANY**
Policy Number:       **ACP BPH 7801069841**
Policy Term:         **04-04-02 To 04-04-03**
Limits of Insurance: **Per Occurrence**      $2,000,000
                     **All Occurrences**     $4,000,000

PB AI 02 (01-01)

ACP BPH 7801069841                          INSURED COPY                          7B    03124

# PREMIER BUSINESSOWNERS POLICY

### PREMIER HABITATIONAL
### FORMS AND ENDORSEMENTS SUMMARY

Policy Number: ACP  BPH  7801069841

From 04-04-02

Policy Period:
To 04-04-03

| FORM NUMBER | | TITLE |
|---|---|---|
| LI0021 | 0101 | NUCLEAR ENERGY LIABILITY EXCLUSION |
| PB0002 | 0101 | PREMIER BUSINESSOWNERS PROPERTY COVERAGE FORM |
| PB0006 | 0101 | PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM |
| PB0009 | 0101 | PREMIER BUSINESSOWNERS COMMON POLICY CONDITIONS |
| PB2999 | 0102 | EXCLUSION - FUNGI OR BACTERIA |
| PB9004 | 0101 | CALIFORNIA AMENDATORY ENDORSEMENT |

PB 81 03 (01-01)

INSURED COPY

78  03057

# PREMIER BUSINESSOWNERS POLICY

### PREMIER HABITATIONAL
### SCHEDULE OF MORTGAGEES AND LOSS PAYEES

Policy Number:  ACP BPH 7801069841

Policy Period:
From 04-04-02 To 04-04-03

WELLS FARGO BANK,
ITS SUCCESSORS AND/OR ASSIGNS                              MORTGAGEE
P.O. BOX 7674
SAN FRANCISCO, CA    94391

PB 81 02 (01-01)

DIRECT BILL    LKTA  05287                    INSURED COPY

Page 1 of 2

REPRINT    78  0305B

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

# PREMIER BUSINESSOWNERS
# PROPERTY COVERAGE FORM

### TABLE OF CONTENTS

A.  COVERAGES .................................................................. 2
   1.  COVERED PROPERTY ................................................. 2
   2.  PROPERTY NOT COVERED ........................................... 2
   3.  COVERED CAUSES OF LOSS ......................................... 3
   4.  LIMITATIONS ....................................................... 3
   5.  ADDITIONAL COVERAGES ........................................... 3
     a.  Debris Removal ............................................... 3
     b.  Preservation of Property ...................................... 4
     c.  Fire Department Service Charge ............................... 5
     d.  Fire Extinguisher Recharge .................................... 5
     e.  Collapse ....................................................... 5
     f.  Water Damage, Other Liquids, Powder or Molten Material Damage ... 5
     g.  Business Income ............................................... 6
     h.  Extra Expense ................................................. 7
     i.  Pollutant Clean Up and Removal ............................... 8
     j.  Civil Authority ................................................ 8
     k.  Money Orders and Counterfeit Paper Currency ................. 8
     l.  Forgery and Alteration ........................................ 9
     m.  Increased Cost of Construction ............................... 9
     n.  Exterior Building Glass ....................................... 9
     o.  Equipment Breakdown ......................................... 10
     p.  Arson Reward for Conviction ................................. 11
     q.  Money and Securities ......................................... 13
     r.  Appurtenant Structures ....................................... 14
     s.  Back Up of Sewer or Drain Water Damage .................... 14
     t.  Dependent Properties – Business Income ..................... 15
   6.  COVERAGE EXTENSIONS ............................................. 15
     a.  Newly Acquired Or Constructed Property ..................... 15
     b.  Newly Acquired Locations - Business Income ................. 15
     c.  Personal Property Off Premises ............................... 16
     d.  Outdoor Trees, Shrubs, Plants, and Lawns ................... 16
     e.  Outdoor Signs ................................................ 16
     f.  Personal Effects .............................................. 17
     g.  Valuable Papers and Records .................................. 17
     h.  Accounts Receivable .......................................... 17
     i.  Salespersons Samples ......................................... 18
     j.  Business Income and Extra Expense - Increased Period of Restoration
       Due to Ordinance or Law ..................................... 18
     k.  Removal Permit ............................................... 18
B.  EXCLUSIONS ............................................................... 19
C.  LIMIT OF INSURANCE ....................................................... 19
D.  DEDUCTIBLES .............................................................. 23
E.  PROPERTY LOSS CONDITIONS ............................................... 24
F.  PROPERTY GENERAL CONDITIONS ........................................... 24
G.  OPTIONAL COVERAGES ..................................................... 29
   1.  Employee Dishonesty Optional Coverage ......................... 30
   2.  Ordinance or Law Optional Coverage ............................. 30
   3.  Optional Amendment of Coverage - Exclude Theft ................. 31
H.  PROPERTY DEFINITIONS .................................................... 33
                                          34

PB 00 02 (01-01)

ACP BPH 7801069841

INSURED COPY

PB 00 02 (01-01)

# PREMIER BUSINESSOWNERS
# PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Please read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insureds shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. Other words and phrases that appear in quotation marks have special meaning. Please refer to Section H. PROPERTY DEFINITIONS.

## A.  COVERAGES

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1.  COVERED PROPERTY

Covered Property, as used in this policy, means Buildings and Business Personal Property as described in paragraphs a. and b. in this section A.1., if a Limit of Insurance is shown in the Declarations for that type of property.

HOWEVER, there is no coverage for property described under A.2. PROPERTY NOT COVERED, unless an exception is stated for that property.

a.  **Buildings**, meaning the buildings and structures at the premises described in the Declarations, including:

1)  Completed additions;

2)  Fixtures, including outdoor fixtures;

3)  Permanently installed:

a)  Machinery;

b)  Equipment; and

c)  Tanks, including pumps;

4)  Your personal property in apartments or rooms furnished by you as landlord;

5)  Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

a)  Fire extinguishing equipment;

b)  Outdoor furniture;

c)  Floor coverings;

d)  Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering; and

e)  Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, mast and towers;

6)  If not covered by other insurance:

a)  Additions under construction, alterations and repairs to the buildings or structures;

b)  Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures; and

7)  Garages, storage buildings, spas, swimming pools, fences, retaining walls or other appurtenant structures usual to your business, but only if:

a)  Coverage is not provided for such structures under the Appurtenant Structures Additional Coverage; and

b)  Such structures are then described in the Declarations.

b.  **Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following:

1)  Personal property you own that is used in your business, including but not limited to furniture, fixtures, machinery, equipment and "stock";

PB 00 02 (01-01)

ACP BPH 7801069841

INSURED COPY

PB 00 02 (01-01)

2) Personal property of others that is in your care, custody or control, except as otherwise provided in Condition 5. Loss Payment under Section E. PROPERTY LOSS CONDITIONS.

3) Tenant improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

a) Made a part of the building or structure you occupy but do not own; and

b) You acquired or made at your expense but cannot legally remove; and

4) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under paragraph 2) personal property of others above.

2. **PROPERTY NOT COVERED**

Covered Property does not include:

a. Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

b. "Money" or "securities" except as provided in:

1) Money and Securities Additional Coverage; or

2) Employee Dishonesty under Section G. OPTIONAL COVERAGES;

c. Contraband, or property in the course of illegal transportation or trade;

d. Land (including land on which the property is located), water, growing crops;

e. Outdoor signs (other than signs attached to the buildings), trees, shrubs, plants or lawns (other than "stock" of trees, shrubs or plants), all except as provided in the:

1) Outdoor Trees, Shrubs, Plants and Lawns Coverage Extension; or

2) Outdoor Signs Coverage Extension;

f. Watercraft (including motors, equipment and accessories) while afloat;

g. Gasoline or diesel fuel contained in above ground or underground storage tanks;

h. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect it or not) from that other insurance;

i. The cost to research, replace or restore the information on "valuable papers and records", including those which exist on "electronic media or records", except as provided in the Valuable Papers Coverage Extension;

j. Grain, hay, straw or other crops while outside of buildings; or

k. Exterior building glass, except as provided in the Exterior Building Glass Additional Coverage.

3. **COVERED CAUSES OF LOSS**

This Coverage Form insures against Risks Of Direct Physical Loss unless the loss is:

a. Excluded in Section B. EXCLUSIONS;

b. Limited in Paragraph A.4. LIMITATIONS in this section; or

c. Limited or excluded in Section E. PROPERTY LOSS CONDITIONS or Section G. PROPERTY GENERAL CONDITIONS;

that follow.

4. **LIMITATIONS**

a. We will not pay for loss of or damage to:

1) Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to Money and Securities Additional Coverage.

2) Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

3) Fences, spas, outdoor swimming pools and related equipment, re-

PB 00 02 (01-01)

taining walls, pavements, bulkheads, pillars, wharves or docks caused by freezing or thawing, impact of watercraft, or by the pressure or weight of ice or water whether driven by wind or not.

4) The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

b. We will not pay for loss of or damage to fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken, unless caused by one of the "specified causes of loss" or building glass breakage. This limitation does not apply to:

1) Glass that is part of the interior of a building or structure;

2) Containers of property held for sale; or

3) Photographic or scientific instrument lenses.

c. For loss or damage by theft, the following types of property are covered only up to the limits shown:

1) $2,500 for furs, fur garments and garments trimmed with fur.

2) $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $250 or less per item.

3) $2,500 for patterns, dies, molds and forms.

5. **ADDITIONAL COVERAGES**

a. **Debris Removal**

1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

2) The most we will pay under this Debris Removal Additional Coverage is:

a) 25% of the amount we pay for the direct physical loss of or damage to Covered Property; plus

b) The deductible in this policy applicable to that loss or damage.

This Debris Removal Additional Coverage will not increase the Limits of Insurance provided by this policy.

HOWEVER, this limitation does not apply to any additional debris removal limit provided in paragraph 4) below.

3) This Debris Removal Additional Coverage does not apply to costs to:

a) Extract "pollutants" from land or water;

b) Remove, restore or replace polluted land or water; or

c) Extract "pollutants" from Covered Property.

4) If:

a) The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

b) The debris removal expense exceeds the amount payable under the 25% Debris Removal coverage limitation in paragraph 2) above;

ACP BPH 7801069841

INSURED COPY

7B    03052

we will pay up to an additional $25,000 for each premises in any one occurrence under this Debris Removal Additional Coverage.

b.  **Preservation of Property**

1)  If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

    a)  While it is being moved or while temporarily stored at another premises; and

    b)  Only if the loss or damage occurs within 45 days after the property is first moved.

2)  This Preservation of Property Additional Coverage will not increase the Limits of Insurance provided by this policy.

c.  **Fire Department Service Charge**

1)  When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500 for your liability for fire department service charges:

    a)  Assumed by contract or agreement prior to loss; or

    b)  Required by local ordinance.

2)  The limit for this Fire Department Service Charge Additional Coverage is in addition to the Limits of Insurance.

3)  No deductible applies to this Fire Department Service Charge Additional Coverage.

d.  **Fire Extinguisher Recharge**

1)  We will pay the expense you incur to recharge portable fire extinguishers when used to combat a covered fire.

2)  This Fire Extinguisher Recharge Additional Coverage is not subject to the Limits of Insurance.

3)  No deductible applies to this Fire Extinguisher Recharge Additional Coverage.

e.  **Collapse**

1)  With respect to buildings:

    a)  Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of a building cannot be occupied for its intended purpose;

    b)  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

    c)  A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of a building; and

    d)  A building that is standing, or any part of a building that is standing, is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

2)  We will pay for direct physical loss of or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if the collapse is caused by one or more of the following:

    a)  The "specified causes of loss" or breakage of building glass, all only as insured against in this policy;

    b)  Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    c)  Insect or vermin damage that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

ACP BPH 7801069841

INSURED COPY

d)   Weight of people or personal property;

e)   Weight of rain, ice, hail or snow that collects on a roof;

f)   Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

HOWEVER, if the collapse occurs after construction, remodeling, or renovation is complete and is caused at least in part by a cause of loss listed in 2)a) through 2)e) above, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling, or renovation, contributes to the collapse.

3)   With respect to the following property:

a)   Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, mast or towers;

b)   Awnings, gutters and downspouts;

c)   Yard fixtures;

d)   Outdoor swimming pools;

e)   Fences;

f)   Bulkheads, pilings, piers, wharves and docks;

g)   Beach or diving platforms or appurtenances;

h)   Retaining walls; and

i)   Walks, roadways and other paved surfaces;

If the collapse is caused by a cause of loss listed in 2)b) through 2)f) above, we will pay for loss or damage to that property in a) through i) above only if:

i)   Such loss or damage is a direct result of the collapse of a building insured under this policy; and

ii)   The property is Covered Property under this policy.

4)   If personal property abruptly falls down or caves in and such collapse is not the result of collapse of a building or any part of a building, we will pay for loss of or damage to Covered Property caused by such collapse of personal property only if:

a)   The collapse was caused by a Cause of Loss listed in 2)a) through 2)f) above;

b)   The personal property which collapses is inside a building; and

c)   The property which collapses is not of a kind listed in 3) above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this paragraph 4) does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by collapse.

Collapse of personal property does not mean cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

5)   This Collapse Additional Coverage will not increase the Limits of Insurance provided in this policy.

f.   Water Damage, Other Liquids, Powder Or Molten Material Damage

1)   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

2)   We will not pay the cost to repair any defect that caused the loss or damage except as provided in the Equipment Breakdown Additional Coverage; but we will pay the cost

to repair or replace damaged parts of fire extinguishing equipment if the damage:

a) Results in discharge of any substance from an automatic fire protection system; or

b) Is directly caused by freezing.

3) This Water Damage Additional Coverage will not increase the Limits of Insurance provided in this policy.

g. **Business Income**

1) **Business Income with Ordinary Payroll Limitation**

a) We will pay for the actual loss of "business income" you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

b) With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

i) The portion of the building which you rent, leases or occupy; and

ii) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to the described premises.

c) We will only pay for loss of "business income" that you

sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for "ordinary payroll expenses" for 60 days following the date of direct physical loss or damage.

2) **Extended Business Income**

a) If the necessary suspension of your "operations" produces a "business income" loss payable under this policy, we will pay for the actual loss of "business income" you incur during the period that:

i) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

ii) Ends on the earlier of:

i. The date you could restore your "operations" with reasonable speed, to the level which would generate the "business income" amount that would have existed if no direct physical loss or damage had occurred; or

ii. Sixty (60) consecutive days after the date determined in 2)a)i) above.

HOWEVER, Extended Business Income does not apply to loss of "business income" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

b) Loss of "business income" must be caused by direct physical loss or damage at the described premises

INSURED COPY

7B    03065

caused by or resulting from any Covered Cause of Loss.

3) This Business Income Additional Coverage is not subject to the Limits of Insurance.

h. **Extra Expense**

1) We will pay necessary "extra expense" you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

2) With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

   a) The portion of the building which you rent, lease or occupy; and

   b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

3) We will only pay for "extra expense" that occurs within 12 consecutive months after the date of direct physical loss or damage.

4) This Extra Expense Additional Coverage is not subject to the Limits of Insurance.

i. **Pollutant Clean Up And Removal**

1) We will pay your expense to extract "pollutants" from land, water or Covered Property at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs

during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

2) This Pollutant Clean Up And Removal Additional Coverage does not apply to:

   a) Costs to test for, monitor or assess the existence, concentration or effects of "pollutants"; or

   b) Any penalties or assessments that may be charged against you due to any statute, regulation or ordinance.

   But we will pay for testing which is performed in the course of extracting the "pollutants" from land or water.

3) The most we will pay for each location under this Pollutant Clean Up And Removal Additional Coverage is $25,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

4) The limit for this Pollutant Clean Up And Removal Additional Coverage is in addition to the Limits of Insurance.

j. **Civil Authority**

1) We will pay for the actual loss of "business income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

2) The coverage for "business income" will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

3) The coverage for necessary "extra expense" will begin immediately after the time of that action and ends:

ACP BPH 7801069841

INSURED COPY

PB 00 02 (01-01)

a)  3 consecutive weeks after the time of that action; or

b)  When your "business income" coverage ends;

whichever is later.

4)  This Civil Authority Additional Coverage is not subject to the Limits of Insurance.

k.  **Money Orders And Counterfeit Paper Currency**

1)  We will pay for loss due to the good faith acceptance of:

a)  Any U.S. or Canadian post office, express company, or national or state (or Canadian) chartered bank money order that is not paid upon presentation to the issuer; or

b)  Counterfeit United States or Canadian paper currency;

in exchange for merchandise, "money" or services or as part of a normal business transaction.

2)  The most we will pay for any loss under this Money Orders And Counterfeit Paper Currency Additional Coverage is $1,000.

3)  The limit for this Money Orders And Counterfeit Paper Currency Additional Coverage is in addition to the Limits of Insurance.

l.  **Forgery And Alteration**

1)  We will pay for loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange or similar written promise of payment in "money", that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

2)  If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

3)  The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500, unless a higher Limit of Insurance is shown in the Declarations.

4)  The limit for this Forgery And Alteration Additional Coverage is in addition to the Limits of Insurance.

m.  **Increased Cost Of Construction**

1)  This Additional Coverage applies only to buildings insured on a replacement cost basis.

2)  In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement or damaged parts of that property, subject to the limitations stated in paragraphs 3) through 9) of this Increased Cost Of Construction Additional Coverage.

3)  The ordinance or law referred to in paragraph 2) of this Increased Cost Of Construction Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

4)  Under this Increased Cost Of Construction Additional Coverage, we will not pay any costs due to an ordinance or law that:

a)  You were required to comply with before the loss, even when the building was undamaged; and

b)  You failed to comply with.

5)  Under this Increased Cost Of Construction Additional Coverage, we will not pay any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

PB 00 02 (01-01)

ACP BPH 7801069841                           INSURED COPY

6)   The most we will pay under this Increased Cost Of Construction Additional Coverage, for each described building insured under this Coverage Form, is $10,000.

The limit for this Increased Cost Of Construction Additional Coverage is in addition to the Limits of Insurance.

7)   With respect to this Increased Cost Of Construction Additional Coverage:

a)   We will not pay any costs:

i)   Until the property is actually repaired or replaced, at the same or another premises; and

ii)  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

b)   If the building is repaired or replaced at the same premises, of if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

c)   If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises for a building of like, kind and quality and of the same size and use.

8)   This Increased Cost Of Construction Additional Coverage is not subject to the terms of the Ordinance or Law Exclusion, to the extent that such exclusion would conflict with the provisions of this Increased Cost Of Construction Additional Coverage.

9)   The costs addressed in Condition 5. Loss Payment of Section E. PROPERTY LOSS CONDITIONS do

not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Increased Cost Of Construction Additional Coverage, as stated in paragraph 6) above, is not subject to such limitation.

n.   Exterior Building Glass

1)   We will pay for direct physical loss of or damage to glass, including lettering or ornamentation, that is part of the exterior of a covered building or structure at the described premises. The glass must be owned by you, or owned by others but in your care, custody or control. We will also pay for necessary:

a)   Expenses incurred to put up temporary plates or board up openings;

b)   Repair or replacement of encasing frames; and

c)   Expenses incurred to remove or replace obstructions.

2)   Paragraph A.3., COVERED CAUSES OF LOSS and Section B., EXCLUSIONS do not apply to this Exterior Building Glass Additional Coverage, except for:

a)   Paragraph B.1.b., Earth Movement;

b)   Paragraph B.1.c., Governmental Action;

c)   Paragraph B.1.d., Nuclear Hazard;

d)   Paragraph B.1.f., War And Military Action; and

e)   Paragraph B.1.g., Water.

3)   Exclusions. We will not pay for loss or damage caused by or resulting from:

a)   Wear and tear;

b)   Hidden or latent defect;

c)   Corrosion; or

d)   Rust.

ACP BPH 7801069841                                      INSURED COPY

4)  The most we pay under this Exterior Building Glass Additional Coverage is the Building Limit of Insurance shown in the Declarations.

HOWEVER, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property, the most we will pay under this Exterior Building Glass Additional Coverage is the Tenant's Exterior Building Glass Limit of Insurance shown in the Declarations.

o.  **Equipment Breakdown**

1)  We will pay for loss caused by or resulting from an "accident" to "covered equipment".

If an initial "accident" causes other "accidents", all will be considered one "accident". All "accidents" that are the result of the same event will be considered one "accident".

2)  The following coverages also apply to loss caused by or resulting from an "accident" to "covered equipment". These coverages do not provide additional amounts of Insurance.

a)  **Expediting Expenses**

With respect to your damaged Covered Property, we will pay, up to $50,000, the reasonable extra cost to:

i)  Make temporary repairs; and

ii)  Expedite permanent repairs or replacement.

b)  **Hazardous Substances**

We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance". This includes the additional expenses to clean up or dispose of such property.

Additional costs mean those beyond what would have been required had no "hazardous substance" been involved.

The most we will pay for loss or damage under this coverage, including actual loss of "business income" you sustain, necessary "extra expense" you incur and loss under Perishable Goods coverage, is $50,000.

c)  **Perishable Goods**

i)  We will pay for your loss of "perishable goods" due to spoilage.

ii)  We will also pay for your loss of "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

iii)  We will also pay necessary expenses you incur to reduce the amount of loss under this coverage. We will pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

iv)  If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident", less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with Condition 5. Loss Payment under Section E. PROPERTY LOSS CONDITIONS.

The most we will pay for loss or damage under this coverage is $50,000.

ACP BPH 7801069841

INSURED COPY

d) **Computer Equipment**

We will pay for loss or damage caused by or resulting from an "accident" to "computer equipment".

"Computer equipment" used primarily to control or operate "covered equipment" is not subject to the following provision.

The most we will pay for loss or damage under this coverage is $50,000, including actual loss of "business income" you sustain and necessary "extra expense" you incur, unless a higher Limit of Insurance for "computer equipment" breakdown is shown in the Declarations.

e) **CFC Refrigerants**

We will pay for the additional cost to repair or replace Covered Property because of the use or presence of a refrigerant containing CFC (chlorofluorocarbon) substances. This means the additional expense to do the least expensive of the following:

i) Repair the damaged property and replace any lost CFC refrigerant;

ii) Repair the damaged property, retrofit the system to accept a non-CFC refrigerant and charge the system with a non-CFC refrigerant; or

iii) Replace the system with one using a non-CFC refrigerant.

Additional costs mean those beyond what would have been required had no CFC refrigerant been involved.

The most we will pay for loss or damage under this coverage, including actual loss of "business income" you sus-

tain, necessary "extra expense" you incur and loss under Perishable Goods coverage, is $50,000.

f) **Service Interruption**

The insurance provided under the Business Income Additional Coverage, the Extra Expense Additional Coverage and for c) Perishable Goods in this Equipment Breakdown Additional Coverage, is extended to apply to loss caused by or resulting from an "accident" to equipment that is owned by a utility, landlord, or other supplier with whom you have a contract to provide you with any of the following services: electrical power, communications, waste disposal, air conditioning, refrigeration, heating, gas, air, water or steam.

g) **Data Restoration**

We will pay for your cost to research, replace and restore data, including programs and operating systems, that is lost or corrupted due to an "accident" to "computer equipment".

The most we will pay for such costs under this data restoration coverage, including actual loss of "business income" you sustain and necessary "extra expenses" you incur, is $50,000.

h) **Environmental, Safety and Efficiency Improvements**

The following provision does not apply to property insured on an "actual cash value" basis.

If "covered equipment" requires replacement due to loss or damage caused by or resulting from an "accident", we will pay your additional cost to replace with equipment that is better for the environment, more efficient or

PB 00 02 (01-01)

safer than the equipment be-ing replaced.

HOWEVER, we will not pay more under this additional coverage than 125% of what it would have cost to repair or replace damaged "covered equipment" with like kind and quality.

3) **Additional Exclusions**

a) We will not pay under this Equipment Breakdown Addi-tional Coverage for loss or damage caused by or result-ing from:

i) Your failure to use all reasonable means to protect the "perishable goods" from damage fol-lowing an "accident";

ii) Any defect, virus, loss of data or other situation within "electronic media and records". But if loss or damage from an "acci-dent" results, we will pay for that resulting loss or damage; or

iii) Any of the following tests:

i. A hydrostatic, pneu-matic or gas pres-sure test of any boiler or pressure vessel; or

ii. An insulation break-down test of any type of electrical equip-ment.

b) With respect to c) Perishable Goods coverage and f) Ser-vice Interruption coverage, we will not pay for loss or dam-age caused by or resulting from: fire; lightning; windstorm or hail; explosion (except for steam or centrifugal explosion); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling ob-jects; weight of snow, ice or sleet; freezing or collapse.

4) **Additional Conditions**

a) **Suspension**

When any "covered equip-ment" is found to be in, or ex-posed to a dangerous condition, any of our repre-sentatives may immediately suspend the insurance against loss from an "acci-dent" to that "covered equip-ment". We can do this by mailing or delivering a written notice of suspension to your address as shown in the Dec-larations, or at the address where the equipment is lo-cated. Once suspended in this way, your insurance can be reinstated only by written notice from us.

b) **Jurisdictional Inspections**

If any property that is "cov-ered equipment" under this Equipment Breakdown Addi-tional Coverage requires in-spection to comply with state or municipal boiler and pres-sure vessel regulations, we agree to perform such in-spection on your behalf.

5) The most we will pay for loss or damage under this Equipment Breakdown Additional Coverage is the applicable Limit of Insurance shown in the Declarations.

This Equipment Breakdown Addi-tional Coverage will not increase the Limits of Insurance provided by this policy.

p. **Arson Reward for Conviction**

1) In the event that a covered fire loss was the result of an act of arson, we will pay a reward to anyone, other than paid investi-gators, who gives legal authorities information that leads to the con-viction of anyone who committed such arson.

2) We will pay up to 10 percent of the amount of the insured fire loss or $10,000, whichever is less. This payment is the most we will pay in any one occurrence, regardless of

the number of persons providing information or convicted of arson.

3) The limit for this Arson Reward for Conviction Additional Coverage is in addition to the Limits of Insurance.

4) No deductible applies to this Arson Reward for Conviction Additional Coverage.

q. Money and Securities

1) We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit by direct route between any of these places, resulting directly from:

a) Theft, meaning any act of stealing;

b) Disappearance; or

c) Destruction.

2) In addition to the Limitations and Exclusions applicable to property coverage, we will not pay for loss:

a) Resulting from accounting or arithmetical errors or omissions;

b) Due to the giving or surrendering of property in any exchange or purchase;

c) Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device; or

d) From an unattended motor vehicle.

3) The most we will pay under this Money and Securities Additional Coverage for loss in any one occurrence is:

a) Inside the Premises, $10,000 for "money" and "securities" while:

PB 00 02 (01-01)

i) In or on the described premises; or

ii) Within a bank or savings institution;

unless a higher Limit of Insurance for "money" and "securities" inside the premises is shown in the Declarations; and

b) Outside the Premises (Limited - loss from an unattended motor vehicle is excluded), $10,000 for "money" and "securities" while anywhere else, unless a higher Limit of Insurance for "money" and "securities" outside the premises is shown in the Declarations.

4) All loss:

a) Caused by one or more persons; or

b) Involving a single act or series of related acts;

is considered one occurrence.

5) You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

6) The limit for this Money and Securities Additional Coverage is in addition to the Limits of Insurance.

r. Appurtenant Structures

1) We will pay for direct physical loss of or damage to any separate garages, storage buildings, swimming pools, spas, fences, retaining walls and other appurtenant structures usual to your business at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

2) The most we will pay for loss or damage under this Appurtenant Structures Additional Coverage in any one occurrence is 10% of the Building Limit of Insurance shown in the Declarations for that described premises.

HOWEVER, if the value of any one garage, storage building, swim-

ming pool, spa, fence, retaining wall or other appurtenant structure exceeds $50,000, this Appurtenant Structures Additional Coverage does not apply to that structure.

3) The limit for this Appurtenant Structures Additional Coverage is in addition to the Limits of Insurance.

s. **Back Up Of Sewer Or Drain Water Damage**

1) For the purpose of the Back Up Of Sewer Or Drain Water Damage Additional Coverage the following definition is added:

"Flood" means a general and temporary condition of partial or complete inundation of normally dry land areas from:

a) The unusual and rapid accumulation or runoff of surface waters from any source;

b) The overflow of inland or tidal waters; or

c) Waves, tides or tidal waves.

2) We will pay for loss of or damage to Covered Property caused by water that backs up from a sewer or drain, sump pump well or similar device designed to prevent overflow, seepage or leakage of subsurface water.

HOWEVER, we will not pay for loss or damage that results from sewer backup or sump pump overflow that occurs during the period beginning 10 days before and ending 10 days after a "flood" on the insured premises.

3) The most we will pay for loss or damage under this coverage is:

a) $5,000 per building; or

b) $25,000 in any one policy period, regardless of the number of losses.

4) The limit of of insurance that applies to coverage under this Back Up Of Sewer Or Drain Water Damage Additional Coverage includes

any loss arising from Business Income Additional Coverage and Extra Expense Additional Coverage.

5) The limit for this Back Up Of Sewer Or Drain Water Damage Additional Coverage is in addition to the Limits of Insurance.

t. **Dependent Properties - Business Income**

1) We will pay for the actual loss of "business income" you sustain due to necessary and unavoidable suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to "dependent property" caused by or resulting from any Covered Cause of Loss.

2) We will only pay for loss of "business income" that occurs within 12 consecutive months after the date of direct physical loss or damage.

3) This Dependent Properties - Business Income Additional Coverage is not subject to the Limits of Insurance.

6. **COVERAGE EXTENSIONS**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises.

In addition to the Limits of Insurance, you may extend the insurance provided by this policy as follows.

a. **Newly Acquired or Constructed Property**

1) You may extend the insurance that applies to:

a) Buildings to apply to:

i) Your new buildings while being built on the described premises; and

ii) Buildings you acquire at locations, other than the described premises, intended for:

ACP BPH 7801069841

INSURED COPY

78   03073

i. Similar use as the building described in the Declarations; or

ii. Use as a warehouse.

b) The most we will pay for loss or damage under this Coverage Extension for buildings is $500,000 for each building.

2) You may extend the insurance that applies to Business Personal Property to apply to that property at any location you acquire, other than at fairs or exhibitions.

The most we will pay for loss or damage under this Coverage Extension for Business Personal Property is $250,000 at each premises.

3) Insurance under this Newly Acquired or Constructed Property Coverage Extension for each newly acquired or constructed premises will end when any of the following first occurs:

a) This Policy expires;

b) 90 days after you acquire or begin to construct the property; or

c) You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

b. **Newly Acquired Locations - Business Income**

1) You may extend the insurance that applies to Business Income Additional Coverages to apply to property at any location you newly acquire, other than temporary locations such as fairs or exhibitions, whether attended regularly or not.

2) The most we will pay for loss under this Newly Acquired Locations - Business Income Coverage Extension is the lesser of:

a) The actual loss of "business income" you sustain, as provided for and described under

the Business Income Additional Coverage; or

b) $100,000.

3) This insurance will end the earlier of:

a) The policy expiration date;

b) 90 days after you acquire the property; or

c) You report the property to us.

We will charge you any additional premium from the date you acquire the property.

c. **Personal Property Off Premises**

You may extend the insurance that applies to Business Personal Property to apply to covered Business Personal Property, other than "money", "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or temporarily at a premises you do not own, lease or operate.

The most we will pay for loss or damage under this Personal Property Off Premises Coverage Extension is $15,000.

d. **Outdoor Trees, Shrubs, Plants, and Lawns**

1) You may extend the insurance provided by this policy to apply to your outdoor trees, shrubs, plants, and lawns (other than "stock"), including debris removal expense, caused by or resulting from any of the following Causes of Loss:

Fire; Lightning; Explosion; Aircraft or vehicles; Riot or civil commotion; Vandalism; or Theft.

2) The most we will pay for loss or damage under this Outdoor Trees, Shrubs, Plants, and Lawns Coverage Extension is $10,000 in any one occurrence, unless a higher limit for outdoor trees, shrubs, plants, and lawns is shown in the Declarations.

3) The Debris Removal Additional Coverage does not apply to this

ACP BPH 7801069841

INSURED COPY

7B    03074

PB 00 02 (01-01)

Outdoor Trees, Shrubs, Plants, and Lawns Coverage Extension.

e.  **Outdoor Signs**

1)  You may extend the insurance provided by this policy to apply to your outdoor signs, including debris removal expense, caused by or resulting from risks of direct physical loss or damage.

HOWEVER, we will not pay for loss or damage caused by or resulting from any of the following causes of loss:

a)  Wear and tear;

b)  Hidden or latent defect;

c)  Rust; or

d)  Corrosion.

2)  The most we will pay for loss or damage under this Outdoor Signs Coverage Extension is $2,500 in any one occurrence, unless a higher limit for outdoor signs is shown in the Declarations.

3)  The Debris Removal Additional Coverage does not apply to this Outdoor Signs Coverage Extension.

f.  **Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or your employees.

HOWEVER, personal effects does not include:

1)  Tools or equipment used in your business; or

2)  "Money", "securities" or jewelry.

The most we will pay for loss or damage under this Personal Effects Coverage Extension is $10,000 in any one occurrence, but not more than $500 for the personal effects of any one individual.

g.  **Valuable Papers and Records**

1)  You may extend the insurance that applies to Business Personal

Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control, caused by or resulting from a Covered Cause of Loss. This Valuable Papers And Records Coverage Extension includes the cost to research lost information on "valuable papers and records", including those which exist on "electronic media and records", for which duplicates do not exist.

2)  This Valuable Papers And Records Coverage Extension does not apply to:

a)  Property held as samples or for delivery after sale;

b)  Property in storage away from the premises shown in the Declarations.

3)  The most we will pay under this Valuable Papers And Records Coverage Extension for loss of or damage to "valuable papers and records", including those which exist on "electronic media and records", in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Declarations.

HOWEVER, for "valuable papers and records", including those which exist on "electronic media and records", not at the described premises, the most we will pay is:

a)  $2,500; or

b)  25% of the "valuable papers and records" limit;

whichever is higher.

4)  Section B. EXCLUSIONS of this Coverage Form does not apply to this Valuable Papers And Records Coverage Extension except for:

a)  Paragraph B.1.c., Governmental Action;

b)  Paragraph B.1.d., Nuclear Hazard;

c)  Paragraph B.1.f., War And Military Action;

PB 00 02 (01-01)

ACP BPH 7801069841          INSURED COPY

    d) Paragraph B.2.e., Dishonesty;

    e) Paragraph B.2.f., False Pretense;

    f) Paragraph B.3.; and

    g) The Accounts Receivable and "Valuable Papers And Records" Exclusions.

h. **Accounts Receivable**

  1) You may extend the insurance that applies to Business Personal Property (or that applies to your Buildings, if Business Personal Property is not covered) to apply to your records of accounts receivable. We will pay:

    a) All amounts due from your customers that your are unable to collect;

    b) Interest charges on any loan required to offset amounts you unable to collect pending our payment of these amounts;

    c) Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

    d) Other reasonable expenses that you incur to re-establish your records of accounts receivable;

  that result from direct physical loss or damage by any Covered Cause or Loss to your records of accounts receivable.

  2) The most we will pay under this Accounts Receivable Coverage Extension for loss or damage in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

  For records of accounts receivable not at the described premises, the most we will pay is $2,500.

  3) Section B. EXCLUSIONS of this Coverage Form does not apply to this Accounts Receivable Coverage Extension except for:

    a) Paragraph B.1.c., Governmental Action;

    b) Paragraph B.1.d., Nuclear Hazard;

    c) Paragraph B.1.f., War And Military Action;

    d) Paragraph B.2.f., Dishonesty;

    e) Paragraph B.2.g., False Pretense;

    f) Paragraph B.3.; and

    g) The Accounts Receivable and "Valuable Papers And Records" Exclusions.

i. **Salespersons Samples**

  1) You may extend the insurance that applies to Business Personal Property to apply to salespersons samples while away from the described premises.

  2) The most we will pay under this Salespersons Samples Coverage Extension for loss or damage in any one occurrence is $2,000.

j. **Business Income and Extra Expense - Increased Period of Restoration Due to Ordinance or Law**

  If a Covered Cause of Loss occurs to property at the premises described in the Declarations, coverage is extended to include the amount of actual and necessary loss you sustain during the "period of restoration" of "operations" caused by or resulting from the enforcement of any ordinance or law that:

  1) Regulates the construction or repair of any property;

  2) Requires the tearing down of parts of any property not damaged by a Covered Cause of Loss; and

  3) Is in force at the time of loss.

k. **Removal Permit**

  If Covered Personal Property is removed to a new premise that is described in the Declarations, you may extend this insurance to include that Covered Personal Property at each premises during the removal. Cover-

ACP BPH 7801069941

INSURED COPY

7B   03076

age at each premises will apply in the proportion that the value at each premises bears to the value of all Covered Personal Property being removed. This permit applies up to 30 days after the date Covered Personal Property is first removed at the previous premises; after that, this Removal Permit Coverage Extension does not apply at the previous premises.

B. **EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other causes or event that contributes concurrently or in any sequence to the loss.

   a. **Ordinance Or Law**

   The enforcement of any ordinance or law:

   1) Regulating the construction, use or repair of any property; or

   2) Requiring the tearing down of any property, including the cost of removing its debris; or

   3) Requiring the removal or disposal of "pollutants".

   This Ordinance Or Law exclusion applies whether the loss results from:

   1) An ordinance or law that is enforced even if the property has not been damaged; or

   2) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

   b. **Earth Movement**

   1) Earthquake, including any earth sinking, rising or shifting related to such event;

   2) Landslide, including any earth sinking, rising or shifting related to such event;

   3) Mine subsidence, meaning subsidence of a man-made mine,

whether or not mining activity has ceased.

4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

HOWEVER, if electrical "covered equipment" requires drying out because of the above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

But if Earth Movement, as described in 1) through 4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

a) Airborne volcanic blast or airborne shock waves;

b) Ash, dust, or particulate matter; or

c) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

ACP BPH 7B01099841

INSURED COPY

c. **Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

d. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, including but not limited to radon gas, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

e. **Off-Premises Services**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

f. **War And Military Action**

1) War, including undeclared or civil war;

2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water**

1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

2) Mudslide or mudflow;

3) Water that backs up or overflows from a sewer, drain or sump, except as provided under the Back Up Of Sewer Or Drain Water Damage Additional Coverage; or

4) Water under the ground surface pressing on, or flowing or seeping through:

   a) Foundations, walls, floors or paved surfaces;

   b) Basements, whether paved or not; or

   c) Doors, windows or other openings.

But if Water, as described in B.1.g.1) through B.1.g.4), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. **Consequential Losses**

Delay, loss of use or loss of market.

b. **Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

c. **Leakage or Seepage**

Constant or repeated seepage or leakage of water or steam, whether continuous or intermittent from any:

1) Heating, air conditioning or refrigerating system;

2) Domestic appliance; or

3) Plumbing system, including from or around any shower stall or other shower bath installation, bathtub or other plumbing fixture.

d. **Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

PB 00 02 (01-01)

1) You do your best to maintain heat in the building or structure; or

2) You drain the equipment and shut off the supply if the heat is not maintained.

e. **Dishonesty**

1) Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose.

2) This exclusion applies whether or not:

a) Such persons are acting alone or in collusion with others; or

b) Such acts occur during the hours of employment.

3) This exclusion does not apply to:

a) Acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered; or

b) Covered Property, including records of accounts receivable and "valuable papers and records", that is entrusted to others who are carriers for hire.

f. **False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

g. **Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

h. **Collapse**

Collapse, except as provided in the Collapse Additional Coverage. But if collapse results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

i. **Pollutants**

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified cause of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

j. **Other Types Of Loss**

1) Wear and tear;

2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

3) Smog;

4) Settling, cracking, shrinking, bulging or expansion;

5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

6) Soil Conditions including, but not limited to:

a) Corrosive action;

b) Chemicals, compounds, elements, suspensions or gels in the soil; or

c) The formation of crystals in the soil;

7) The following causes of loss to personal property:

a) Dampness or dryness of atmosphere;

PB 00 02 (01-01)

ACP BPH 7801069841

INSURED COPY

Page 21 of 38

78    03079

b) Changes in or extremes of temperature; or

c) Marring or scratching; or

But if an excluded cause of loss that is listed in paragraphs 1) through 7) above results in a "specified cause of loss", "accident" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

3. We will not pay for loss or damage caused by or resulting from any of the following B.3.a. through B.3.d. But if an excluded cause of loss that is listed in B.3.a. through B.3.d. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. **Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

b. **Acts Or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. **Negligent Work**

Faulty, inadequate or defective:

1) Planning, zoning, development, surveying, siting;

2) Design, specifications, workmanship, work methods, repair, construction, renovation, remodeling, grading, compaction, failure to protect the property;

3) Materials used in repair, construction, renovation or remodeling; or

4) Maintenance;

of part or all of any property on or off the described premises.

d. **Errors In Data Processing:** Human errors or omissions in installing, testing, processing, recording or storing information on "electronic media and records" and electronic data processing equipment, including programming errors or faulty machine instructions.

4. **Business Income And Extra Expense Exclusions**

We will not pay for:

a. Any "extra expense", or increase of "business income" loss, caused by or resulting from:

1) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

2) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration".

b. Any other consequential loss.

5. **Accounts Receivable And "Valuable Papers And Records" Exclusions**

The following additional exclusions apply to the Accounts Receivable and "Valuable Papers And Records" Coverage Extensions:

a. We will not pay for loss or damage caused by or resulting from electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

1) Programming errors or faulty machine instructions;

2) Faulty installation or maintenance of data processing equipment or component parts;

But we will pay for direct loss or damage caused by lightning.

b. Applicable to "Valuable Papers and Records" only:

We will not pay for loss or damage caused by or resulting from any errors

ACP BPH 7801068841

INSURED COPY

or omissions in processing or copying. But if errors or omissions in processing or copying results in fire or explosion, we will pay for the direct loss or damage caused by the fire or explosion.

c. Applicable to Accounts Receivable only:

We will not pay for:

1) Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

2) Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

3) Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

C. **LIMITS OF INSURANCE**

1. The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations, except as otherwise provided in this Section.

2. The limits applicable to Additional Coverages are in addition to the Limit of Insurance only if so indicated in that Section of this Coverage Form.

3. The limits applicable to the Coverage Extensions are in addition to the Limits of Insurance.

4. **Inflation Guard - Building**

a. The Limit of Insurance for Buildings will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

1) The Building limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Building limit, times

2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

3) The number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Building limit, divided by 365.

Example:

If: The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last Policy change) is 146.

The amount of increase is

$100,000 x .08 x (146 / 365) = $3,200.

c. The Inflation Guard percentage for Buildings will be the percentage selected by you at the inception date or the most recent renewal date of this policy.

5. **Inflation Guard - Business Personal Property**

a. The Limit of Insurance for Business Personal Property will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy renewal date, or any other policy change amending the Limit of Insurance, times

2) The percentage of increase shown in the Declarations, expressed as a decimal (example: 2% is .02), times

3) The number of days since the beginning of the current policy year, or since the effective date of the most recent policy change amending the Business Personal Property limit, divided by 365.

ACP BPH 7801068841

INSURED COPY

Example:

If: The applicable limit is $150,000; and

The annual percentage increase is 3%; and

The number of days since the beginning of the policy year (or last policy change) is 146;

Then the amount of increase is $150,000 x .03 x (146 / 365) = $1,800.

c.  The Inflation Guard percentage for Business Personal Property will be the average annual Index shown in the Declarations. This percentage may change at each renewal date.

In no event will the Limit of Insurance be reduced unless you specifically request us to do so.

6.  **Business Personal Property Limit - Seasonal Increase**

a.  The Limit of Insurance for Business Personal Property will automatically increase by 25% to provide for seasonal variations.

b.  This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

1)  The 12 months immediately preceding the date the loss or damage occurs; or

2)  The period of time you have been in business as of the date the loss or damage occurs.

D.  **DEDUCTIBLES**

1.  We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

2.  Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under the Exterior Building Glass Additional Coverage in any one occurrence is $250.

But this $250 Deductible will not increase the Deductible shown in the Declarations. This $250 Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

3.  No deductible applies to the following Additional Coverages:

a.  Fire Department Service Charge;

b.  Fire Extinguisher Recharge;

c.  Business Income;

d.  Extra Expense;

e.  Civil Authority; and

f.  Arson Reward for Conviction.

E.  **PROPERTY LOSS CONDITIONS**

1.  **Abandonment**

There can be no abandonment of any property to us.

2.  **Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser after receiving a written request from the other, and will advise the other party of the name of such appraiser within 20 days. The two appraisers will select an umpire. If appraisers cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of property and the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a.  Pay its chosen appraiser; and

b.  Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

3.  **Duties In The Event Of Loss Or Damage**

a.  You must see that the following are done in the event of loss of or damage to Covered Property:

1)  Notify the police if a law may have been broken.

2)  Give us prompt notice of the loss or damage. Include a description of the property involved.

3)  As soon as possible, give us a description of how, when and where the loss or damage occurred.

4)  Take all reasonable steps to protect the Covered Property from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

HOWEVER, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss.

5)  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values, amount of loss claimed and a detailed description of each item.

6)  As often as may be reasonably required, permit us to inspect the damaged property and examine your books and records, including financial records and tax returns.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7)  Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

8)  Cooperate with us in the investigation or settlement of the claim.

9)  Resume all or part of your "operations" as quickly as possible.

b.  We may examine any insured or their employee under oath, while not in the presence of any other insured or employee, at such times as may be rea-

sonably required, about any matter relating to this insurance or the claim, including an insured's books and records. At our option and expense, any examination under oath may be video or audio taped as well as being recorded by stenographic record. If a written transcript is prepared of the testimony, then at our request your answers under oath must be signed under penalty of perjury.

4.  **Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

a.  There has been full compliance with all of the terms of this insurance; and

b.  The action is brought within 1 year after the date on which the direct physical loss or damage occurred.

5.  **Loss Payment**

In the event of loss or damage covered by this policy:

a.  At our option, we will either:

1)  Pay the value of lost or damaged property as described in e. below;

2)  Pay the cost of repairing or replacing the lost or damaged property;

3)  Take all or any part of the property at an agreed or appraised value; or

4)  Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

b.  The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c.  We will give notice of our intentions within 30 days after we receive the sworn proof of loss, provided you have complied with all of the conditions set forth in paragraph 3. above.

d.  We will not pay you more than your financial interest in the Covered Property.

PB 00 02 (01-01)

e.  Except as provided in (2) through (10) below, we will determine the value of Covered Property as follows:

1)  At replacement cost without deduction for depreciation, subject to the following:

   a)  If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts, subject to E.5.b. above:

      i)  The Limit of Insurance under this policy that applies to the lost or damaged property;

      ii)  The cost to replace, on the same premises, the lost or damaged property with other property:

         I.  Of comparable material and quality; and

         ii.  Used for the same purpose; or

      iii)  The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

   b)  If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance under this policy that applies to the property:

      i)  The "actual cash value" of the lost or damaged property; or

      ii)  A proportion of the cost to repair or replace the lost or damaged property,

after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the cost of repair or replacement.

   c)  You may make a claim for loss or damage covered by this insurance on an "actual cash value" basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an "actual cash value" basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

   d)  We will not pay on a replacement cost basis for any loss or damage:

      i)  Until the lost or damaged property is actually repaired or replaced; and

      ii)  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

2)  If the "Actual Cash Value – Buildings" option applies, as shown in the Declarations, Paragraph 1) above does not apply to Buildings. Instead, we will determine the value of Buildings at "actual cash value".

3)  The following property at "actual cash value":

   a)  Used or second-hand merchandise held in storage or for sale;

   b)  Property of others, other than leased personal property you have a contractual responsibility to insure, but this property is not covered for more than the amount for which you are liable, plus the cost of labor, materials or services furnished or arranged by you on personal property of others;

PB 00 02 (01-01)

ACP BPH 7801069841

INSURED COPY

Page 26 of 38

7B    03084

PB 00 02 (01-01)

c) Household contents, except personal property in apartments or rooms furnished by you as landlord;

d) Manuscripts;

e) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac.

4) Glass at the cost of replacement with safety glazing material if required by law.

5) Tenants' Improvements and Betterments at:

a) Replacement cost if you make repairs promptly.

b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

ii) Divide the amount determined in i) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

c) Nothing if others pay for repairs or replacement.

6) "Valuable papers and records", including those which exist on "electronic media or records" (other than prepackaged software programs), at the cost of:

a) Blank materials for reproducing the records; and

b) Labor to transcribe or copy the records.

This condition does not apply to "valuable papers and records" that are actually replaced or restored.

7) Applicable only to Money and Securities Additional Coverage:

a) "Money" at its face value; and

b) "Securities" at their value at the close of business on the day the loss is discovered.

8) Applicable only to Accounts Receivable:

a) If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage, the following method will be used:

i) Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

ii) Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

b) The following will be deducted from the total amount of accounts receivable, however that amount is established:

i) The amount of the accounts for which there is no loss or damage;

ii) The amount of the accounts that you are able to re-establish or collect;

iii) An amount to allow for probable bad debts that you are normally unable to collect; and

iv) All unearned interest and service charges.

PB 00 02 (01-01)

Page 27 of 38

7B    03085

9) "Stock" you have sold but not delivered at the selling price less expenses you otherwise would have had.

10) Business Income and Extra Expense:

   a) We will determine the amount of a "business income" loss based on:

      i) the net income of your business before the direct physical loss or damage occurred;

      ii) the likely net income of your business if no physical loss or damage occurred, but not including any likely increase in net income attributable to an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

      iii) the operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

      iv) other relevant sources of information, including:

         i. financial records and accounting procedures;

         ii. bills, invoices and other vouchers; and

         iii. deeds, liens and contracts.

   b) We will determine the amount of "extra expense" based on:

      i) all expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage occurred. The following will be deducted from the total of such expenses:

         i. the remaining salvage value of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

         ii. any "extra expense" that is paid for by other insurance.

      ii) all necessary expenses that reduce the "business income" loss that otherwise would have been incurred.

f. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

g. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

h. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if

   1) You have complied with all of the terms of this policy, and

   2) a) We have reached agreement with you on the amount of loss; or

      b) An appraisal award has been made.

6. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery ex-

ACP BPH 7801068841

INSURED COPY

penses and the expenses to repair the recovered property, subject to the Limit of Insurance.

HOWEVER if, at the time of loss, the amount of loss or damage to your property exceeded our Limit of Insurance and your property in excess of the Limit of Insurance was turned over to us, you retain your rights to recovery on such uninsured property. We will return to you a portion of any recovery on that property based upon the proportion of the loss in excess of our Limit of Insurance bears to the total loss.

7.  **Resumption Of Operations**

We will reduce the amount of your:

a.  Loss payable under Business Income Additional Coverage, other than "extra expense", to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

b.  Loss payable under Extra Expense Additional Coverage to the extent you can return "operations" to normal and discontinue such "extra expense".

8.  **Vacancy**

a.  **Description Of Terms**

1)  As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in 1)a) and 1)b) below:

a)  When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

b)  When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its total square footage:

i)  Is not rented; or

ii)  Is not used to conduct customary operations.

2)  Buildings under construction or renovation are not considered vacant.

b.  **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs, we will:

1)  Not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

a)  Vandalism;

b)  Sprinkler leakage, unless you have protected the system against freezing;

c)  Building glass breakage;

d)  Water damage;

e)  Theft; or

f)  Attempted theft.

2)  Reduce by 15% the amount we would otherwise pay for the loss or damage caused by a Covered Causes of Loss not listed in 1) above.

F.  **PROPERTY GENERAL CONDITIONS**

The following conditions apply in addition to the COMMON POLICY CONDITIONS.

1.  **Control Of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form, other than the Concealment, Misrepresentation or Fraud Common Policy Condition, at any one or more locations will not affect coverage at any locations where, at the time of loss or damage, the breach of condition did not exist.

2. **Mortgageholders**

   a. The term "mortgageholder" includes trustee.

   b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

   c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

   d. If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

      1) Pays any premium due under this policy at our request if you have failed to do so;

      2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

      3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

   All of the terms of this policy will then apply directly to the mortgageholder.

   e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

      1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

      2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

   At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

   f. If we cancel this policy, we will give written notice to the mortgageholder at least:

      1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

      2) 30 days before the effective date of cancellation if we cancel for any other reason.

   g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

3. **No Benefit To Bailee**

   No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

4. **Policy Period, Coverage Territory**

   Under this form:

   a. We cover loss or damage commencing:

      1) During the policy period shown in the Declarations; and

      2) Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

   b. The coverage territory is:

      1) The United States of America (including its territories and possessions);

      2) Puerto Rico; and

      3) Canada.

G. **OPTIONAL COVERAGES**

If shown as applicable in the Declarations, the following Optional Coverages also apply. These Optional Coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

1. **Employee Dishonesty Optional Coverage**

   a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting

INSURED COPY

PB 00 02 (01-01)

from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you, your partner or an officer of a closely held corporation) with the manifest intent to:

1) Cause you to sustain loss or damage; and also

2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

    a) Any employee; or

    b) Any other person or organization.

b. We will not pay for loss or damage:

1) Resulting from any dishonest or criminal act that you, any of your partners or any officer of a closely held corporation commit whether acting alone or in collusion with other persons; or

2) The only proof of which as to its existence or amount is:

    a) An inventory computation; or

    b) A profit and loss computation.

c. This Employee Dishonesty Optional Coverage does not apply to any employee immediately upon discovery by:

1) You; or

2) Any of your partners, officers or directors not in collusion with the employee;

of any dishonest act committed by that employee before or after being hired by you.

d. We will pay only for covered loss or damage discovered no later than one year from the end of the Policy Period.

e. All loss or damage:

1) Caused by one or more persons; or

2) Involving a single act or series of related acts;

is considered one occurrence.

f. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

g. We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid and regardless that previous policies were in effect, whether issued by us, any affiliated company or any other company, this coverage shall not be cumulative from year to year or period to period.

h. If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

i. The insurance under Paragraph h. above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

1) This Optional Coverage as of its effective date; or

2) The prior insurance had it remained in effect.

2. Ordinance or Law Optional Coverages

a. Coverage 1 - Loss to the Undamaged Portion of Building

When the Declarations show that Ordinance or Law - Coverage 1 applies at a premises described in the Declarations and if a Covered Cause of Loss occurs to covered Building property, we will pay for the loss in value of the

PB 00 02 (01-01)

undamaged portion of the building as a consequence of enforcement of any ordinance or law that:

1) Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

2) Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the premises where the loss occurred; and

3) Is in force at the time of loss.

This Coverage 1 of Ordinance or Law Optional Coverage is included within the Limit of Insurance shown in the Declarations as applicable to the covered Building property. This portion of the Ordinance or Law Optional Coverage does not increase the Limit of Insurance.

b. **Coverage 2 - Demolition Cost and Broadened Increased Cost of Construction**

When the Declarations show that Ordinance or Law - Coverage 2 applies at a premises described in the Declarations and if a Covered Cause of Loss occurs to covered Building property.

1) We will pay the cost to demolish and remove debris of undamaged parts of the property caused by enforcement of building, zoning, or land use ordinance or law; and

2) In addition to the coverage provided for damaged portions of property under the Increased Cost of Construction Additional Coverage, we will also pay for the increased costs to reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required when the increased cost is a consequence of the enforcement of building, zoning or land use ordinance or law.

HOWEVER:

1) This Coverage 2 applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by

zoning or land use ordinance or law.

2) We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

Paragraph e. of 5. Loss Payment under Section E. PROPERTY LOSS CONDITIONS does not apply.

The most we will pay for the total of all covered losses under this Coverage 2 of Ordinance or Law Optional Coverage in any occurrence is the Limit of Insurance shown in the Declarations.

The $10,000 Limit of Insurance that applies to Increased Cost of Construction Additional Coverage is also increased to the Limit of Insurance shown in the Declarations.

This portion of the Ordinance or Law Optional Coverage is in addition to the Limits of Insurance.

c. **Additional Terms and Conditions of Ordinance or Law**

1) The terms of this Ordinance or Law Optional Coverage apply separately to each building to which this Optional Coverage applies.

2) With respect to this Ordinance or Law Optional Coverage, we will not pay for any costs associated with the enforcement of any ordinance, law, rule, or regulation which requires any insured or others to test for, monitor, clean up, remove, treat, detoxify, or neutralize, or in any way respond to or assess the effects of "pollutants".

3) Under this Ordinance or Law Optional Coverage, we will not pay for loss due to any ordinance or law that:

a) You were required to comply with before the loss, even if the building was undamaged; and

b) You failed to comply with.

4) Loss Payment

ACP BPH 7801068841

INSURED COPY

PB 00 02 (01-01)

a) When Coverage 1 applies, loss or damage to the building, including loss in value of the undamaged portion of the building due to enforcement of an ordinance or law, will be determined as follows:

i) If the property is repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

   I. The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

   ii. The Limit of Insurance applicable to the covered Building property.

ii) If the property is not repaired or replaced, we will not pay more than the lesser of:

   I. The "actual cash value" of the building at the time of loss; or

   ii. The Limit of Insurance applicable to the covered Building property.

b) When Coverage 2 applies, the most we will pay, for the total of all covered losses for Demolition Cost and Broadened Increased Cost of Construction, is the Limit of Insurance for Coverage 2.

Subject to this Combined Limit of Insurance, the following loss payment provisions apply:

i) For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

ii) With respect to the Broadened Increased Cost of Construction:

   i. We will not pay for the increased cost of construction until the property is actually repaired or replaced, at the same or another premises; and

   ii. Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

iii) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay under Coverage 2 is the increased cost of construction at the same premises.

iv) If the ordinance or law requires relocation to another premises, the most we will pay under Coverage 2 is the increased cost of construction at the new premises.

d. This Ordinance or Law Optional Coverage is not subject to the terms of the Ordinance or Law Exclusion, to the extent that such exclusion would conflict with the provisions of this Optional Coverage.

3. **Optional Amendment of Coverage - Exclude Theft**

When "- Excluding Theft" is stated in the Declarations after Business Personal Property coverage, then under:

a.  Paragraph 3. of Section B. EXCLU-
SIONS, the following exclusion is
added:

Theft:  Theft or attempted theft result-
ing in loss of or damage to Business
Personal Property.

b.  The Money and Securities Additional
Coverage, paragraph 1)a) is deleted.

## H.  PROPERTY DEFINITIONS

The terms "you", "your", "we", "us", "our" and
"insured" are defined in the Preamble of this
Coverage Form.  The following words or
phrases, which appear in quotation marks
throughout this Coverage Form and any of its
endorsements, are defined as follows:

1.  "Accident" means direct physical loss as
follows:

a.  Mechanical breakdown, including rup-
ture or bursting caused by centrifugal
force;

b.  Artificially generated electrical current,
including electric arcing, that disturbs
electrical devices, appliances or wires;

c.  Explosion of steam boilers, steam
pipes, steam engines or steam tur-
bines owned or leased by you, or op-
erated under your control;

d.  Loss of or damage to steam boilers,
steam pipes, steam engines or steam
turbines caused by or resulting from
any condition or event inside such
equipment; or

e.  Loss or damage to hot water boilers
or other water heating equipment
caused by or resulting from any condi-
tion or event inside such boilers or
equipment.

2.  "Actual Cash Value" means the cost to re-
pair or replace Covered Property, at the
time of loss or damage, whether that prop-
erty has sustained partial or total loss or
damage, with material of like kind and
quality, subject to a deduction for deteri-
oration, depreciation and obsolescence.

3.  "Business Income" means the:

a.  Net Income (Net Profit or Loss before
income taxes) that would have been
earned or incurred if no physical loss
or damage had occurred, but not in-
cluding any Net Income that would

likely have been earned as a result of
an increase in the volume of business
due to favorable business conditions
caused by the impact of the Covered
Cause of Loss on customers or on
other businesses; plus

b.  Necessary continuing normal operat-
ing expenses incurred, while "oper-
ations" are suspended, including
payroll.

4.  "Computer equipment" means Covered
Property that is electronic computer or
other data processing equipment, including
peripherals used in conjunction with such
equipment, and "electronic media and re-
cords".

5.  "Covered equipment" means Covered
Property built to operate under vacuum or
pressure, other than weight of contents, or
used for the generation, transmission or
utilization of energy.

None of the following is "covered equip-
ment":

a.  Structure, foundation, cabinet, com-
partment or air supported structure or
building;

b.  Insulating or refractory material;

c.  Sewer piping, underground vessels or
piping, piping forming a part of a
sprinkler system or water piping other
than boiler feedwater piping, boiler
condensate return piping or water pip-
ing forming a part of a refrigerating or
air conditioning system;

d.  Dragline, excavation or construction
equipment; or

e.  Equipment manufactured by you for
sale.

f.  Vehicle, aircraft or floating vessel or
any equipment mounted on such vehi-
cle, aircraft or floating vessel.  How-
ever, any property that is stationary,
permanently installed at a covered lo-
cation and that receives electrical
power from an external power supplier
will not be considered a vehicle, air-
craft or floating vessel.

B.  "Dependent property" means property
owned or operated by others, not including
any described premises, on whom you de-
pend on to:

ACP BPH 7801069841

INSURED COPY

PB 00 02 (01-01)

a. Deliver materials or services to you, or to others for your account. Services does not include water, steam, fuel, communication, or power supply services.

b. Purchase your products or services.

c. Manufacture products for delivery to your customers under contract of sale.

d. Attract customers to your business. But this does not include firms in the business of promoting or advertising your business.

7. "Electronic Media and Records" means:

a. Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

b. Data stored on such media; or

c. Programming records used for electronic data processing or electronically controlled equipment.

8. "Extra Expense" means expense incurred:

a. To avoid or minimize the suspension of business and to continue "operations":

1) At the described premises; or

2) At replacement premises or at temporary locations, including relocation expenses and costs to equip and operate the replacement or temporary locations.

b. To minimize the suspension of business if you cannot continue "operations".

c. (1) To repair or replace any property; or

(2) To research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under the Extra Expense Additional Coverage or the Business Income Additional Coverage.

9. "Hazardous substance" means any substance other than ammonia that has been declared to be hazardous to health by a governmental agency.

PB 00 02 (01-01)

ACP BPH 7801069841                    INSURED COPY

10. "Money" means:

a. Currency, coins and bank notes whether or not in current use and having a face value; and

b. Travelers checks, register checks and money orders held for sale to the public.

11. "Operations" mean your business activities occurring at the described premises.

12. "Ordinary payroll expenses" mean payroll expenses for all your employees except:

a. Officers;

b. Executives;

c. Department Managers;

d. Employees under contract; and

e. Additional Exemptions shown in the Declarations as:

1) Job Classifications; or

2) Employees.

Ordinary payroll expenses include:

a. Payroll;

b. Employee benefits, if directly related to payroll;

c. FICA payments you pay;

d. Union dues you pay; and

e. Workers' compensation premiums.

13. "Period of restoration" means:

a. For other than the Dependent Properties Additional Coverage and Business Income and Extra Expense – Increased Period of Restoration Due to Ordinance or Law Additional Coverage:

1) The period of time that:

a) Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b) Ends on the earlier of:

i) The date when the property at the described premises should be re-

Page 35 of 38

7B   03083

paired, rebuilt or re-placed with reasonable speed and similar quality; or

    ii)   The date when business is resumed at a new per-manent location.

  2)  "Period of restoration" does not include any increased period re-quired due to the enforcement of any ordinance or law that:

    a)  Regulates the construction, use or repair, or requires the tearing down of any property; or

    b)  Requires any insured or oth-ers to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

  3)  The expiration date of this policy will not cut short the "period of restoration".

b.  For Business Income and Extra Ex-pense - Increased Period of Restora-tion Due to Ordinance or Law Additional Coverage:

  1)  The period of time that:

    a)  Begins:

      i)  At the time of direct physical loss or damage for Business Income Ad-ditional Coverage;

      ii)  or immediately after the time of direct physical loss or damage for Extra Expense Additional Cov-erage:

    Caused by or resulting from any Covered Cause of Loss at the described premises; and

    b)  Ends on the earlier of:

      i)  The date when the prop-erty at the described premises should be re-paired, rebuilt or re-placed with reasonable speed and similar quality; or

      ii)  The date when business is resumed at a new per-manent location.

  2)  "Period of restoration" includes any increased period required to repair or reconstruct the property to conform with the minimum standards or any ordinance or law, in force at the time of loss, that regulates the construction or re-pair, or requires the tearing down of any property.

  3)  The expiration date of this policy will not cut short the "period of restoration".

c.  For Dependent Properties Additional Coverage:

  1)  The period of time that:

    a)  Begins:

      i)  24 hours after the time of direct physical loss or damage for Business In-come Additional Cover-age; or

      ii)  Immediately after the time of direct physical loss or damage for Extra Expense;

    Caused by or resulting from any Covered Cause of Loss at the premises of the "de-pendent property"; and

    b)  Ends on the earlier of:

      i)  The date when the prop-erty at the premises of the "dependent property" should be repaired, re-built or replaced with reasonable speed and similar quality; or

      ii)  The date when your busi-ness is resumed at a permanent new location.

  2)  "Period of restoration" does not include any increased period re-quired due to the enforcement of any ordinance or law that:

    a)  Regulates the construction, use or repair, or requires the

ACP BPH 7801069841

INSURED COPY

tearing down of any property;
or

b)   Requires any insured or oth-
ers to test for, monitor, clean
up, remove, contain, treat,
detoxify or neutralize, or in
any way respond to or assess
the effects of "pollutants".

3)   The expiration date of this policy
will not cut short the "period of
restoration".

14.   "Perishable goods" mean personal property
maintained under controlled conditions for
its preservation, and susceptible to loss or
damage if the controlled conditions change.

15.   "Pollutants" mean any solid, liquid,
gaseous or thermal irritant or contaminant,
including but not limited to smoke, vapor,
soot, fumes, acids, alkalis, petroleum pro-
ducts and their derivatives, chemicals and
waste. Such irritants or contaminants are
"pollutants" whether or not they have any
function in your business, operations,
premises, sites or locations.

Waste includes but is not limited to materi-
als to be recycled, reconditioned or re-
claimed and livestock, poultry or other
animal excrement.

16.   "Securities" mean negotiable and non-
negotiable instruments or contracts re-
presenting either "money" or other
property and includes:

a.   Tokens, tickets, revenue and other
stamps (whether represented by actual
stamps or unused value in a meter)
whether or not in current use; and

b.   Evidences of debt issued in connection
with credit or charge cards, which
cards are not issued by you;

It does not include "money" or lottery tick-
ets held for sale.

17.   "Specified Causes of Loss" means the fol-
lowing:

Fire; lightning; explosion, windstorm or hail;
smoke; aircraft or vehicles; riot or civil
commotion; vandalism; leakage from fire
extinguishing equipment; sinkhole collapse;
volcanic action; falling objects; weight of
snow, ice or sleet; water damage.

a.   Sinkhole collapse means the sudden
sinking or collapse of land into under-
ground empty spaces created by the
action of water on limestone or
dolomite. This cause of loss does not
include:

1)   The cost of filling sinkholes; or

2)   Sinking or collapse of land into
man-made underground cavities.

b.   Falling objects does not include loss
of or damage to:

1)   Personal property in the open; or

2)   The interior of a building or struc-
ture, or property inside a building
or structure, unless the roof or an
outside wall of the building or
structure is first damaged by a
falling object.

c.   Water damage means accidental dis-
charge or leakage of water or steam
as the direct result of the breaking
apart or cracking of any part of a sys-
tem or appliance (other than a sump
system including its related equipment
and parts) containing water or steam.

HOWEVER, damage from constant or
repeated seepage or leakage of water
or steam over a period of weeks,
months or years from any part of a
system or appliance containing water
or steam is not water damage.

18.   "Stock" means merchandise held in stor-
age or for sale, raw materials and in-
process or finished goods, including
supplies used in their packing or shipping.

19.   "Valuable papers and records" mean in-
scribed, printed, or written:

a.   Documents;

b.   Manuscripts; and

c.   Records;

PB 00 02 (01-01)

including abstracts, books, deeds, drawings, films, maps or mortgages.

HOWEVER, "valuable papers and records" does not mean:

d.   "Money" or "Securities";

e.   Converted Data;

f.   Programs or instructions used in your data processing operations, including the materials on which the data is recorded.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1999

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

# PREMIER BUSINESSOWNERS
# LIABILITY COVERAGE FORM

## TABLE OF CONTENTS

I.   COVERAGES ........................................................................................................ 2
    COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY ........................ 2
        INSURING AGREEMENT ............................................................................... 2
        EXCLUSIONS ................................................................................................ 2
        TENANTS PROPERTY DAMAGE LEGAL LIABILITY ........................................ 3
    COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY ........................... 9
        INSURING AGREEMENT .............................................................................. 10
        EXCLUSIONS ............................................................................................... 10
    COVERAGE C - MEDICAL PAYMENTS .................................................................... 10
        INSURING AGREEMENT .............................................................................. 13
        EXCLUSIONS ............................................................................................... 13
    SUPPLEMENTARY PAYMENTS - COVERAGES A AND B ........................................ 13
II.  WHO IS AN INSURED .......................................................................................... 13
    Automatic Additional Insureds .......................................................................... 15
        Co-Owners of Insured Premises .................................................................... 16
        Controlling Interest ...................................................................................... 16
        Grantor of Franchise or License .................................................................... 16
        Lessors of Leased Equipment ....................................................................... 16
        Managers or Lessors of Leased Premises ...................................................... 16
        Mortgagee, Assignee or Receiver .................................................................. 17
        Owners or Other Interest from Whom Land has been Leased ......................... 17
        State or Political Subdivisions - Permits Relating to Premises ........................ 17
III. LIMITS OF INSURANCE AND DEDUCTIBLE ......................................................... 17
    General Aggregate Limit of Insurance (Other than Products-Completed Operations) .. 18
    Products-Completed Operations Aggregate Limit of Insurance ............................. 18
    Personal and Advertising Injury Limit of Insurance ............................................. 18
    Each Occurrence Limit of Insurance ................................................................... 18
    Tenants Property Damage Legal Liability Limit of Insurance ................................ 18
    Medical Payments Limit of Insurance ................................................................. 18
    Property Damage Deductible ............................................................................. 18
IV.  LIABILITY CONDITIONS ..................................................................................... 18
    Bankruptcy ...................................................................................................... 19
    Duties in the Event of Occurrence, Offense, Claim or Suit .................................. 19
    Financial Responsibility Laws ............................................................................ 19
    Legal Action Against Us ....................................A............................................... 20
    Separation of Insureds ..................................................................................... 20
V.   DEFINITIONS ..................................................................................................... 20
                                                                                            21

PB 00 06 (01-01)

# PREMIER BUSINESSOWNERS
# LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Please read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations,, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance. The word "insured" means any person or organization qualifying as such under Section II. WHO IS AN INSURED. Other words and phrases that appear in quotation marks have special meaning. Please refer to Section V. DEFINITIONS.

## I.    COVERAGES

## A.    COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1.    INSURING AGREEMENT

a.    We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.

HOWEVER, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

We may, at our sole discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

1)    The amount we will pay for damages is limited as described in Section III. LIMITS OF INSURANCE; and

2)    Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under COVERAGES A or B or medical expenses under COVERAGE C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

b.    This insurance applies to "bodily injury" and "property damage" only if:

1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

2)    The "bodily injury" or "property damage" occurs during the policy period; and

3)    Prior to the policy period, no insured listed under Paragraph 1. of Section II. WHO IS AN INSURED and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.    "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II. WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II. WHO IS AN INSURED or any "employee" authorized

by you to give or receive notice of an "occurrence" or claim:

1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. EXCLUSIONS

This insurance, including any duty we have to defend "suits", does not apply to:

a. Expected Or Intended Injury

"Bodily injury" or "property damage" which is expected or intended by the insured.

This exclusion applies even if the resulting "bodily injury" or "property damage":

1) Is of a different kind, quality or degree than initially expected or intended; or

2) Is sustained by a different person, entity, real property, or personal property than that initially expected or intended.

HOWEVER, this exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

1) That the insured would have in the absence of the contract or agreement; or

2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

1) Causing or contributing to the intoxication of any person;

2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

1) Manufacture, sell or distribute alcoholic beverages;

2) Serve or furnish alcoholic beverages for a charge whether or not such activity:

a) Requires a license; or

ACP BPH 7801068841                    INSURED COPY

b)   is for the purpose of financial gain or livelihood; or

3)   Serve or furnish alcoholic beverages without a charge, if a license is required for such activity.

d.   **Laws**

Any liability or legal obligation of any insured with respect to "bodily injury" or "property damage" arising out of any of the following:

1)   Any federal, state, county, municipal or local law, ordinance, order, directive or regulation barring discrimination, including but not limited to those based on race, color, national origin, ancestry, citizenship, gender, sexual orientation, marital status, religion or religious belief, age, economic status, income, medical condition, pregnancy, parenthood or mental or physical disability;

2)   Any workers' compensation, unemployment compensation, disability benefits law, or any other statutory benefits law;

3)   The Migrant and Seasonal Agricultural Worker Protection Act;

4)   Any state, federal or governmental antitrust statute or regulation, including but not limited to the Racketeer Influenced and Corrupt Organizations Act (RICO), the Securities Act of 1933, the Securities Exchange Act of 1934, or any state Blue Sky law;

5)   The Employees' Retirement Income Security Act (E.R.I.S.A.) of 1974; or

6)   Any other similar statutes, ordinances, orders, directives or regulations.

e.   **Employer's Liability**

"Bodily injury" to:

1)   An "employee" of the insured arising out of and in the course of:

a)   Employment by the insured; or

b)   Performing duties related to the conduct of the insured's business; or

2)   The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph 1) above.

This exclusion applies:

1)   Whether the insured may be liable as an employer or in any other capacity; and

2)   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f.   **Pollution**

1)   "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a)   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

HOWEVER, this subparagraph does not apply to:

i)   "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

ii)   "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is

PB 00 06 (01-01)

not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

   iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on, or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

HOWEVER, this subparagraph does not apply to:

   i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional dis-

charge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

   ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

   iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

2) Any loss, cost or expense arising out of any:

a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

b) Claim or "suit" by or on behalf of a governmental authority for damages because of test-

ACP BPH 7801060641

INSURED COPY

PB 00 06 (01-01)

ing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

HOWEVER, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g.  **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading".

HOWEVER, this exclusion does not apply to:

1)  A watercraft while ashore on premises you own or rent;

2)  A watercraft you do not own that is:

    a)  Less than 26 feet long; and

    b)  Not being used to carry persons or property for a charge;

3)  Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

4)  Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

5)  "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.2) or f.3) of the definition of "mobile equipment".

h.  **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

1)  The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

2)  The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i.  **War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war.  War includes civil war, insurrection, rebellion or revolution.  This exclusion applies only to liability assumed under a contract or agreement.

j.  **Damage To Property**

"Property damage" to:

1)  Property you own, rent, or occupy;

2)  Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

3)  Property loaned to you;

4)  Personal property in the care, custody or control of the insured;

5)  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

6)  That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Other than damage by the Covered Causes of Loss provided under Tenants Property Damage Legal Liability, paragraph 1), 3) and 4) of this exclusion do not apply to "property damage" to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days.  A

PB 00 06 (01-01)

ACP BPH 7801069841                          INSURED COPY

PB 00 06 (01-01)

separate limit of insurance applies to Damage To Premises Rented To You as described in Section III. LIMITS OF INSURANCE.

Paragraph 2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs 3), 4), 5) and 6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph 6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k.   **Damage To Your Product**

"Property damage" to "your product", arising out of it or any part of it.

l.   **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

HOWEVER, this exclusion does not apply if the damaged work, or the work out of which the damage arises, was performed on your behalf by a subcontractor.

m.   **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

1)   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

2)   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n.   **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1)   "Your product";

2)   "Your work"; or

3)   "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o.   **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

p.   **Bodily Injury To Any Insured** "Bodily injury" to:

1)   Any insured; or

2)   Any insured whenever the ultimate benefits of any indemnification will accrue directly or indirectly to any insured or the heirs of any insured.

q.   **Damage To Named Insured's Property**

Any claim or "suit" for "property damage" by you or on your behalf against any other person or organization that is also a Named Insured under this policy.

r.   **Abuse or Molestation**

"Bodily injury" or "property damage" arising out of:

1)   The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

2)   The negligent:

a)   Employment;

b)   Investigation;

c)   Supervision;

*Not part of denial ltr*

d)   Reporting to the proper authorities, or failure to so report; or

e)   Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1) above.

s.   **Asbestos, Electromagnetic Emissions, Lead or Radon**

"Bodily injury" or "property damage" arising out of:

1)   Asbestos including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of asbestos or any other duty involving asbestos;

2)   Electromagnetic emissions or radiation including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of electromagnetic emissions or radiation or any other duty involving electromagnetic emissions or radiation;

3)   Lead including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of lead or any other duty involving lead; or

4)   Radon or any other radioactive emissions, manmade or natural, including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance act, error, omission, failure to disclose or warn of the presence of radon or any other

radioactive emissions or any other duty involving radon or other radioactive emissions.

t.   **Employment Practices**

"Bodily injury" to:

1)   A person arising out of any:

a)   Refusal to employ that person;

b)   Termination of that person's employment; or

c)   Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

2)   The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs a), b), or c) above is directed.

This exclusion applies:

1)   Whether the insured may be liable as an employer or in any other capacity; and

2)   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

u.   **Fiduciary Responsibility**

"Bodily injury" or "property damage" arising out of the ownership, maintenance or use, including all related operations, of property in relation to which you or any insured is acting in any fiduciary or representative capacity.

v.   **Professional Services**

"Bodily injury" or "property damage" that arises out of or is a result of the rendering of, or failure to render, any professional service, treatment, advice or instruction. This exclusion includes, but is not limited to, any:

PB 00 06 (01-01)

1) Legal, accounting, insurance, real estate, financial, advertising or consulting service, advice or instruction;

2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

3) Supervisory, inspection, engineering, or architectural service, advice or instruction;

4) Medical, surgical, psychiatric, chiropractic, chiropody, physiotherapy, osteopathy, acupuncture, dental, x-ray, nursing or any other health service, treatment, advice or instruction;

5) Any psychological therapy or any other counseling or mental health service, treatment, advice or instruction;

6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming, including but not limited to cosmetology, tonsorial, tattooing, tanning or massage;

7) Optometry or optical or hearing aid service, treatment, advice or instruction, including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

8) Ear or other body piercing service, treatment, advice or instruction; or

9) Service, treatment, advice or instruction in the practice of pharmacy.

w. Testing, Evaluating or Consulting

"Bodily injury" or "property damage" arising out of:

1) An error, omission, defect or deficiency:

   a) In any test performed, or any evaluation, consultation or advice given by or on behalf of you or any insured; or

   b) In experimental data or the insured's interpretation of that data.

2) The reporting of or reliance upon any such test, evaluation, consultation or advice.

3. TENANTS PROPERTY DAMAGE LEGAL LIABILITY

Certain Exclusions Not Applicable

Exclusions c. through n., p., q., r., t., u., v. and w. do not apply to "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner, if such "property damage" arises out of a Covered Cause Of Loss provided under the BUSINESSOWNERS PROPERTY COVERAGE FORM. A separate limit of insurance, called Tenants Property Damage Legal Liability Limit, applies to this coverage as described in Section III. LIMITS OF INSURANCE.

PB 00 06 (01-01)

ACP BPH 7801069841

INSURED COPY

B.  **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

1.  **INSURING AGREEMENT**

    a.  We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.

    HOWEVER, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

    We may, at our sole discretion, investigate any offense and settle any claim or "suit" that may result. But:

    1)  The amount we will pay for damages is limited as described in Section III. LIMITS OF INSURANCE; and

    2)  Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under COVERAGES A or B or medical expenses under COVERAGE C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

    b.  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2.  **EXCLUSIONS**

    This insurance, including any duty we have to defend "suits", does not apply to:

    a.  "Personal and advertising injury":

    1)  Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

    2)  Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

    3)  Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

    4)  Arising out of a criminal act committed by or at the direction of any insured;

    5)  For which the insured has assumed liability in a contract or agreement.

    HOWEVER, this exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

    6)  Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

    7)  Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

    8)  Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

    9)  Committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

    HOWEVER, this exclusion does not apply to Paragraphs a., b. and c. of the definition of "personal and advertising injury" under Section V. DEFINITIONS;

    10)  Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

    11)  Any liability or legal obligation of any insured arising out of any of the following:

ACP BPH 7801068841                        INSURED COPY

a) Any federal, state, county, municipal or local law, ordinance, order, directive or regulation barring discrimination, including but not limited to those based on race, color, national origin, ancestry, citizenship, gender, sexual orientation, marital status, parenthood, religion or religious belief, age, economic status, income, medical condition, pregnancy, or mental or physical disability;

b) Any workers' compensation, unemployment compensation, disability benefits law, or any other statutory benefits law;

c) The Migrant and Seasonal Agricultural Worker Protection Act;

d) Any state, federal or governmental antitrust statute or regulation, including but not limited to the Racketeer Influenced and Corrupt Organizations Act (RICO), the Securities Act of 1933, the Securities Exchange Act of 1934, or any state Blue Sky law;

e) The Employees' Retirement Income Security Act (E.R.I.S.A.) of 1974; or

f) Any other similar statutes, ordinances, orders, directives or regulations;

12) Arising out of:

a) The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

b) The negligent:

   i) Employment;

   ii) Investigation;

   iii) Supervision;

   iv) Reporting to the proper authorities, or failure to so report; or

   v) Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph a) above;

13) To:

a) A person arising out of any:

   i) Refusal to employ that person;

   ii) Termination of that person's employment; or

   iii) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

b) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs i), ii), or iii) above is directed.

This exclusion applies:

a) Whether the insured may be liable as an employer or in any other capacity; and

b) To any obligation to share damages with or repay someone else who must pay damages because of the injury;

14) Arising out of:

a) Asbestos including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of asbestos or any other duty involving asbestos;

b) Electromagnetic emissions or radiation including but not

limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of electromagnetic emissions or radiation or any other duty involving electromagnetic emissions or radiation;

c) Lead including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of lead or any other duty involving lead; or

d) Radon or any other radioactive emissions, manmade or natural, including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of radon or any other radioactive emissions or any other duty involving radon or other radioactive emissions;

15) That arises out of the ownership, maintenance or use, including all related operations, of property in relation to which you or any insured is acting in any fiduciary or representative capacity;

16) That arises out of or is a result of the rendering of, or failure to render, any professional service, treatment, advice or instruction. This exclusion includes, but is not limited to any:

a) Legal, accounting, insurance, real estate, financial, advertising or consulting service, advice or instruction;

b) Preparing, approving, or failing to prepare or approve

maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

c) Supervisory, inspection, engineering, or architectural service, advice or instruction;

d) Medical, surgical, psychiatric, chiropractic, chiropody, physiotherapy, osteopathy, acupuncture, dental, x-ray, nursing or any other health service, treatment, advice or instruction;

e) Any psychological therapy or any other counseling or mental health service, treatment, advice or instruction;

f) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming, including but not limited to cosmetology, tonsorial, tattooing, tanning or massage.

g) Optometry or optical or hearing aid service, treatment, advice or instruction, including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

h) Ear or other body piercing service, treatment, advice or instruction; or

i) Service, treatment, advice or instruction in the practice of pharmacy; or

17) Arising out of:

e) An error, omission, defect or deficiency:

i) In any test performed, or any evaluation, consultation or advice given by or on behalf of you or any insured; or

ii) In experimental data or the insured's interpretation of that data.

PB 00 06 (01-01)

b) The reporting of or reliance upon any such test, evaluation, consultation or advice.

b. Any loss, cost or expense arising out of any:

1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any responding to, or assessing the effects of, "pollutants".

## C. COVERAGE C - MEDICAL PAYMENTS

1. INSURING AGREEMENT

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

1) On premises you own or rent;

2) On ways next to premises you own or rent; or

3) Because of your operations;

provided that:

1) The accident takes place in the "coverage territory" and during the policy period;

2) The expenses are incurred and reported to us within one year of the date of the accident; and

3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

1) First aid administered at the time of an accident;

2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

3) Necessary ambulance, hospital, professional nursing and funeral services.

2. EXCLUSIONS

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard".

g. Excluded under COVERAGE A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## D. SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

PB 00 06 (01-01)

ACP BPH 7801069841

INSURED COPY

d.   All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e.   All costs taxed against the insured in the "suit".

f.   Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.   All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2.   If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a.   The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b.   This insurance applies to such liability assumed by the insured;

c.   The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d.   The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e.   The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f.   The indemnitee:

1)   Agrees in writing to:

a)   Cooperate with us in the investigation, settlement or defense of the "suit";

b)   Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

c)   Notify any other insurer whose coverage is available to the indemnitee; and

d)   Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

2)   Provides us with written authorization to:

a)   Obtain records and other information related to the "suit"; and

b)   Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.2) of Section I. COVERAGE, A. COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a.   We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b.   The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**II.  WHO IS AN INSURED**

1.  If you are:

a.  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b.  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d.  A trust, you are an insured. Your trustee or co-trustees are also insureds, but only with respect to their duties as a trustee in connection with your property, operations and activities.

e.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2.  Each of the following is also an insured:

a.  Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

HOWEVER, none of these "employees" is an insured for:

1)  "Bodily injury" or "personal and advertising injury":

a)  To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

b)  To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph 1)a) above;

c)  For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs 1)a) or b) above; or

d)  Arising out of his or her providing or failing to provide professional health care services.

2)  "Property damage" to property:

a)  Owned, occupied or used by; or

b)  Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by,

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b.  Any person (other than your "employee"), or any organization while acting as your real estate manager.

c.  Any person or organization having proper temporary custody of your property if you die, but only:

1)  With respect to liability arising out of the maintenance or use of that property; and

2)  Until your legal representative has been appointed.

d.  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

3.  With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the

conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability.

HOWEVER, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization.

HOWEVER:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. COVERAGE A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. COVERAGE B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

5. No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

6. **Automatic Additional Insureds**

Any of the following persons or organizations are automatically insureds when you and such person or organization have agreed in a written contract or agreement that such person or organization be added as an additional insured on your policy providing general liability coverage.

a. **Co-Owners of Insured Premises**

Any person or organization with whom you co-own a premises insured under this policy is an additional insured, but only with respect to their liability as the co-owner of such premises.

HOWEVER, their status as additional insured under this policy ends when you cease to co-own such premises with that person or organization.

b. **Controlling Interest**

Any person or organization that has a controlling interest in you is an additional insured, but only with respect to liability arising out of:

1) Their financial control of you; or

2) Their ownership, maintenance or control of premises you lease or occupy;

subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to structural alterations, new construction or demolition operations performed by or for such person or organization.

HOWEVER, their status as additional insured under this policy ends when they cease to have such controlling interest in you.

c. **Grantor of Franchise or License**

Any person or organization that has granted you a franchise or license by written contract or agreement is an additional insured, but only with respect to their liability as the grantor of a franchise or license to you.

HOWEVER, their status as additional insured under this policy ends when their contract or agreement with you granting the franchise or license ends.

d. **Lessors of Leased Equipment**

Any person or organization from whom you lease equipment by written contract or agreement is an additional insured, but only with respect to their liability arising out of the maintenance,

PB 00 06 (01-01)

ACP BPH 7801069841                    INSURED COPY

operation or use by you of the equipment leased to you by that person or organization, subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to "bodily injury" or "property damage" arising out of, in whole or in part, or results from, in whole or in part, the active negligence of such person or organization.

HOWEVER, their status as additional insured under this policy ends when their contract or agreement with you for such leased equipment ends.

e.  **Managers or Lessors of Leased Premises**

Any person or organization from whom you lease premises is an additional insured, but only with respect to their liability arising out of your use of that part of the premises leased to you, subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to structural alterations, new construction or demolition operations performed by or for such person or organization.

HOWEVER, their status as additional insured under this policy ends when you cease to be a tenant of such premises.

f.  **Mortgagee, Assignee or Receiver**

Any person or organization who has status as mortgagee, assignee or receiver of your property is an additional insured, but only with respect to their liability as mortgagee, assignee or receiver arising out of your ownership, maintenance, or use of such premises, subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to structural alterations, new construction or demolition operations performed by or for such person or organization.

HOWEVER, their status as additional insured under this policy ends when their status as mortgagee, assignee or receiver ends.

g.  **Owners or Other Interest from Whom Land has been Leased**

Any person or organization from whom you lease premises is an additional insured, but only with respect to their liability arising out of your maintenance or use of that part of the land leased to you, subject to the following additional exclusion:

This insurance, including any duty we have to defend "suits", does not apply to structural alterations, new construction or demolition operations performed by or for such person or organization.

HOWEVER, their status as additional insured under this policy ends when you cease to lease that land.

h.  **State or Political Subdivisions - Permits Relating to Premises**

Any state or political subdivision which has issued a permit in connection with premises insured by this policy which you own, rent, or control is an additional insured, but only with respect to the following hazards:

1)  The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoistaway openings, sidewalk vaults, street banners, or decoration and similar exposures;

2)  The construction, erection, or removal of elevators; or

3)  The ownership, maintenance, or use of any elevators covered by this insurance.

HOWEVER, such state or political subdivision's status as additional insured under this policy ends when the permit ends.

III.  **LIMITS OF INSURANCE AND DEDUCTIBLE**

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  Claims made or "suits" brought; or

    c.  Persons or organizations making claims or bringing "suits".

2.  **General Aggregate Limit of Insurance (Other than Products-Completed Operations)**

    The General Aggregate Limit is the most we will pay for the sum of:

    a.  Medical expenses under COVERAGE C;

    b.  Damages under COVERAGE A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    c.  Damages under COVERAGE B.

    The General Aggregate Limit applies separately to each of your described premises. For the purposes of this provision, premises means involving the same or connecting lots, or premises whose connection is interrupted only by a public street, roadway or waterway, or railroad right-of-way.

3.  **Products-Completed Operations Aggregate Limit of Insurance**

    The Products-Completed Operations Aggregate Limit is the most we will pay under COVERAGE A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4.  **Personal and Advertising Injury Limit of Insurance**

    Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under COVERAGE B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5.  **Each Occurrence Limit of Insurance**

    Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    a.  Damages under COVERAGE A; and

    b.  Medical expenses under COVERAGE C

    because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6.  **Tenants Property Damage Legal Liability Limit of Insurance**

    Subject to 5. above, the Tenants Property Damage Legal Liability Limit is the most we will pay under COVERAGE A for damages because of all "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one "occurrence".

7.  **Medical Payments Limit of Insurance**

    Subject to 5. above, the Medical Payments Limit is the most we will pay under COVERAGE C for all medical expenses because of "bodily injury" sustained by any one person.

8.  The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

9.  **Property Damage Deductible**

    If a deductible amount is shown in the Liability Declarations, the following provisions apply:

    a.  If a deductible amount for Property Damage is shown in the Liability Declarations, any obligation by us under this policy to pay sums on your behalf because of "property damage", applies only to sums in excess of the deductible amount shown in the Declarations for any one "occurrence".

ACP BPH 7801068841                              INSURED COPY

PB 00 06 (01-01)

b.  If a deductible amount for Car Wash Property Damage is shown in the Liability Declarations, any obligation by us under this policy to pay sums on your behalf because of "property damage", applies only to sums in excess of the deductible amount shown in the Declarations for any one "claim".

c.  If we pay all or any part of a deductible to settle any claim or "suit", upon notification of such payment by us, you shall promptly reimburse us for the amount of the deductible that has been paid by us.

## IV.  LIABILITY CONDITIONS

The following conditions apply in addition to the COMMON POLICY CONDITIONS.

1.  **Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

2.  **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a.  You and any insured must see to it that we are notified as soon as practicable of an "occurrence" or an offense that may result in a claim.  To the extent possible, notice should include:

1)  How, when and where the "occurrence" or offense took place;

2)  The names and addresses of any injured persons and witnesses; and

3)  The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.  If a claim is made or "suit" is brought against any insured, you must:

1)  Immediately record the specifics of the claim or "suit" and the date received; and

2)  Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.  You and any other involved insured must:

1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

2)  Authorize us to obtain records and other information;

3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit";

4)  Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to

PB 00 06 (01-01)

ACP BPH 7801069841

INSURED COPY

Page 19 of 24

7B    03115

PB 00 06 (01-01)

which this insurance may also apply; and

5) Agree to be examined under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim or "suit". At our option and expense, any examination under oath may be video or audio taped as well as being recorded by stenographic record. In the event of an examination, an insured's answers must be signed.

d. No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Financial Responsibility Laws**

a. When this policy is certified as proof of financial responsibility for the future under the provision of any motor vehicle financial responsibility law, the insurance provided by the policy for "bodily injury" liability and "property damage" liability will comply with the provisions of the law to the extent of the coverage and limits of insurance required by law.

b. With respect to "mobile equipment" to which this insurance applies, we will provide any liability, uninsured motorists, underinsured motorists, no-fault

or other coverage required by any motor vehicle law. We will provide the required limits for those coverages.

4. **Legal Action Against Us**

No person or organization has a right under this policy:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

5. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

PB 00 06 (01-01)

## V. DEFINITIONS

The terms "you", "your", "we", "us", "our" and "insured" are defined in the Preamble of this Coverage Form. The following words or phrases, which appear in quotation marks throughout this Coverage Form and any of its endorsements, are defined as follows:

1. **"Advertisement"** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

2. **"Auto"** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. **"Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. **"Coverage territory"** means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      1) The injury or damage arises out of:

         a) Goods or products made or sold by you in the territory described in a. above; or

         b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. **"Employee"** includes a "leased worker". "Employee" does not include a "temporary worker".

PB 00 06 (01-01)

ACP BPH 7601069841

INSURED COPY

6. **"Executive officer"** means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. **"Hostile fire"** means one which becomes uncontrollable or breaks out from where it was intended to be.

8. **"Impaired property"** means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. **"Insured contract"** means:

   a. A contract for a lease of premises.

   HOWEVER, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury"

7B    03117

or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in 2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, forklifts, farm machinery, farm implements and other vehicles designed for use or used principally off public roads. This includes motorized golf carts, snowmobiles, and other land vehicles designed for recreational use;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles, other than snowmobiles, that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

       1) Power cranes, shovels, loaders, diggers or drills; or

       2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in paragraphs a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

       1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

       2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in paragraphs a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

    HOWEVER, self-propelled vehicles with the following types of permanently attached equipment are not "mobile

ACP BPH 7801059841

INSURED COPY

PB 00 06 (01-01)

equipment" but will be considered "autos":

1) Equipment designed primarily for:

a) Snow removal;

b) Road maintenance, but not construction or resurfacing; or

c) Street cleaning;

2) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; and

3) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, petroleum products and their derivatives, chemicals and waste. Such irritants or contaminants are "pollutants" whether or not they have any function in your business, operations, premises, sites or locations.

Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed and livestock, poultry or other animal excrement.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

1) Products that are still in your physical possession; or

2) Work that has not yet been completed or abandoned.

HOWEVER, "your work" will be deemed completed at the earliest of the following times:

a) When all of the work called for in your contract has been completed.

b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

HOWEVER, the "bodily injury" or "property damage" must occur away from premises you own or rent unless your business includes the selling, handling or distribution of "your prod-

uct" for consumption on premises you own or rent.

b. Does not include "bodily injury" or "property damage" arising out of:

1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

2) The existence of tools, uninstalled equipment or abandoned or unused materials.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

1) You;

2) Others trading under your name; or

3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

21. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
Copyright, Insurance Services Office, Inc., 1997

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

INTERLINE
LI 00 21 (01-01)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION
## (BROAD FORM)

All Coverage Parts included in this policy that provide Liability Coverage are subject to the following exclusion.

A.   This insurance does not apply:

1.   Under any Liability Coverage, to "bodily injury" or "property damage":

a.   With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b.   Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

1)   Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

2)   The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.   Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

3.   Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

a.   The "nuclear material":

1)   Is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured"; or

2)   Has been discharged or dispersed therefrom;

b.   The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

c.   The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to "property damage" to such "nuclear facility" and any property thereat.

B.   As used in this endorsement:

1.   "Hazardous properties" includes radioactive, toxic or explosive properties.

2.   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

3.   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

4.   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

5.   "Waste" means any waste material:

a.   Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of

LI 00 21 (01-01)

uranium or thorium from any ore processed primarily for its "source material" content; and

b. Resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

6. "Nuclear facility" means:

a. Any "nuclear reactor";

b. Any equipment or device designed or used for:

1) Separating the isotopes of uranium or plutonium;

2) Processing or utilizing "spent fuel"; or

3) Handling, processing or packaging "waste";

c. Any equipment or device used for the processing, fabricating or alloying of

"special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

d. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

7. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

8. "Property damage" includes all forms of radioactive contamination of property.

All terms and conditions of this policy apply unless modified by this endorsement.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

BUSINESSOWNERS
PB 00 09 (01-01)

# PREMIER BUSINESSOWNERS
# COMMON POLICY CONDITIONS

Various provisions in this policy restrict coverage. Please read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insureds shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

All coverages of this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. Five (5) days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy.

      1) The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

         a) Seasonal unoccupancy; or

         b) Buildings in the course of construction, renovation or addition.

         Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

      2) After damage by a covered cause of loss, permanent repairs to the building:

         a) Have not started, and

         b) Have not been contracted for,

         within 30 days of initial payment of loss.

      3) The building has:

         a) An outstanding order to vacate;

         b) An outstanding demolition order; or

         c) Been declared unsafe by governmental authority.

      4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

      5) Failure to:

         a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

         b) Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

   b. Ten (10) days before the effective date of cancellation if we cancel for non-payment of premium.

   c. Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro

PB 00 09 (01-01)

ACP BPH 7801069841

INSURED COPY

Page 1 of 4

78    03126

rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

1. This policy contains all the agreements between you and us concerning the insurance afforded.

2. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent.

3. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. CONCEALMENT, MISREPRESENTATION OR FRAUD

1. This policy is void in its entirety in any case of fraud, at any time, by you or your representative as it relates to this policy.

2. This policy is also void if you, your authorized representative or any other insured, at any time, conceal or misrepresent any material fact, or violate any material warranty, concerning:

   a. This policy, including your application for this policy;

   b. The Covered Property;

   c. Your interest in the Covered Property; or

   d. A claim under this policy.

3. We also have the right to rescind this policy based upon any other grounds provided by law.

## D. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy or to any claim arising under this policy at any time during the policy period and up to three years afterward.

## E. INSPECTIONS AND SURVEYS

1. We have the right but are not obligated to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## F. INSURANCE UNDER TWO OR MORE COVERAGES OF THIS POLICY

If two or more of this policy's coverages apply to the same injury, loss or damage, we will not pay more than the actual amount of the injury, loss or damage, up to the highest applicable Limit of Insurance under any one coverage.

## G. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

## H. OTHER INSURANCE

1. Under any property coverage provided by this policy, if there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

2. Under any liability coverage provided by this policy,

   a. If, for injury or loss we cover, there is other valid and collectible insurance available to any insured under another policy:

      1) Issued by another insurer, or if there is self insurance or similar

risk retention that applies to a loss covered by this policy, then this insurance provided by us shall be excess over such other insurance; or

2) Issued by us that applies to a loss covered by this policy, then only the highest applicable Limit of Insurance shall apply to such loss. This condition does not apply to any policy issued by us which is designed to provide Excess or Umbrella liability insurance.

b. This insurance, if applicable, is also excess, whether that other insurance is primary, excess, contingent or provided on any other basis:

1) Over any applicable property insurance or other insurance that insures for direct physical loss or damage;

2) Over any valid and collectible insurance available to you as an additional insured under a policy issued to a tenant renting or leasing land or premises from you; or

3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. under Section I. COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY of the Premier Businessowners Liability Coverage Form.

c. When this insurance is excess, we will have no duty under the liability coverage provided by this policy to defend any insured against any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to any insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this policy.

d. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

I. **PREMIUMS**

1. The first Named Insured shown in the Declarations:

a. Is responsible for the payment of all premiums; and

b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. Undeclared exposures or change in your business operation and acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules in effect at the inception of such policy.

J. **PREMIUM AUDIT**

1. We have the right but are not obligated to audit this policy. The first Named Insured must keep records of the information we

ACP BPH 7801069841

INSURED COPY

78    0312B

need for premium computation, and send us copies of those records at such times as we may request.

2. If we do audit your policy, at the close of that audit period, we will compute the earned premium for that period and the final premium due based upon your actual exposures.

3. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

K. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

1. Applicable to Businessowners Property Coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

a. Prior to a loss to your Covered Property.

b. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

1) Someone insured by this insurance;

2) A business firm:

a) Owned or controlled by you; or

b) That owns or controls you; or

3) Your tenant, but only with our written consent.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

2. Applicable to Businessowners Liability Coverage:

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Payments Coverage.

L. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

1. Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

2. If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

BUSINESSOWNERS
PB 29 99 (01-02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - FUNGI OR BACTERIA
# (WITH LIMITED PROPERTY COVERAGE)

This endorsement modifies insurance provided under the following:

PREMIER BUSINESSOWNERS PROPERTY COVERAGE FORM
PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM

**A.** **AMENDMENT TO THE PREMIER BUSINESSOWNERS PROPERTY COVERAGE FORM**

1. In Section A. COVERAGES, under paragraph 5. ADDITIONAL COVERAGES, the following additional coverage is added:

   u. **Additional Coverage - Limited Coverage For Fungi, Wet Rot, Dry Rot And Bacteria**

   1) The coverage described in paragraphs 2) through 6) below applies:

      a) Only when the "fungi", wet or dry rot or bacteria is the result of a "specified cause of loss", other than fire or lightning, that occurs during the policy period; and

      b) Only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence..

   2) We will pay for loss or damage by "fungi", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

      a) Direct physical loss or damage to Covered Property caused by "fungi", wet or dry rot or bacteria, including the cost of removal of the "fungi", wet or dry rot or bacteria;

      b) The cost to tear out and replace any part of the building or other property as needed

      to gain access to the "fungi", wet or dry rot or bacteria; and

      c) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet or dry rot or bacteria are present.

   3) The coverage described under paragraph 2) of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all such loss or damage arising out of all occurrences of "specified causes of loss", other than fire or lightning, which take place in a 12-month period, starting with the beginning of the present annual policy period. With respect to a particular occurrence of loss which results in "fungi", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungi", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

   4) The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5)  The terms of this Limited Coverage do not increase or reduce the coverage provided under either Additional Coverage e. Collapse or f. Water Damage, Other Liquids, Powder Or Molten Material Damage.

6)  Under Additional Coverages g. Business Income and/or h. Extra Expense:

a)  If the loss which resulted in "fungi", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungi", wet or dry rot or bacteria, then our payment under the Business Income and/or Extra Expense Additional Coverages is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

b)  If a covered "suspension" of "operations" was caused by loss or damage damage other than "fungi", wet or dry rot or bacteria but remediation of of "fungi", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay, regardless of when such a delay occurs during the "period of restoration", but such coverage is limited to 30 days. The days need not be consecutive.

2.  In Section B. EXCLUSIONS, under paragraph 1., the following exclusion is added:

ACP BPH 78D1069B41                    INSURED COPY

h.  Fungi, Wet Rot, Dry Rot And Bacteria

Presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot or bacteria.

But if "fungi", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

1)  When "fungi", wet or dry rot or bacteria results from fire or lightning; or

2)  To the extent that coverage is provided in the Additional Coverage - Limited Coverage For Fungi, Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a "specified cause of loss" other than fire or lightning.

3.  In Section B. EXCLUSIONS, under paragraph 2., exclusion c. Leakage or Seepage is replaced by the following:

c.  Leakage or Seepage

Constant or repeated discharge, seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, whether continuous or intermittent from any:

1)  Heating, air conditioning or refrigerating system;

2)  Appliance; or

3)  Fire protection or plumbing system, including from or around any shower bath installation, bathtub or other plumbing fixture.

4.  In Section B. EXCLUSIONS, under paragraph 2., exclusion j. Other Types Of Loss, paragraph (2) is replaced by the following:

j.  Other Types Of Loss

2)  Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

B. **AMENDMENTS TO THE PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM**

1. In Section I. COVERAGES, COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, under paragraph 2. EXCLUSIONS, the following exclusions are added:

This insurance, including any duty we have to defend "suits", does not apply to:

**Fungi or Bacteria**

a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for:

   1) The actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents; or

   2) The failure to warn or to disclose the presence of "fungi" or bacteria;

   regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

HOWEVER, this exclusion does not apply to any "fungi" or bacteria that are, are on or are contained in, "your product" intended for human or animal consumption.

2. In Section I. COVERAGES, COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY, under paragraph 2. EXCLUSIONS, the following exclusions are added:

This insurance, including any duty we have to defend "suits", does not apply to:

**Fungi or Bacteria**

a. "Personal and advertising injury" which would not have occurred, in whole or in part, but for:

   1) The actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents; or

   2) The failure to warn or to disclose the presence of "fungi" or bacteria;

   regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. **ADDITIONAL DEFINITION**

The following definition is added to:

1. The PREMIER BUSINESSOWNERS PROPERTY COVERAGE FORM, under Section H. DEFINITIONS; and

2. The PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM, under Section V. DEFINITIONS.

"Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi.

All terms and conditions of this policy apply unless modified by this endorsement.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2001

**IMPORTANT INSURANCE INFORMATION**    ★★★★★★★★★

Please read this Notice carefully. No coverage is provided by this notice nor can it be construed to replace any provision of your policy. You should read your policy and review your declarations page for complete information on the coverages you are provided. If there is any conflict between the policy and this notice, the provisions of the policy shall prevail.

## Exclusion - Fungi or Bacteria
## (With Limited Property Coverage)

**Fungi or Bacteria.** This Notice communicates our coverage intent on an emerging issue confronting the insurance industry - loss or damage from fungi or mold claims. Claims for mold or fungi damage have been increasing markedly in frequency and severity in recent months, to a point where the insurance industry has become concerned with the large financial impact threatened by this increasing problem not yet reflected in our premium.

Under property, we have responded by adding an additional coverage, limitations and exclusions that will offset damages in whole or in part, but will also limit the fungi loss in a 12 month period to $15,000 for certain covered specified causes of loss, other than fire and lightning. For liability, the mold exposure would be excluded.

**Rates.** Our rates have not reflected the exposure to the emerging mold claims, thus this change to your coverage is viewed as a mitigation of future rate increases rather than a change that would lead to a reduction in your current rates.

IN 71 86 (01-02)

ACP BPH 7801069841                    **INSURED COPY**                    7B    03121

EFFECTIVE DATE: 12:01 AM Standard Time,
(at your principal place of business)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ THIS CAREFULLY.**

# CALIFORNIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

PREMIER BUSINESSOWNERS COMMON POLICY CONDITIONS
PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM

A. **CANCELLATION**

In the COMMON POLICY CONDITIONS, Condition A. CANCELLATION is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy at any time by giving us advance written notice of the date cancellation is to take effect.

2. **By Us-Policies in Effect 60 Days or Less**

   a. If this policy has been in effect for 60 days or less, and is not a renewal renewal of a policy we issued, we may cancel this policy for any reason by mailing or delivering to the first Named Insured and the producer of record written notice of cancellation stating the reason for cancellation at least:

      1) Ten (10) days before the effective date of cancellation if we cancel for:

         a) Nonpayment of premium;

         b) Discovery of fraud or material misrepresentation by:

            i) Any insured, or insured person, or his or her representative in obtaining this Policy; or

            ii) You or your representative in pursuing a claim under this Policy.

      2) Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

3. **By Us - Policies in Effect More Than 60 Days**

   a. If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy

only upon the occurrence, after the effective date of the policy, of one or more of the following:

1) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

2) Discovery of fraud or material misrepresentation by:

   a) Any insured or his or her representative in obtaining this insurance; or

   b) You or your representative in pursuing a claim under this policy.

3) A judgment by a court or an administrative tribunal that you have violated any state law or any federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

4) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

5) Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

PB 90 04 (01-01)

ACP BPH 7801069841

INSURED COPY

6) A determination by the Commissioner of Insurance that the:

   a) Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

   b) Continuation of the policy coverage would:

      i) Place us in violation of the laws of this state or the state of our domicile; or

      ii) Threaten our solvency.

7) A change by you or your representative in the activities or property of your commercial or industrial enterprise that results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

b. If we cancel, we will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured and to the producer of record, at least:

1) Ten (10) days before the effective date of cancellation if we cancel for a reason listed in 3.a.(1) or (2).

2) Thirty (30) days before the effective date of cancellation if we cancel for any other reason listed in 3.a.

4. We will mail or deliver our notice to the first Named Insured at the address shown on the policy Declarations.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. However, our failure to make or offer a refund does not make the cancellation ineffective nor reinstate the policy.

7. If notice is mailed, proof of mailing will be sufficient proof of notice.

8. Instead of canceling your policy for any of the reasons stated in Paragraph 3.a.(4), (5), (6)(a), and (7) above, we may, at our sole option, revise your policy by:

   a. Increasing your premium in accordance with our current rates and rules;

   b. Reducing your policy Limits of Insurance; or

   c. Changing the conditions of your coverage.

If we exercise these rights, we will give the first Named Insured shown in the Declarations and the producer of record at least 30 days advance written notice of the effective date and the reasons for such increase, reduction or change.

9. **Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units.

   a. If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in b. and c. below.

   b. We may not cancel this policy solely because the first Named Insured has accepted an offer of earthquake coverage.

   c. We may not cancel such coverage solely because corrosive soil conditions exist on the premises.

B. **NONRENEWAL/CONDITIONAL RENEWAL**

The following is added to the COMMON POLICY CONDITIONS and supercedes any provisions to the contrary:

1. **NONRENEWAL**

   a. We may nonrenew your policy for any reason not prohibited by applicable law.

   b. If we decide not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least sixty (60) days, but not

ACP BPH 7891069841          INSURED COPY

more than 120 days, before the expiration date.

2.  **CONDITIONAL RENEWAL**

    Instead of nonrenewing your policy, we may, at our sole option, offer you a conditional renewal of your policy based upon a reduction of your policy Limits of Insurance, an elimination of coverages, an increase in deductibles and/or an increase of more than 25% in the rate upon which the premium is based. If we decide to offer a conditional renewal of this policy, we will mail or deliver written notice stating the reason for such conditional renewal to the first Named Insured shown in the Declarations and to the producer of record within the time periods specified in paragraph 1. above.

3.  We will mail or deliver our notice of nonrenewal or conditional renewal to the first Named Insured at the address shown on the policy Declarations. Proof of mailing shall be sufficient proof of notice.

4.  We are not required to send notice of nonrenewal in the following situations:

    a.  If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

    b.  If the policy has been extended for 90 days or less, provided that notice has been given in accordance with paragraph B.1.

    c.  If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

    d.  If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

    e.  If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period. If we have made a written offer to you, in accordance with the time periods shown in paragraph 1. above to conditionally renew the policy under changed terms or conditions or at an increased premium rate as specified in paragraph 2. above.

5.  **Residential Property**

    This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units.

    a.  We may elect not to renew such coverage for any reason, except as provided in b. and c. below:

    b.  We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

    c.  We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises.

C.  **ADDITIONAL LIABILITY EXCLUSION**

    In the LIABILITY COVERAGE FORM, under Section I. COVERAGES, the following exclusion is added to COVERAGES A and B:

    This insurance, including any duty we have to defend "suits", does not apply to:

    **Breach of Contract**

    "Bodily injury", "property damage" or "personal and advertising injury" that arises out of or is a result of any breach of a written or oral contract, any breach of any other written or oral agreement, or any breach of an express or implied warranty.

All terms and conditions of this policy apply unless modified by this endorsement.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1999

# EXHIBIT "A-3"

Eric M. Leeper
The Marston Building
San Diego, California 92101

Telephone
619•232•0086
Facsimile
619•232•0089

May 21, 2007



Neal H. Rockwood, Esq.
C. Brant Noziska, Esq.
ROCKWOOD & NOZISKA, LLP
5060 North Harbor Drive, Suite 255
San Diego, CA  92106

RE:     Hidden Glen Maintenance Corp. v. 1800 South Maple Street, LLC, et al.
San Diego Superior Court Case No. GIC852647
Policy No. ACP BPH 7801069841
Claim No. 84L52141

Dear Messrs. Rockwood and Noziska:

I have received and read your letter of May 7, 2007, regarding the request for coverage of the above-referenced litigation.  Please excuse my delay in responding; I had been busy with other matters, and wanted to make sure that I could give your letter careful consideration.

A.      The Request For Information

Initially, it should be noted that my letter of March 3, 2006, did not state that AMCO had unequivocally denied its insureds' request for coverage.  Rather, the letter requested specific information regarding the relationships between AMCO's named insureds and the defendants in the Hidden Glen action, and said that the request for coverage would be considered denied if no responsive information was provided.

The defendants named in the Hidden Glen complaint were Ralph and Keith Gianella (both individually and as co-trustees of a revocable trust), William Ayyad, William Ayyad, Inc., 1800 South Maple Street, LLC, Premier Communities, LLC, Dan Tomasi and Mark Holmes Construction.  The named insureds under AMCO policy no. ACP BPH 7801069841 are "ACDW Properties/Gianella Properties" and "4-Way Farms."  Accordingly, none of the named insureds were named defendants in the litigation.[1]  "South Maple Street LLC" is named as an additional insured on two endorsements, and may be the same entity as defendant "1800 South Maple Street, LLC," but the endorsements only cover liability as a "mortgagee, assignee or receiver," or as a manager or lessor of the property, and the complaint did not appear to make any allegations against any defendants acting in such a capacity.

---

[1] Your letter of May 7, 2007, does nothing to clear up the relationship between AMCO's insureds and the named defendants.  In fact, you state that you represent "Allied/Amco's insureds," and you refer to your "clients" having to pay a settlement, but you nowhere identify who those "insureds" or "clients" are.

Obviously, it could be assumed that there were connections between some of the named insureds and the named defendants -- e.g., Giannella Properties presumably involved Ralph and/or Keith Giannella, and Ralph Giannella and William Ayyad are involved with ACDW Properties. However, the mere existence of relationships as shareholders, owners, partners or employees does not create insurance coverage. Consequently, AMCO wanted information regarding the relationships, or some explanation of why it was believed that entities and/or individuals who were not named insureds were nonetheless entitled to coverage under the AMCO policy, so that careful consideration could be given to possible alternative grounds for coverage. Since both AMCO and I had independently concluded that the complaint did not allege any covered claims against the named or identified insureds, the refusal to respond to my request for information left us with no reason to believe that any of the defendants were entitled to insurance coverage.[2]

B.    The Insureds Have Not Been Accused Of Fraud

Neither AMCO's letter of November 10, 2005, nor my letter of March 3, 2006, accused your clients of "fraud." The letter of November 10 (which, contrary to your characterization, did not state that coverage had been denied), made no mention of the subject. My letter discussed the fact that the complaint's allegations, if true, indicated that material information had not been disclosed on the application for insurance, and that if subsequently "warranted by the facts," AMCO might seek rescission of the policy. This was only a reservation of rights; no claim was made that your clients engaged in fraud, or that they were directly responsible for any misrepresentation or nondisclosure on the application.

C.    AMCO Is Aware Of No Other Policies Covering Your Clients

The Hidden Glen litigation was originally tendered to AMCO under policy no. 7801069841, and the coverage analysis was performed under that policy. However, AMCO has checked to determine whether the defendants in that litigation might be insured, or whether the South Maple Street property is a "described premises," under any other policy. No such policy has been located.

D.    No Potential For Coverage Has Been Shown

It is significant that your letter nowhere attempts to address any of the specific reasons, discussed in detail in my letter of March 3, 2006, for my conclusion that coverage did not exist based on the facts known to AMCO. I still cannot see where the complaint in Hidden Glen alleges any potentially covered claim for "bodily injury" or "personal and advertising injury." And, it still seems clear that coverage of any claim for "property damage" would be completely precluded by the exclusions for "[p]roperty you own, rent, or occupy" and "premises you sell," and by the other exclusions discussed in my previous letter.

---

[2] I did receive a letter dated March 9, 2006, from Robyn Spagnuolo, Assistant to General Counsel of United Development Group, stating that "we are reviewing our files for additional information per your request." However, no further communications were received.

Consequently, it remains my opinion, and AMCO concurs, that there was no duty under the insurance policy to cover the claims in the Hidden Glen litigation. However, I have no desire to render an opinion which erroneously denies coverage to an insured, and AMCO is not seeking to avoid any legitimate contractual obligations. If you are aware of another policy issued by AMCO or its affiliated companies which may cover some or all of your clients, or if you believe that there are mistaken assumptions of fact or conclusions of law in my coverage analysis, please let me know as soon as possible. Also, and despite the long period of time which its request has been ignored, AMCO is still willing to consider any information you could provide regarding the relationships between the named insureds and the named defendants which might indicate a potential for insured status.

Very truly yours,

MILLER JOHNSON LAW

Scott A. Johnson, Esq.

SAJ/gp

# EXHIBIT "A-4"

1 | Brian C. Dawson (SBN 183251)
Brendan K. Ozanne (SBN 185806)
2 | DAWSON & OZANNE
614 Fifth Avenue, Suite B
3 | San Diego, CA 92101
Telephone: (619) 237-5161
4 | Facsimile: (619) 237-5151

5

6 | Attorneys for Plaintiff THE HIDDEN GLEN MAINTENANCE CORPORATION

7

8

9 | SUPERIOR COURT OF CALIFORNIA

10 | COUNTY OF SAN DIEGO -- CENTRAL BRANCH

11 | THE HIDDEN GLEN MAINTENANCE    ) CASE NO: GIC 852647
    CORPORATION, a California Corporation;    )
12 |                                          ) COMPLAINT FOR DAMAGES
13 |                 Plaintiff,               ) BASED UPON:
14 | v.                                       ) 1.   NEGLIGENCE
                                             ) 2.   CIVIL CONSPIRACY
15 | 1800 SOUTH MAPLE STREET, LLC, a         ) 3.   BREACH OF CCRS
    California Limited Liability Company; RALPH ) 4.   BREACH OF FIDUCIARY
16 | GIANNELLA individually and as co-trustee of the )      DUTY
    RALPH GIANNELLA AND KEITHA           ) 5.   ALTER EGO
17 | GIANNELLA REVOCABLE TRUST; WILLIAM   ) 6.   NEGLIGENCE PER
    AYYAD; WILLIAM G. AYYAD, INC., a      )      SE-CIVIL CODE SECTION
18 | California Corporation; KEITHA GIANNELLA, )      1134
    individually and as co-trustee of the RALPH ) 7.   VIOLATION OF B&P
19 | GIANNELLA AND KEITHA GIANNELLA       )      CODE SECTION 17200
    REVOCABLE TRUST; PREMIER             )
20 | COMMUNITIES LLC, a California Limited )
    Liability Company; DAN TOMASI; MARK   )
21 | HOLMES CONSTRUCTION, a business entity )
    form currently unknown; and DOES 1 through 150, )
22 | inclusive,                               )
                                             )
23 |                 Defendants.              )
                                             )
24 |                                          )
                                             )
25 |                                          )
                                             )
26 |                                          )
                                             )
27 | _____       )
                                             )
28

Plaintiff demands a jury trial and against each of the defendants alleges as follows:

## I.

## INTRODUCTION AND PARTIES

1.    This case involves a plan by the defendants to develop and sell depleted and run down condominiums to a majority of first time purchasers.  The condominiums contain water intrusion, mold and in many instances Code violations with regard to all major systems of the development, among other significant problems.

2.    Plaintiff, THE HIDDEN GLEN MAINTENANCE CORPORATION (hereinafter referred to as "ASSOCIATION"), is a California nonprofit mutual benefit corporation organized and existing under the laws of the State of California with its principal place of business within the County of San Diego, State of California.  ASSOCIATION is the governing board for the Maple Street Condominiums located at 1800 S. Maple Street, Escondido, California, within the State of California, County of San Diego and hereinafter referred to as the "subject property." The subject property contains five buildings and a total of thirty (30) one and two bedroom condominiums as well as a pool, spa, car ports, parking lots and a laundry and office building. ASSOCIATION is the proper party in interest and has standing to sue as it was given the authority to prosecute actions on behalf of the unit owners at the development for damages to common areas and the resulting damages to private units therefrom, pursuant to the terms of the governing documents, including the Conditions, Covenants and Restrictions ("CCRs") and by-laws.  These documents are attached hereto as Exhibit "A."

3.    ASSOCIATION alleges, upon information and belief, that Defendant 1800 SOUTH MAPLE STREET, LLC, (hereinafter "MAPLE"), is and was at all times relevant, a California Limited Liability Company, organized and existing under the laws of the State of California and, at all times herein mentioned, was authorized to do and was, doing business in the County of San Diego.

////

////

////

4.     ASSOCIATION alleges, upon information and belief, that Defendant PREMIER COMMUNITIES, LLC, (hereinafter "PREMIER"), is and was at all times relevant, a California Limited Liability Company, organized and existing under the laws of the State of California and, at all times herein mentioned, was authorized to do and was, doing business in the County of San Diego.

5.     ASSOCIATION alleges, upon information and belief, that Defendant WILLIAM AYYAD, (hereinafter "AYYAD"), is and was at all times relevant, an individual residing in the County of San Diego, State of California and was a principal partner in the Limited Liability Companies identified herein as MAPLE and PREMIER.

6.     ASSOCIATION alleges, upon information and belief, that Defendant RALPH GIANNELLA, (hereinafter "RALPH"), is and was at all times relevant, an individual residing in the County of San Diego, State of California and was a principal partner in the Limited Liability Companies identified above and a co-trustee of the RALPH GIANNELLA AND KEITHA GIANNELLA REVOCABLE TRUST.

7.     ASSOCIATION alleges, upon information and belief, that Defendant KEITHA GIANNELLA, (hereinafter "KEITHA"), is and was at all times relevant, an individual residing in the County of San Diego, State of California and was a principal partner in the Limited Liability Companies identified above and a co-trustee of the RALPH GIANNELLA AND KEITHA GIANNELLA REVOCABLE TRUST.

8.     ASSOCIATION alleges, upon information and belief, that WILLIAM G. AYYAD, INC. (hereinafter "AYYAD, INC."), was and is a California Corporation organized and existing under the laws of the State of California and, at all times relevant, was doing business in the County of San Diego, State of California.

9.     ASSOCIATION alleges, upon information and belief, that Defendant DAN TOMASI, (hereinafter "TOMASI"), is and was at all times relevant, an individual residing in the County of San Diego, State of California and was a principal partner and/or managing agent of or in the Limited Liability Companies identified above.

////

10.    ASSOCIATION alleges, upon information and belief, that MARK HOLMES CONSTRUCTION (hereinafter "HOLMES") was and is a business entity, form currently unknown, doing business and with its principal place of business in San Diego County, State of California and was engaged in the business of construction. HOLMES performed construction on the subject property.

11.    The above-referenced defendants were and are developers, designers, marketers, sellers, and otherwise responsible for the construction of condominium projects throughout San Diego County, State of California and were principal developers, marketers, sellers, designers, or otherwise involved in the development and sale of the subject property identified above.

12.    The true names and capacities of additional defendants is currently unknown by ASSOCIATION. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1-150 are unknown to ASSOCIATION, who therefore sues these defendants by such fictitious names. ASSOCIATION is informed and believes and thereon alleges that each of the defendants designated as DOE is a resident of and did business in the State of California, and is responsible in the same manner for the events and happenings herein referred to, and proximately caused injury and damages to ASSOCIATION as herein alleged. ASSOCIATION is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants and DOES herein was the successor, predecessor, alter-ego, partner, parent company, subsidiary, joint venturer, agent, servant and employee of each of the remaining developer defendants and/or DOE defendants, and was acting within the scope and purpose of such relationship in the conversion, repair, construction, sale, marketing, development and design of the subject property and creation of the subject property's operating budget.

II.

## BACKGROUND AND COMMON FACTUAL ALLEGATIONS

13.    Defendants purchased the subject property in or about 2001. At that time the property was a single parcel. The improvements were an apartment complex comprised of five buildings. At the time of purchase by these defendants, the lot had not been subdivided and no separate interest had ever been sold. Soon after purchase, the defendants began a process to

4

COMPLAINT

1  acquire an amended final "Subdivision Public Report" (hereinafter "Public Report") from the

2  Department of Real Estate.

3      14.    In order to acquire the Public Report defendants made numerous representations

4  to the Department of Real Estate indicating that the project and all of its common areas would be

5  in an "as new" condition at the time of sale and/or fully repaired or replaced.  Further, material

6  changes to the master management documents used in the application and other portions of the

7  previously submitted application documents  were not disclosed to the Department of Real

8  Estate.  These representations were made to persuade the Department of Real Estate to issue the

9  Public Report and included in the Department of Real Estate Form 639 ("DRE 639"), Public

10  Report and RE Form 623 Budget Worksheet (DRE "623").  Some of these false representations

11  include:

12      a.    The flat roof will be replaced/repaired prior to the first conveyance;

13      b.    The pool, pool heaters, pool filter, pool heaters, club house and restrooms

14        will be replaced/repaired prior to the first conveyance;

15      c.    There are no known defects in the foundations, frame, wood structures,

16        plumbing, heating, air condition, etc.;

17      d.    The spa, spa heater, spa filter, and pumps will be replaced prior to first

18        conveyance;

19      e.    Fencing around the complex will be replaced prior to first conveyance;

20      f.    Streets and drives shall be new concrete prior to first conveyance;

21      g.    The asphalt parking area will be re-surfaced and stripped prior to first

22        conveyance;

23      h.    The landscaping shall be enhanced/installed prior to first conveyance;

24      i.    The hot water heaters and air conditioners will be replaced/repaired prior

25        to first conveyance;

26      j.    Developer is aware of absolutely no defects in the common areas and

27        major systems at the subject property.

28  ////

15.    In anticipation of the eventual sale of individual condominium units, in or about March of 2002, these defendants sought segregation of the lot into individual units by the County of San Diego Assessor's office, including the issuance of individual assessor parcel numbers.  In or about September 4, 2002, these defendants received a Final Public Report from the Department of Real Estate, and sold the first individual unit in or about November of 2002.

16.    Between 2001 and 2002, defendants ignored the significant grading, water intrusion, structural, landscaping and other problems with the subject property.  Instead, they painted the inside of the units, installed new appliances and flooring.  The purpose of these repairs was to create a picture of "new" and "refurbished" condominiums to these first time home buyers and inexperienced ASSOCIATION.

17.    This construction was performed by defendants and various subcontractors.  During the construction, defendants became aware of mold, termites, water intrusion, electrical and plumbing malfunctions.  However, defendants chose to ignore the problems to the detriment of ASSOCIATION.

18.    The next step for the defendants was to market these units.  To do so, they represented to the public that these units would contain a one year warranty and be "as new" and had been completely "refurbished," among other material misrepresentations.  These descriptions were contained on defendants' web-sites and the Multiple Listing Service.  Defendants further made these representations at the time of showing the properties and throughout the sales process.  The units were entry-level residences, marketed to inexperienced, first-time buyers.  The purchase agreement was a take-it-or-leave-it proposition and potential buyers who wished to negotiate were summarily turned away.

19.    After the purchase and sale of these units to the individual homeowners, the ASSOCIATION began to realize the major problems with the common areas and damages to units arising therefrom.  Immediately, ASSOCIATION began registering both written and verbal complaints with defendants and asked them to comply with their warranty and the representations made to the Department of Real Estate, ASSOCIATION and homeowners.  A majority of these complaints were met with responses to the effect that, "These were sold as is," and "Your

6

1   homeowners signed a disclaimer and/or waiver" and other similar responses designed to lead

2   ASSOCIATION to believe that it had no legal remedies against the defendants. In making these

3   denials and disclaimers of liability, defendants referred ASSOCIATION to the unconscionable

4   language contained in the Conditions, Covenants and Restrictions ("CCRs").

5       20.    Furthermore, the CCRs for the project, attached hereto as Exhibit "A" mandate

6   that the ASSOCIATION be responsible for all maintance and repairs of the common areas.

7   Despite the fact that these CCRs were drafted by the defendants, defendants then prepared a

8   budget for the subject property and created such budget based on the premise that these units and

9   the common areas were akin to "as new" construction. The result was an ASSOCIATION

10  proscribed with the duty of maintaining and repairing the common areas with grossly insufficient

11  monetary funding to do so. In addition, the defendants failed to provide any insurance for the

12  ASSOCIATION whatsoever. Instead, they kept the insurance in their names so as to keep the

13  individual homeowners dues to a minimum and thereby make the units more attractive to

14  potential purchasers.

15      21.    ASSOCIATION brings this action under sections 367 and 383 of the Code of

16  Civil Procedure and section 1363 of the Civil Code. For the past six months the ASSOCIATION

17  has been engaged in protracted mediations with defendants as well as inspections of the property.

18  Accordingly, ASSOCIATION has met all requirements of the *Calderon* process. No resolution

19  was made at the various mediations of this matter.

20      22.    As the party required to maintain and repair the common areas, as the party

21  holding an easement over all common areas, and as the party harmed by defendants' conduct as

22  herein described, ASSOCIATION is a real party in interest under Code of Civil Procedure

23  section 363 that is entitled to bring claims concerning defective construction and conversion of

24  the common areas and the damages caused to the units by such defective construction.

25  ////

26  ////

27  ////

28  ////

III.

FIRST CAUSE OF ACTION

(NEGLIGENCE AGAINST ALL DEFENDANTS)

23.    ASSOCIATION incorporates paragraphs 1 through 22 of this Complaint as though fully set forth herein word for word.

24.    Defendants, and each of them, as developers, designers, contractors, marketers and sellers of the subject property had a duty to act reasonably in the conversion of the subject property into condominium units. Furthermore, these defendants voluntarily assumed the duty to fully refurbish the units and make them "as new."

25.    Defendants, and each of them, breached these duties in several respects, failing to use reasonable care in the conversion, construction, design, marketing and planning process. These breaches include, but are not necessarily limited to the following:

a.    Failing to prevent and remedy mold and water intrusion problems throughout the subject property;

b.    Failing to prevent and remedy faulty grading and landscaping throughout the subject property;

c.    Failing to bring the subject property up to the standards of the Uniform Building Code, Electrical Code, among others;

d.    Failing to properly inspect the condition of the units;

e.    Failing to prepare proper plans and specifications;

f.    Failing to properly set up the ASSOCIATION to meet the duties imposed by said defendants as set forth in the CCRs;

g.    Otherwise acting negligently in their construction, sale, conversion, and marketing of the units and subject property.

////
////
////
////

26.    As a direct and proximate result of the above breaches of duty and duties by defendants and each of them, the ASSOCIATION has suffered damages to property, loss of use of property, damages to common areas and budget. At this time, the exact amount of said damages is unascertainable, however, ASSOCIATION asserts that such damages are in excess of this Court's jurisdictional requirements and will be proven in certainty at the time of trial.

## IV.

## SECOND CAUSE OF ACTION

(FOR CIVIL CONSPIRACY TO VIOLATE BUSINESS AND PROFESSIONS CODE SECTION 11020 AGAINST DEFENDANTS 1800 SOUTH MAPLE STREET LLC, RALPH GIANNELLA, WILLIAM AYYAD, WILLIAM G. AYYAD, INC., KEITHA GIANNELLA, DAN TOMASI, RALPH GIANNELLA AND KEITHA GIANNELLA REVOCABLE TRUST, PREMIER COMMUNITIES, LLC, MARK HOLMES CONSTRUCTION AND ALL DOES)

27.    ASSOCIATION incorporates paragraphs 1 through 26 of this Complaint as though fully set forth herein word for word.

28.    Defendants, and each of them, acted together and with knowledge of the others' actions, in a plan and scheme to violate Business and Professions Code Section 11020 which states, in pertinent part:

(a)    It shall be unlawful for any person to make, issue, publish, deliver, or transfer as true and genuine any public report which is forged, altered, false or counterfeit, knowing it to be forged, altered, false, or counterfeit or to cause to be made or participate in the making, issuance, delivery, transfer, or publication of a public report with knowledge that it is forged, altered, false, or counterfeit . . . (Cal. Bus. & Prof. Code Section 11020(a)).

29.    Specifically, each of these defendants prepared numerous official documents, including but not limited to, DRE 639, DRE 623, sample Civil Code §1134 statements, the Public Report and disclosures therein, the Conditions, Covenants and Restrictions, that include misrepresentations regarding the subject property, ASSOCIATION's rights, and defendants' obligations, all in violation of California Bus. & Prof. Code §11020. For example, and not meant as an all inclusive list, the defendants made the following misrepresentations:

a.    The flat roof will be replaced/repaired prior to the first conveyance;

b.    The pool, pool heaters, pool filter, pool heaters, club house and restrooms will be replaced/repaired prior to the first conveyance;

c.    There are no known defects in the foundations, frame, wood structures, plumbing, heating, air condition, etc.;

d.    The spa, spa heater, spa filter, and pumps will be replaced prior to first conveyance;

e.    Fencing around the complex will be replaced prior to first conveyance;

f.    Streets and drives shall be new concrete prior to first conveyance;

g.    The asphalt parking area will be re-surfaced and stripped prior to first conveyance;

h.    The landscaping shall be enhanced/installed prior to first conveyance;

i.    The hot water heaters and air conditioners will be replaced/repaired prior to first conveyance; and,

j.    Developer is aware of absolutely no defects in the common areas and major systems at the subject property.

30.    Prior to the units at the subject property being sold, and thereafter, defendants, and each of them, made affirmative representations to government officials and ASSOCIATION members that each unit, common areas and utilities would be repaired or replaced, or conversely, defendants represented that they had no knowledge of any defects in the common areas or units. Defendants, and each of them, concealed material facts, including but not limited to the presence of mold, defective plumbing, defective electrical, termite damage, improper grading and landscaping, from the Department of Real Estate and ASSOCIATION. Defendants, and each of them, were the only parties with knowledge of these material facts and as the seller of real property, had a legal obligation and duty to disclose the true condition of the subject property to the Department of Real Estate and ASSOCIATION.

////
////
////
////
////

31.    Defendants, and each of them, knew that these representations were false when they made them and/or had no reasonable basis for making such assertions and representations. Defendants further concealed material facts regarding the condition of the subject property from ASSOCIATION and governmental officials when they prepared the ASSOCIATION budget based upon "as new" construction, while simultaneously creating governing documents for the ASSOCIATION asserting or omitting the following:

a.    The ASSOCIATION is mandated to make all repairs to all common areas;

b.    The condominium complex and all common areas are being sold in an "as is" condition;

c.    The project was built in 1981 and the ASSOCIATION should expect defects;

d.    Limiting the amount of money the ASSOCIATION could levy via special assessments from the homeowners;

e.    Omitting as a line item in the budget all plumbing and electrical maintenance;

f.    Otherwise misrepresenting the ASSOCIATION's ability to perform all necessary repairs given the inadequate budget based upon "as new" construction.

32.    The Department of Real Estate relied on the defendants' misstatements of material facts in approving the budget and the other master documents.

////
////
////
////
////
////
////
////

33.     Defendant, AYYAD, is, and was at all times relevant, the corporate officer and managing agent of defendants PREMIER, MAPLE and AYYAD, INC. In this capacity, he personally made the aforementioned misrepresentations and also ratified, condoned and approved the making of such representations by employees, including but not limited to, defendants TOMASI and GIANNELLA. Specifically, defendant AYYAD knew that elements of the subject property were not going to be replaced or repaired, yet still encouraged his agents and employees to make such representations to further the Department of Real Estate's approval of the budget and governing documents. In turn, this would create for AYYAD and his entities the benefit of more sales and profits.

34.     Defendant, RALPH, is, and was at all times relevant, the corporate officer and managing agent of defendants PREMIER, TRUST and MAPLE. In this capacity he personally made the aforementioned misrepresentations and also ratified, condoned and approved the making of such representations by employees, including but not limited to, defendants TOMASI and AYYAD. Specifically, RALPH knew that elements of the subject property were not going to be replaced or repaired, yet, still encouraged his agents and employees to make such representations to further the Department of Real Estate's approval of the budget and governing documents. In turn, this would create for RALPH and his entities the benefit of more sales and profits.

35.     As a direct and proximate result of the actions complained of herein, ASSOCIATION has been damaged in its property, loss of use of property, damages to common areas and budget. The exact amount of said damages is currently unknown, however, such amount is in excess of this Court's jurisdictional requirement and will be proven with specificity at the time of trial.

36.     Defendants, and each of them, in making the aforementioned representations, non-disclosures of material fact and acting together with the intent to violate California Bus. & Prof. Code § 11020 and defraud ASSOCIATION and public agencies, acted with malice, oppression and fraud as they knew said representations and concealment, would cause irreparable harm and damages. Defendants, and each of them, performed such actions with the intent of furthering

1   their personal profits to the detriment of ASSOCIATION. As such, ASSOCIATION is entitled

2   to punitive and exemplary damages from each defendant.

3                                              V.

4                              **THIRD CAUSE OF ACTION**

5   (FOR BREACH OF CCRS/CONTRACT AGAINST DEFENDANTS MAPLE, WILLIAM
        G. AYYAD, INC., WILLIAM AYYAD, RALPH GIANNELLA,  PREMIER
6   COMMUNITIES, LLC, KEITHA GIANNELLA, RALPH AND KEITHA GIANNELLA
                    REVOCABLE TRUST AND ALL DOES)

7

8       37.    ASSOCIATION incorporates paragraphs 1 through 36 of this Complaint as

9   though fully set forth herein word for word.

10      38.    The CCRs provided to ASSOCIATION and purchasers contain the following

11  statement/warranty:

12      The Successor Declarant represents that the following items in the Project will be
        in "working condition" as of the Close of Escrow of each Condominium subject to
13      this Declaration: Appliances, Roof, Plumbing, and Electrical. (See Exhibit "B" at
        Page 88, paragraph 17.1(G).)
14

15      39.    Defendants, and each of them, breached this contract and warranty as the

16  condominiums and common areas were not free from defects in material and/or workmanship at

17  the time of sale and within one (1) year of purchase.

18      40.    Defendants, and each of them, were given proper notice of defects in material

19  and/or workmanship and failed to correct same, despite timely demands made by

20  ASSOCIATION.

21      41.    ASSOCIATION complied with all essential terms and provisions of the contract

22  except those that were excused or deemed void by way of the breach of the defendants, and each

23  of them.

24  ////

25  ////

26  ////

27  ////

28  ////

42.    As a result of defendants, and each of their, breach of the aforementioned CCRs, the ASSOCIATION has suffered damage to property, loss of use of property, damages to common areas and budget.   In addition, ASSOCIATION has incurred attorneys fees and expended sums in assertion of their rights under the CCRs.  The exact amount of said damages is currently unascertainable, however, such amount is in excess of this Court's jurisdictional requirement and will be proven with specificity at the time of trial.

## VI.

## FOURTH CAUSE OF ACTION

### (FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS WILLIAM G. AYYAD, INC., WILLIAM AYYAD, RALPH GIANNELLA, MAPLE, PREMIER COMMUNITIES, LLC, RALPH GIANNELLA AND KEITHA GIANNELLA REVOCABLE TRUST, AND ALL DOES)

43.    ASSOCIATION incorporates paragraphs 1 through 42 of this Complaint as though fully set forth herein word for word.

44.    Pursuant to the CCRs, and common law obligations, defendants had an obligation to adequately fund a reserve account for contingencies, avoid conflicts of interest or actions or decisions which benefit their own interests at the expense of the ASSOCIATION,  provide and maintain liability, fire and casualty insurance for the ASSOCIATION and all common area property, draft the CCRs without self-serving exculpatory clauses.

45.    Defendants, and each of them, failed to meet their fiduciary duties to the ASSOCIATION.  Defendants failed to adequately fund a reserve account for contingencies, avoid conflicts of interest or actions or decisions which benefit their own interests at the expense of the ASSOCIATION,  provide and maintain liability, fire and casualty insurance for the association and all common area property, and failed to properly draft the CCRs without self-serving exculpatory clauses as more fully set forth herein.

////

////

////

////

46.    As a direct and proximate result of the actions complained of herein, ASSOCIATION has been damaged in its property, loss of use of property, damages to common areas and budget.   The exact amount of said damages is currently unascertainable, however, such amount is in excess of this Court's jurisdictional requirement and will be proven with specificity at the time of trial.

47.    Defendants, and each of them, violated their fiduciary duty to ASSOCIATION with malice and oppression in that defendants, and each of them, prepared a false budget and submitted false documents to the Department of Real Estate in order to achieve greater profits for their companies and related entities.  Such conduct is the type of conduct that entitles ASSOCIATION to exemplary and punitive damages.

## VII.

### FIFTH CAUSE OF ACTION

**(FOR ALTER EGO LIABILITY AGAINST DEFENDANTS WILLIAM G. AYYAD, INC., WILLIAM AYYAD, RALPH GIANNELLA, MAPLE, RALPH GIANNELLA AND KEITHA GIANNELLA REVOCABLE TRUST, KEITHA GIANNELLA, PREMIER COMMUNITIES, LLC, AND ALL DOES)**

48.    ASSOCIATION incorporates paragraphs 1 through 47 of this Complaint as though fully set forth herein word for word.

49.    Defendants, and each of them, created the fiction of a separate corporate entity in the form of MAPLE.  Defendants, and each of them, engaged in a pattern and practice of fraud in commingling corporate and individual assets and use of corporate funds or property for individual purposes; utilized the corporate entity to procure labor, services or merchandise for the benefit of shareholders or another entity; engaged in a practice of diverting assets from a corporation to a shareholder or to another entity; or manipulation of the assets and liabilities between several controlled corporations so as to concentrate all assets in one and all liabilities in another; made representations by a shareholder that he or she is responsible for corporate obligations; failed to maintain minimum or adequate corporate records, and confusion of shareholder and corporate records; had, despite the presence of several separate LLCs and individuals, kept their identical equitable ownership, identical officers and directors, and identical

1  domination and control; had in many instances sole ownership of all corporate stock by one
2  individual or the members of a single family; utilized the same offices or business location; or
3  employed and utilized the same employees and/or attorney; failed to adequately capitalize the
4  corporation and LLCs, in light of its expected business obligations; formed LLCs and
5  corporations as a shell for a single venture, or the business of an individual or another
6  corporation; disregarded legal formalities and failure to maintain arms' length relationships
7  among related business entities; signed and executed legal documents without regard for the legal
8  entity responsible or prescribed the duty of executing such documents; and, used the corporations
9  an8d LLCs as a subterfuge for an illegal transaction.

10        50.    There exists at all times since MAPLE's incorporation, a unity of interest and
11  ownership between MAPLE and these defendants such that any separateness between them has
12  ceased to exist.  As a result of the aforementioned conduct, each defendant is  the same as the
13  other and the corporate form or business entity became, for all practical and legal purposes, one
14  and the same.

15        51.    Defendant MAPLE is, and at all times mentioned was a mere shell,
16  instrumentality and conduit through which these defendants carried on their activities in the
17  corporate name to avoid personal liabilities and obligations and/or obligations from one corporate
18  entity to the other.  Should the acts alleged in referenced in this Complaint and otherwise be
19  treated as those of MAPLE's alone, an inequitable and unjust result will follow.

20                              VIII.

21                   SIXTH CAUSE OF ACTION

22  (FOR NEGLIGENCE PER SE [VIOLATION OF CIVIL CODE §1134] AGAINST
     DEFENDANTS WILLIAM G. AYYAD, INC., WILLIAM AYYAD, RALPH
23  GIANNELLA, MAPLE, RALPH GIANNELLA AND KEITHA GIANNELLA
     REVOCABLE TRUST, PREMIER COMMUNITIES, AND DOES 1-150)
24

25        52.    ASSOCIATION incorporates paragraphs 1 through 51 of this Complaint as
26  though fully set forth herein word for word.

27  ////

28  ////

---

53.     Defendants and each of them had an obligation, pursuant to Civil Code §1134 to provide a written statement listing all substantial defects or malfunctions of the major systems in the unit and common areas of the premises or a statement disclaiming knowledge of any such substantial defects of malfunctions.  The disclaimer may only be delivered after owner or subdivider has inspected the unit and the common areas and has not discovered a substantial defect of malfunction which would have been disclosed by a reasonable inspection.

54.     Defendants and each of them failed to perform a reasonable inspection of the major systems.  Defendants and each of them failed to deliver a statement which complied with Civil Code §1134.

55.     This ordinance was enacted to protect the purchasers of "converted" condominiums from substandard construction and dangerous conditions.  ASSOCIATION is a member of this class and thereby has standing to sue for negligence per se.

56.     As a direct and proximate result of the above breach of the aforementioned law by defendants and each of them, the ASSOCIATION has suffered damages in to its property, loss of use of property, damages to common areas and budget.  At this time, the exact amount of said damages is unascertainable, however, ASSOCIATION asserts that such damages are in excess of this Court's jurisdictional requirements and will be proven in certainty at the time of trial.

IX.

## SEVENTH CAUSE OF ACTION

### (FOR VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 AGAINST ALL DEFENDANTS AND DOES, EXCEPT MARK HOLMES CONSTRUCTION)

57.     ASSOCIATION incorporates paragraphs 1 through 56 of this Complaint as though fully set forth herein word for word.

58.     Defendants, and each of them, engaged in unfair and fraudulent business practices as more fully described above.  In particular, defendants, and each of them, submitted false and fraudulent documents in furtherance of their conspiracy to defraud the Department of Real Estate and violate California Bus. & Prof. Code § 11020, an act or actions that is forbidden by law.

59.    As a result of defendants' conduct, the ASSOCIATION has and continues to suffer irreparable harm and injuries.

## X.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff preys for judgment against Defendants and for relief as follows:

1.    For general damages according to proof;

2.    For special damages according to proof;

3.    For compensatory damages according to proof;

4.    For consequential damages according to proof;

5.    For attorneys' fees and costs as permitted by law;

6.    For punitive and exemplary damages;

7.    For all other relief as deemed just and appropriate and allowed by law.

DATE: August 16, 2005

DAWSON & OZANNE

By: _____
Brendan K. Ozanne
Attorneys for Plaintiff

# EXHIBIT "A-5"

**Allied**
Insurance
A Nationwide® Company
On Your Side℠

San Diego Service Office
P.O. Box 1820
La Mesa, California 91944-1820

November 10, 2005

**Vekeno Kennedy, General Counsel**
**United Development Group, Inc.**
**9252 Chesapeake Drive, Suite 100**
**San Diego, CA 92123**

Re: **Hidden Glen Maintenance Corp. v. 1800 South Maple Street, LLC**
     SDSC Case Number: GIN 852647
     Policy Number: ACP BPH 7801069841
     Effective Dates: 04/04/2002 to 11/25/2002
     Insureds: ACDW Properties, Gianella Properties, 4-Way Farms, a California Corp.,
     South Maple LLC, A California Limited Liability Company, Subsequently
     Changed to a Corporation
     Date of Loss: Undetermined, Set at 11/24/2004 for Administrative Purposes
     Claim Number: 84L52141

Dear Ms. Kennedy,

This letter is intended to memorialize what has been discussed in our various telephone conversations.

First of all, I want to repeat that AMCO Insurance Company is conducting an investigation to determine if it has any obligation to defend and/or indemnify any of the policy insureds in the above captioned litigation. As we have discussed, AMCO doesn't presently have enough information to make a decision on whether or not it has any defense obligation in this matter, although given the allegations included within the Complaint and given information included in other documents you have provided to this company, our current understanding of this matter leads us to the conclusion that AMCO does not have any defense and/or indemnity obligations to its insureds in this litigation. Accordingly, all future investigation conducted by this company will be undertaken under the Company's reservation of its right to decline to defend or indemnify its insureds in this matter.

You verbally advised me on October 6, that service has not been properly effectuated on any of the named defendants. Please confirm that remains the case or, if not, please identify the parties served and the dates of service.

The following will be a summary of the facts as we currently understand them. Later in this letter, I will outline policy terms and conditions and list the reasons we currently believe that policy number ACP BPH 7801069841 does not afford coverage for the claims asserted by plaintiffs in this matter. Finally, I will list additional documents and

Allied Group, Inc.
AMCO Insurance Company
Allied Property and Casualty Insurance Company
Depositors Insurance Company

information that I believe may be in your possession and I will ask you to provide copies of those documents and to provide additional information so that a final coverage determination can be made by this company.

## THE FACTS

The Complaint filed by The Hidden Glen Maintenance Corporation alleges that "defendants" purchased the "subject property", an apartment complex, in or about 2001. All named defendants, except certain contractors, are alleged to be partners in the 1800 South Maple Street LLC and it is alleged that this entity was the purchaser and subsequent owner of the apartment complex. The Complaint alleges that "At the time of purchase by these defendants, the lot had not been subdivided and no separate interest had ever been sold."

The Complaint alleges that "Soon after purchase, the defendants began a process to acquire an amended final "Subdivision Public Report" (hereinafter "Public Report" from the Department of Real Estate. The Complaint alleges that the defendants made representations to the Department of Real Estate indicating that the project and all its common areas would be in an "as new" condition at the time of same and/or fully repaired or replaced. Plaintiffs then go on to list a number of improvements they allege defendants represented to the Department of Real Estate would be performed. These improvements included repairs or replacement of major building components and allegedly included representations that the common areas and major systems were defect free.

The Complaint alleges that "in or about March of 2002, defendants sought segregation of the lot into individual units by the County of San Diego Assessor's office, including the issuance of individual assessor parcel numbers. In or about September 4, 2002, these defendants received a Final Public Report from the Department of Real Estate, and sold the first individual unit in November 2002." The Complaint does not indicate when the remaining units were sold.

The Complaint alleges that "between 2001 and 2002, defendants ignored the significant grading, water intrusion, structural, landscaping and other problems with the subject property. Instead, they painted the inside of the units, installed new appliances and flooring. The purpose of these repairs was to create a picture of "new" and "refurbished" condominiums."

The Complaint further alleges that "this Construction (painting, new appliances and flooring) was performed by defendants and various subcontractors. During the construction, defendants became aware of mold, termites, water intrusion, electrical and plumbing malfunctions." However, defendants chose to ignore the problems to the detriment of ASSOCIATION."

The Complaint alleges that the units were marketed as entry level residences to unsophisticated buyers and that defendants represented to the public that "these units

would contain a one year warranty and be "as new" and had been completely "refurbished," among other material misrepresentations."

The Complaint alleges that "after the purchase and sale of these units to the individual homeowners, the ASSOCIATION began to realize the major problems with common areas and damages to units arising therefrom." Plaintiff allege that verbal and written complaints made to the defendants relating to the problems prompted, in most instances, response to the effect that "the units were sold as is," and "Your homeowners signed a disclaimer and./or waiver".

The Complaint asserts Causes of Action for:

Negligence
Civil Conspiracy to Violate Business and Professions Code Section 11020
Breach of CCRS/Contract
Breach of Fiduciary Duty
Alter Ego Liability
Negligence Per Se
Violation of Business and Professions Code Section 17200

The Complaint seeks recovery of general damages according to proof, special damages, compensatory damages, attorney's fees, and punitive damages.

The CC&Rs include the following provisions:

1.19 Declarant.
Declarant shall mean South Maple Street, LOC, a California Limited Liability Company, its successors and any Person to which the Declarant shall have assigned any of its rights hereunder by an express written assignment.

2.4 Classes of Membership.
The Association shall have two (2) classes of voting membership.

   (a) Class A. Class A Members shall originally be all Owners except Declarant for so long as there exists a Class A Membership. Class A Members shall be entitled to one (1) vote for each Condominium owned by such Class A Members and subject to assessment. Declarant shall become a Class A member with regard to Condominiums owned by Declarant upon conversion of Declarant's Class B membership as provided below. When more than one (1) Person owns any condominium, all such Persons shall be members. The vote for such Condominium shall be exercised in accordance with Section 2.6, but in no event shall more than one (1) Class A vote be cast for any Condominium.
   (b) Class B. The Class B Member shall be Declarant. The Class B Member shall be entitled to three (3) votes for each Condominium owned by Declarant and subject to assessment. The Class B Membership shall cease and be converted to Class A membership immediately upon the first to occur of the following events:

(1) When the total votes outstanding in the Class A membership equal the total votes outstanding in the Class B membership or

(2) The second anniversary of the first Close of escrow in the Project;

The CC&R's require that the Association shall be responsible for maintenance and upkeep of the common area except for repair or improvement of the units or the Exclusive use Common Area, the maintenance of which is the responsibility of the Owners as provide in Section 2.8.

## THE POLICY

The AMCO Insurance Company Premier Businessowners policy promises to do the following:

A. COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY
   1. INSURING AGREEMENT
   a. We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.
      HOWEVER, We will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
      We may, at our sole discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
      1) The amount we will pay for damages is limited as described in Section III, LIMITS OF INSURANCE; and
      2) Our right and duty to defend end when we have used up the applicable limit of insurance in payment of judgements or settlements under COVERAGES A AND B.
      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.
   b. This insurance applies to "bodily injury" and "property damage" only if:
      1) The "bodily injury" or "property damage" is caused by an 'occurrence" that takes place in the "coverage territory"; and
      2) The "bodily injury" or "property damage" occurs during the policy period; and
      3) Prior to the policy period, no insured listed under Paragraph 1. Of Section II, WHO IS AN INSURED and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the 'bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II. WHO IS AN ISURED or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II. WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any or any other insurer;

2) Receives a written or verbal demand or claim for damages because of the "bodily Injury" or "property damage"; or

3) Becomes aware by any other means that "bodily injury" or "property damage" Has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

The following terms are defined by the policy:

"Bodily injury means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

"Occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

"Property damage means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed t o occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it."

The following exclusions are included under Coverage A of the policy:

j. Damage To Property

This insurance, including any duty we have to defend 'suits", does not apply to:

"Property damage: to:

1) Property you own, rent, or occupy;

2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

3) Property loaned to you;

4) Personal property in the care, custody or control of the insured;

5) That particular part of real property on which you or any contractors or subcontractors

working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;

6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it."

Other than damage by the Covered Causes of Loss provided under Tenants Property Damage legal Liability, paragraph 1), 3) and 4) of this exclusion do not apply to "property damage" to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage to Premises Rented To You as described in Section III. LIMITS OF INSURANCE.

Paragraph 2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs 3), 4), 5) and 6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph 6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

m. Damage To Impaired Property Or Property Not Physically Injured

This insurance, including any duty we may have to defend "suits", does not apply to: "Property damage" to "impaired Property" or property that has not been physically injured, arising out of:

1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to loss of use of other property arising out of the sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use."

Added via endorsement PB 29 99 (01-02); EXCLUSION – FUNGI OR BACTERIA (WITH LIMITED PROPERTY COVERAGE)

B.  AMENDMENTS TO THE PREMIER BUSINESSOWNERS LIABIITY COVERAGE FORM

1. In Section I, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGES LIABIITY,  under paragraph 2. EXCLUSIONS, the following exclusions are added: This insurance, including any duty we have to defend  "suits", does not apply to:

FUNGI OR BACTERIA

a.  "Bodily injury" or "property damage" which would not have occurred, in whole or in part , but for:

1)  The actual, alleged or threatened inhalation of, ingestion of, contract with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents; or

2)  The failure to warn or to disclose the presence of "fungi" or bacteria;

Regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the testing for, monitoring cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi" or bacteria, by any insured or by any other person or entity.
HOWEVER, this exclusion does not apply to any "fungi" or bacteria that are, are on or are contained in, "your product" intended for human or animal consumption.

This endorsement adds the following definitions:
ADDITIONAL DEFINITION
1. The PREMIER BUSINESSOWNERS PROPERTY COVERAGE FORM, under Section H. DEFINITIONS; and
2. The PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM, under Section V. DEFINITIONS.
"Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi.


The AMCO Premier Businessowners policy also includes coverage under Coverage B. Coverage B states the following:

COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY, the policy promises the following:

1. INSURING AGREEMENT
a. We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages for which there is coverage under this policy.

HOWEVER, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our sole discretion, investigate any offense and settle any claim or "suit" that may result.......

The policy defines the term "personal and advertising injury" as follows:

"Personal and advertising injury means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;
b. Malicious prosecution;
c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
e. Oral or written publication of material that violates a person's right of privacy;
f. The use of another's advertising idea in your "advertisement"; or
g. Infringing upon another's copyright, trade dress or slogan in your "advertisement.

Endorsement PB 29 99 (01-02) also adds an exclusion to COVERAGE B barring coverage for claims involving "personal and advertising injury" which would not have occurred, in whole or in part, but for

1) The actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, any "fungi" or bacteria on or within a building or structure, including its contents........(the rest of the exclusion is identical to the Fungi or Bacteria exclusion quoted above applying to COVERAGE A of the policy.

A California Amendatory Endorsement (PB9004 03/04) was made part of the policy. This endorsement adds an exclusion that is applicable to both Coverage A and Coverage B of the policy. It states:

D. Additional Liability Exclusion
In the LIABILITY COVEAGE FORM under Section 1, COVERAGES, the following exclusion is added to COVERAGES A and B:
This insurance, including any duty we have to defend "suits" does not apply to:
BREACH OF CONTRACT
"Bodily injury"; "property damage" or "personal and advertising injury" that arises out of or is a result of any breach of a written or oral contract, any breach of any other written or oral agreement, or any breach of an express or implied warranty."

## COVERAGE ISSUES

1) Coverage under the AMCO policy was cancelled by the insureds effective 11/25/2002. The Complaint filed by the Hidden Glenn Maintenance Corp, alleges that the first individual unit was sold in or about November 2002. Assuming the Complaint seeks covered damages arising out of an "occurrence," did the "occurrence" take place within the policy period?

2) Coverage under the AMCO policy was cancelled by the insureds effective 11/25/2002. The Complaint filed by the Hidden Glenn Maintenance Corp. alleges that the first individual unit was sold in or about November 2002. 1800 South Maple Street LLC is the Declarant, as defined by the CC&Rs. Given the formula prescribed by the CC&Rs for determining when responsibility for the Common Areas of the condominium would transfer to the Class A members (owners), would exclusion j of Coverage A apply?

3) All defendants, except for the contractor defendants, are sued as partners in the 1800 South Maple Street LLC. Is that allegation factual?

4) The Complaint alleges that defendants failed to repair major site systems prior to the sale of the individual condominium units. The Complaint alleges that failure to make repairs to existing problems constitutes negligence. There is no assertion

in the Complaint that work performed by the insured or by contractors engaged by the insured resulted in consequential damage that "occurred" within the AMCO policy period.

5) The policy doesn't cover claims arising out of alleged misrepresentations made in the sale of real property. That is well settled law in California.

6) The policy does not cover claims for Breach of Contract or Breach of Warranty. (See exclusion quoted above).

7) The policy does not cover claims arising out of the Cause of Action for Civil Conspiracy to Violate Business and professions Code Section 11020 because such claims do not arise out of an "occurrence" as that term is defined by the policy and such claims do not qualify as an offense under the definition of "personal and advertising injury."

8) The policy does not cover claims arising out of Breach of Fiduciary Duty because such claims do not arise out of circumstances that qualify as an "occurrence," as that term is defined by the policy or out of an offense listed within the definition of "personal and advertising injury".

9) The policy does not cover claims for damages arising out of alleged Breach of CCRS/Contract because such claims do not arise out of an "occurrence," as that term is defined by the policy and such claims are excluded by the Breach of Contract exclusion quoted above.

10) The policy does not cover damages arising out of alleged Violation of Business and Professions Code Section 17200 because such claims do not arise out of circumstances that qualify as an "occurrence" as the policy defines that term or out of an offense included within the definition of "personal and advertising injury."

## DOCUMENTATION, INFORMATION NEEDED:

1) On what date was the first condominium purchased by an individual homeowner? On what date did escrow close on that unit.

2) On what date did the Class A owners assume control of the Homeowners Association?

3) Provide a list of all partners in the 1800 Maple Street LLC.

4) Did 1800 Maple Street LLC employ contractors to make repairs to the apartment complex before individual units were sold as condominiums to individual homeowners? If so, please identify those contractors, the dates they were hired and what work they performed. Please provide copies of any contracts entered between 1800 South Maple LLC (or any other potential insured) and any contractors hired to perform work.

5) The Complaint alleges that defendants performed some repairs after receiving complaints from the Association. If that is true, please provide any paperwork retained that describes the nature and extent of repairs made, the date of those repairs and identifies who did the repairs.

I acknowledge receipt of the CCRS you sent to me as well as a copy of attorney Ozanne's demand letter dated September 27, 2005. Has the insured given any response to this demand? If so, please provide me with a copy of that response.

I am anxious to gather the documentation and information necessary to make a decision on whether or not the AMCO policy affords coverage for the claims asserted in the Complaint filed by the Hidden Glen HOA so AMCO can promptly respond to your tender. You have already agreed to send me selected documents. I hope they include documents that will answer some of the questions posed above.

AMCO's investigation of this claim shall not be construed as a waiver of any policy defense or legal grounds available in support of our eventual coverage position. Nor shall AMCO be deemed to be estopped in the future to assert any additional policy defenses or legal grounds in support of our eventual coverage position, not stated here. Likewise, none of the insured's rights under the AMCO policy or at law shall be deemed to have been waived. Nor shall the insured be deemed to be estopped in the future to assert any of its rights to coverage under the AMCO policy.

Please call me at 619 668-6559 when you have gathered sufficient documents and information to allow us to have a constructive meeting on this matter.

Sincerely,

Robert K. Johnson
AMCO Insurance Company
A Nationwide Company

# EXHIBIT "A-6"

# MILLER LAW FIRM

Scott A. Johnson

The Marston Building
427 C Street, Suite 410
San Diego, California 92101

Telephone
619•232•0086

Facsimile
619•232•0089

March 3, 2006

Ms. Vekeno Kennedy
General Counsel
United Development Group, Inc.
9252 Chesapeake Drive, Ste. 100
San Diego, Calif. 92123

Re:  <u>Hidden Glen Maintenance Corp. v. 1800 South Maple Street, LLC, et al.</u>
San Diego Superior Court Case No. GIC852647
Policy No. ACP BPH 7801069841
Claim No. 84L52141

Dear Ms. Kennedy:

My firm has been retained by AMCO Insurance Company to independently evaluate the request for coverage of the above-referenced litigation, that has been made under the AMCO insurance policy issued to ACDW Properties/Gianella Properties and 4-Way Farms.  Pursuant to that evaluation, I have carefully reviewed the complaint filed by The Hidden Glen Maintenance Corporation, the insurance policy and endorsements thereto issued by AMCO, plaintiff's bylaws and Hidden Glen's CC&Rs, other documents and information which you have provided to AMCO's Robert Johnson, and AMCO's underwriting file.

Based upon my review of these documents, and my independent legal research, it is my opinion that the complaint does not allege any claims which would potentially be covered by the AMCO insurance policy.  AMCO has come to the same conclusion.  However, before formally denying the claim for coverage, AMCO would like to give further consideration to one remaining issue.

Specifically, the documents and information now in AMCO's possession do not clearly establish the relationship between AMCO's insureds and the defendants named in the complaint.  To ensure that no basis for coverage of an AMCO insured has been overlooked, it would be appreciated if you could provide information, discussed below, regarding those relationships.

If you choose not to respond to this request for information, you may consider the request for coverage of the above-referenced litigation denied.  The reasons for that denial are explained in detail below.  If, after reading that explanation, you believe that you are aware of additional new facts which would justify a different conclusion, please contact the undersigned, or Mr. Johnson, as soon as possible.

Ms. Vekeno Kennedy
Page 2 of 13
March 3, 2006

I

## REQUEST FOR INFORMATION REGARDING THE DEFENDANTS
## AND THEIR RELATIONSHIP WITH THE NAMED INSUREDS

The complaint filed by plaintiff Hidden Glen Maintenance Corporation names as defendants: 1800 South Maple Street, LLC; Ralph Giannella and Keith Giannella, both individually and as the trustees of the Ralph Giannella and Keith A. Giannella Revocable Trust, William Ayyad and William G. Ayyad, Inc., Premier Communities LLC, Dan Tomasi, and Mark Holmes Corporation. None of these individuals and entities are named insureds in the AMCO insurance policy.

The AMCO insurance policy declarations, the underwriting file and the application for insurance all identify AMCO's insureds as being "ACDW Properties/Gianella Properties and 4-Way Farms." Two endorsements to the AMCO policy name as an additional insured "South Maple Street, LLC," in its capacity as manager or lessor of leased property, and as the mortgagee, assignee or receiver of the named insureds' property. The AMCO policy also provides specific limited types of coverage for a named insured's partners, stockholders, officers, members, managers and employees, and adds as "automatic additional insureds," subject to express limitations, the co-owners of insured premises, and persons or organizations having a controlling interest in an insured.

Presumably, defendant 1800 South Maple Street, LLC, is the same entity as additional insured South Maple Street LLC. However, as an additional insured, its coverage would be limited as stated above -- to claims involving its status as a manager, lessor, mortgagee, assignee or receiver of the named insureds' property. Also, such status would be difficult to reconcile with the CC&Rs for the Hidden Glen condominium project, which state that South Maple Street was the <u>owner</u> of the property.

The complaint alleges that defendants William Ayyad, Ralph Giannella and Keith Giannella were "principal partners" of 1800 South Maple Street LLC, and that defendant Dan Tomasi was a "principal partner and/or a managing agent" of the LLC. The complaint does not allege the role of defendants William Ayyad Inc., or the Giannella Revocable Trust, but the CC&Rs indicate that those entities were "members" of the South Maple Street LLC. Finally, the complaint does not explain what relationship defendants Premier Construction and Mark Holmes Corporation have with any of the named or additional insureds, other than William Ayyad's alleged partnership interest in Premier.

It would seem likely that relationships exist between the defendants and AMCO's named and additional insureds, and those relationships may entitle some of the defendants to the status of an insured. However, the information currently available to AMCO prevents any certain determination of which defendants are claiming that they are covered under the AMCO policy, and what the basis for their claim might be.

Consequently, it would be appreciated if you would provide AMCO's Mr. Johnson, or the undersigned, information regarding the connections and relationships between AMCO's named or additional insureds and the entities and individuals named as defendants in Hidden Glen's complaint, including: (1) whether any of AMCO's named insureds -- ACDW Properties/Gianella Properties and 4-Way Farms -- have exposure to liability in the <u>Hidden Glen</u> litigation, and if so,

why; (2) is the claim for coverage based upon South Maple Street LLC's additional insured status, and if so, are any other defendants claiming through that additional insured, and on what basis; and (3) are there connections between the named and additional insureds and the named defendants -- e.g., co-ownership of the insured premises, control, stockholder status, etc. -- that might give those defendants insured status under the AMCO policy, and if so, explain those connections in detail.

On the facts now known to AMCO, the complaint filed by The Hidden Glen Maintenance Corporation does not allege any covered claims.  However, AMCO would like to make sure that all of the possible grounds for coverage of all potentially insured individuals and entities have been considered, so I would greatly appreciate your cooperation with this request for information, or your thoughts regarding any other potential arguments for coverage.  If no response to this request is made, the claim for coverage will be considered denied, for the reasons discussed below.

II
**BACKGROUND OF THE REQUEST FOR COVERAGE**

A.    <u>The Litigation</u>

It is alleged that in 2001, the defendants purchased a five-building apartment complex located at 1800 South Maple Street in Escondido, California.  Soon after the purchase, defendants began taking steps to subdivide the property, and to convert the apartments to condominiums. After the conversion process was completed, defendants began selling units at the complex.

On August 18, 2005, a complaint was filed in the San Diego Superior Court by The Hidden Glen Maintenance Corporation, the homeowners association for the condominiums sold by defendants.  The complaint names as defendants: 1800 South Maple Street, LLC; Ralph Giannella and Keith Giannella, both individually and as the trustees of the Ralph Giannella and Keith A. Giannella Revocable Trust; William Ayyad and William G. Ayyad, Inc.; Premier Communities LLC; Dan Tomasi; and Mark Holmes Corporation.  Although the complaint does not specify which defendant or defendants actually owned the condominium complex, the CC&Rs for the property identify South Maple Street LLC as the owner.

The complaint alleges that the defendants, in order to obtain the Department of Real Estate's approval of the "condo conversion," made "false representations" regarding repairs, replacements and upgrades that would be made to the common areas at the facilities.  It is alleged that the defendants did not make these promised improvements, ignored significant existing problems with the property, and instead just covered up the problems by painting the units, and installing new appliances and flooring, so that the units could be marketed "as new" and completely "refurbished."

The complaint alleges that the defendants misrepresented the condition of the condominium complex, and concealed the defects, and that after the units were sold, it was realized that there were "major problems with the common area and damages to units arising therefrom."  As the party with standing to "bring claims concerning defective materials and conversion of the common areas and the damages caused to the units by such defective construction," the homeowners association filed suit.

B.    The Insurance Policy

AMCO issued a "Premier Businessowners/Premier Habitational" insurance policy to named insureds "ACDW Properties/Giannella Properties" and "4-Way Farms." As discussed previously, none of these entities are named as a defendant in the litigation. The policy was effective on April 4, 2002, and was cancelled at the insureds' request on November 24, 2002.

The policy identifies the insured premises as five apartment buildings at 1800 South Maple Street. The file shows that two additional insured endorsements to the policy were issued, both naming "South Maple Street LLC" as an additional insured. One of the additional insured endorsements covers mortgagees, assignees or receivers of the named insured's property, but only with respect to liability as a mortgagee, assignee or receiver. The other endorsement covers managers or lessors of leased premises, but only with respect to liability arising out of the named insured's use of the part of the premises leased to the named insured. Both endorsements contain an exclusion for "structural alterations, new construction or demolition operations..."

For limited liability companies, the policy includes within the definition of "an insured": (1) "members," but only with respect to the conduct of the company's business; (2) managers, but only with respect to their duties as managers; (3) employees, but only for acts within the scope of employment or while performing duties related to the conduct of the LLC's business; and (4) a person acting as the LLC's real estate manager.

The policy also adds as "automatic additional insureds": (1) co-owners of the insured premises, but only with respect to liability as the co-owner of the premises; and (2) any person or organization that has a controlling interest in the insured, but only with respect to liability arising out of that financial control, or the ownership of the premises, and not as to "structural alterations, new construction or demolition operations performed by or for such person or organization."

C.    The Request For Coverage

On or about September 29, 2005, AMCO received a request for coverage of the complaint filed by The Hidden Glen Maintenance Corporation. After reviewing the file and investigating the claim, AMCO's Robert Johnson called your office on October 6, 2005. You agreed to fax copies of the CC&Rs for the condominiums, and the plaintiff's demand letter, to Mr. Johnson, and did so on or about October 28. After a few unsuccessful attempts to arrange a personal meeting, Mr. Johnson sent you a letter dated November 10, 2005, outlining the coverage issues and asking you to provide documents which would allow resolution of those issues.

By January 11, 2006, Mr. Johnson had received no response to his letter, and called your office. The next day, Mr. Johnson received a call from your assistant, who said that you would be out of the office for the week. The assistant said that the complaint had been properly served on the insureds, and that settlement negotiations were being engaged in. Mr. Johnson asked the assistant to have you call him, but apparently this has not yet happened.

Ms. Vekeno Kennedy
Page 5 of 13
March 3, 2006

III
**COVERAGE ANALYSIS**

A.    <u>Possible Rescission Based On Misrepresentations Regarding The Insured Risk</u>

The application for the AMCO insurance policy here at issue lists "applicant's operations" as being "Apartment Owner" of the apartments at 1800 South Maple Street, and information is provided regarding average percentage of units occupied and average monthly rent charged for a unit.  No mention is made of any intent to convert the apartments into condominiums.

Conversion of apartments into condominiums gives rise to different types of risks than simple ownership of an apartment building, and subjects an insurer to substantially greater exposure.  Consequently, if AMCO had been informed that the insureds intended to convert the apartments at South Maple Street, a higher premium would have been charged, and a different type of policy would have been issued.

If the allegations of the complaint are true, the defendants were already planning to convert the apartments when they applied for the insurance sometime around April of 2002.  It is alleged that "[s]oon after purchase" of the apartment complex "in or about 2001," the defendants began to take steps to obtain reports from the Department of Real Estate that would allow the property to be subdivided.  It is also alleged that "in or about March of 2002," the defendants requested the County of San Diego Assessor's office to segregate the property into individual units.

California Insurance Code section 332 provides that "[e]ach party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract..."  Since knowledge that the applicants intended to convert the condominiums would have affected AMCO's treatment of the application, that intent was a material fact.  Misstatements or concealment of material facts in an application for insurance, even if unintentional, may entitle an insurer to rescind the insurance policy.  <u>Cal</u>. <u>Ins</u>. <u>Code</u> §§ 331, 359; <u>Mitchell v. United Title Ins. Co.</u>, 127 Cal.App.4th 457, 469 (2005).  Such rescission also applies to innocent co-insureds.  <u>Cal</u>. <u>Ins</u>. <u>Code</u> § 650.

Based on the file materials now available, it cannot be said with certainty whether an action by AMCO for rescission of the insurance policy would be appropriate.  However, such an action may subsequently prove warranted by the facts, and if rescission is granted, AMCO would be relieved of any obligations under the policy.

B.    <u>The Complaint Does Not Allege Claims For Bodily Or Personal Injury</u>

The liability part of the insurance policy issued by AMCO covers claims for damages caused by "bodily injury," "property damage," and "personal and advertising injury."  The complaint filed by The Hidden Glen Maintenance Corporation does not allege any claims for "bodily injury."  Indeed, since the plaintiff is a corporation, it cannot suffer any "bodily injury."

For a covered "personal and advertising injury" claim to exist, the injury must arise out of one of the "offenses" specified in the policy (Liability Coverage Form, p. 10 of 24, par. 1.b).  Those offenses are: (a) false arrest, detention or imprisonment; (b) malicious prosecution; (c) wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling

Ms. Vekeno Kennedy
Page 6 of 13
March 3, 2006

or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; (d) oral or written publication of material that slanders or libels a person or organization or disparages a person or organization's goods, products or services; (e) oral or written publication of material that violates another's right of privacy; (f) the use of another's advertising idea in your advertising; or (g) infringing upon another's copyright, trade dress or slogan in your advertising (Liability Coverage Form, p. 23 of 24, Definitions, no. 14). The complaint filed by Hidden Glen does not allege, or potentially involve, injuries arising out of any of these "offenses."

C.    The Claims For "Property Damage" Are Excluded

Since the complaint does not allege any claims for "bodily injury" or "personal and advertising injury," coverage obligations under the AMCO policy can only be triggered if there are allegations of "property damage." A possibility exists that the complaint alleges continuing "property damage," although any such damage was actually caused by previous owners of the property. In any event, the claims for that "property damage" are not covered, because they fall within a number of the exclusions in the AMCO policy.

The facts alleged in the complaint, and undisputable facts from other sources, establish that two of the exclusions, for property owned by the insured and for premises sold by the insured, completely bar coverage of the Hidden Glen litigation. Those exclusions will be discussed in some detail below. A number of other exclusions, which may completely or partially bar coverage, are briefly discussed thereafter.

1.    The "Owned Property" Exclusion

Exclusion "j.1" applies to claims for property damage to "[p]roperty you own, rent, or occupy." According to the complaint, defendants purchased the apartment complex in 2001, and defendants' alleged wrongful acts occurred while they owned the property. For example: (1) defendants owned the property when they allegedly made misrepresentations to the Department of Real Estate so that the property could be converted; (2) defendants owned the property when they made the cosmetic repairs to cover up defects; and (3) defendants owned the property when they allegedly had a duty to properly set up the homeowners association. Since the "property damage" allegedly continued throughout defendants' ownership of the premises, the claims alleged in the complaint all fall within the "owned property" exclusion.

Moreover, defendants were probably still "owners" of the common areas after the policy period ended. The CC&Rs note that unit owners are given an undivided interest in the common areas of the condominium complex. The CC&Rs also provide that the defendants would continue to hold the ownership interests of the unsold units, so defendants were arguably still "owners" of the common areas until all of the units were sold, which almost certainly did not occur before the policy period ended.

2.    The "Premises Alienated" Exclusion

The complaint does allege that defendants "sold the first individual unit in November of 2002," so it is possible that some of the units were no longer owned by defendants when the AMCO policy was cancelled, on November 24, 2002. However, if defendants were no longer the

owners of some of the units, or the common area, on November 24, 2002, those properties would be premises sold by defendants, and would fall within the "premises alienated" exclusion.

Exclusion "j.2" applies to property damage to "[p]remises you sell, give away or abandon, if the 'property damage' arises out of any part of those premises." This exclusion, combined with the "owned property" exclusion, bars coverage to the AMCO insureds in this case -- the individual units and the common areas where the property damage allegedly occurred were either owned by defendants, or were sold by defendants, and in either event, coverage is excluded.

The application of the "premises alienated" exclusion can sometimes be a complex issue, primarily because of two decisions of the Fourth District Court of Appeal, Prudential - LMI Commercial Ins. Co. v. Reliance Ins., 22 Cal.App.4th 1508 (1994) and Maryland Casualty Co. v. Reeder, 221 Cal.App.3d 961 (1990). Both cases held that, in certain circumstances, the "premises alienated" exclusion should not be literally applied.

However, Maryland Casualty and Prudential both make it clear that the exclusion is properly applied on the facts presented here. Both cases involved pre-1986 liability policies, and noted that a change was made to the standard "premises alienated" exclusion in 1986, which clarified that it was designed to apply to "situations where the premises were first 'occupied, rented, or held for rental by [the insured]'." Prudential, supra, 22 Cal.App.4th at p. 1512; Maryland Casualty, supra, 221 Cal.App.3d at 978.

The AMCO policy is a post-1986 policy, and its "premises alienated" exclusion contains the changed provision, specifying that the exclusion does not apply "if the premises are 'your work' and were never occupied, rented or held for rental by you." Given the allegations of the complaint and the representations on the insurance application, it cannot here be disputed that the premises were "held for rental" by defendants, so the exclusion remains applicable.

As noted by the court in Prudential, the purpose of the exclusion was to "deny coverage to an insured who has failed to repair property prior to its sale or who has failed to disclose the existence of a defect at the time of sale." Prudential, supra, 22 Cal.App.4th at p. 1512. Here, the claims against defendants are specifically based upon allegations that they failed to properly repair the rental property, and failed to disclose defects on the property, before sale. In this situation, it is clear that the "premises alienated" exclusion is applicable, and would bar coverage of any claims that were not already barred by the "owned property" exclusion.

3.    The Exclusion For Property Damage Arising Out Of Operations

Exclusion "j.5" applies to property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." If plaintiff is claiming that the repair and restoration work performed by "defendants and various subcontractors" did not just mask preexisting damage, but actually caused property damage, then this exclusion might apply.

4.     The Exclusion For Property That Must Be Restored, Repaired Or Replaced

Exclusion "j.6" applies to property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." However, this exclusion "does not apply to 'property damage' included in the 'products-completed operations hazard'." Pursuant to the definition in the policy, the "products-completed operations hazard" only includes property damage that occurred "away from premises you own or rent," and does not apply to work that has not yet been completed.

This exclusion might be inapplicable to the work on <u>some</u> of the individual units, since it is possible that defendants' "condo conversion" work had been completed and some of the units sold while the policy was still in effect.  However, to the extent that the damage was to common areas, defendants' likely status as an owner throughout the policy period would make the definition of "completed operations" inapplicable, and therefore make the exclusion applicable.

5.     The Exclusion For Damage To Your Work

Exclusion "l" to the policy applies to property damage to "'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'."  However, the exclusion is not applicable if "the damaged work, or the work out of which the damage arises, was performed on your behalf by a subcontractor."  This exclusion may bar indemnification of some of the claims, but since the complaint alleges that "defendants and various subcontractors" performed the work, the extent of its application cannot be determined at this time.

6.     The Exclusion For Damage To Impaired Property

Exclusion "m" to the policy applies to property damage to "impaired property" or property that has not been physically injured which arises out of "1) A defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'; or 2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms."  "Impaired property" is defined as including property other than "your work" that cannot be used or is less useful because:

> a. It incorporates 'your product' or 'your work'
> that is known or thought to be defective, deficient,
> inadequate or dangerous; or
> b. You have failed to fulfill the terms of a
> contract or agreement;
> If such property can be restored to use by:
> a. The repair, replacement, adjustment
> or removal of 'your product' or 'your
> work'; or
> b. Your fulfilling the terms of the contract
> or agreement.

This exclusion might ultimately prove applicable.  Plaintiff alleges that defendants had entered into an agreement with the Department of Real Estate to perform various repairs and upgrades of the common areas at the complex.  Plaintiff alleges that defendants failed to perform

Ms. Vekeno Kennedy
Page 9 of 13
March 3, 2006

any of these improvements, and it is possible that plaintiff will subsequently attempt to prove that
use of the units, or of other parts of the common areas, was impaired by the breach of the
agreement.

      7.    <u>The Mold Exclusion</u>

    The complaint alleges that one of the preexisting problems with the complex was mold, and
that defendants failed "to prevent and remedy mold...problems throughout the subject property..."
An endorsement to the AMCO policy excludes coverage of:

> a. "Bodily injury" or "property damage" which would
> not have occurred, in whole or in part, but for:
> 1) The actual, alleged or threatened...contact with,
> exposure to, existence of, or presence of, any "fungi"
> or bacteria on or within a building or structure... or
> 2) The failure to warn or to disclose the presence of
> "fungi" or bacteria;
>
> regardless of whether any other cause, event, material
> or product contributed concurrently or in any sequence
> to such injury or damage.
>
> b. Any loss, cost or expenses arising out of the testing
> for, monitoring, cleaning up, removing, containing....
> remediating or disposing of... "fungi" or bacteria...

    The endorsement defines "fungi" as including "mold." Consequently, to the extent that
plaintiff is seeking recovery for "property damage" caused by the presence of mold, or the failure
to disclose mold, the claim is excluded.

      8.    <u>The Breach Of Contract Exclusion</u>

    The "California Amendatory Endorsement" to the AMCO policy here at issue contains an
exclusion for property damage "that arises out of or is a result of any breach of a written or oral
contract, and breach of any other written or oral agreement, or any breach of an express or implied
warranty." This exclusion is directly applicable to, and precludes coverage of, the complaint's third
cause of action, for "Breach of CC&Rs/Contract."

    The exclusion might also apply to plaintiff's claims based on the alleged failure to comply
with the improvements promised in the documents filed with the Department of Real Estate.
Although plaintiff was not a party to these agreements, some of its claims "arise out of" the breach
of the agreements.

      9.    <u>The Exclusion For Expected Or Intended Injury</u>

    Coverage of some of the causes of action alleged in the complaint should be barred by the
exclusion for property damage "which is expected or intended by the insured." For example, the
second cause of action, for civil conspiracy, alleges that defendants <u>knowingly</u> conspired to breach

Business and Professions Code section 11020 by making <u>intentional</u> misrepresentations to the Department of Real Estate.  The seventh cause of action, for violation of California Business and Professions Code section 17200, alleges that the defendants "submitted false and <u>fraudulent</u> documents in furtherance of their <u>conspiracy to defraud</u> the Department of Real Estate..."

    10.   <u>Fiduciary Responsibility Exclusion</u>

The AMCO policy excludes claims for property damage "arising out of the ownership, maintenance or use, including all related operations, of property in relation to which you or any insured is acting in any fiduciary or representative capacity."  The fourth cause of action in the complaint is for breach of fiduciary duty, and alleges that defendants, "[p]ursuant to the CCRs, and common law obligations," owed fiduciary duties to the homeowners association, including duties to fund an adequate reserve account, avoid conflicts of interest, and maintain adequate insurance. This claim may not be for "property damage" arising out of "ownership, maintenance or use" of "property" as to which defendants were acting in a fiduciary capacity, but the exclusion might be applicable.

    D.   <u>The Causes Of Action Alleged By Plaintiff Are Not Covered</u>

    1.   <u>Negligence</u>

The first cause of action in the complaint is for negligence.  Plaintiff alleges that defendants had a duty to act reasonably in converting the apartments to condominium units, and breached that duty by: failing to "prevent and remedy" mold, water intrusion problems, and faulty grading and landscaping; failing to bring the units up to Code standards; failing to inspect the condition of the units; failing to "prepare proper plans and specifications"; failing to properly set up the homeowners association; and "[o]therwise acting negligently in their construction, sale, conversion, and marketing of the units and subject property."

The combination of the "owned property" and the "premises alienated" exclusions bars coverage of this cause of action.  This is because all of plaintiff's claims involve property damage to units that were owned by defendants during the AMCO policy period, or were sold by defendants during the AMCO policy period.

    2.   <u>Civil Conspiracy</u>

The second cause of action in the complaint is for civil conspiracy to violate Business and Professions Code section 11020.  That section makes it "unlawful" to make or issue public reports which contain information that is known to be "forged, altered, false or counterfeit..."  Plaintiff alleges that defendants conspired to violate this section in their preparation of the report to the Department of Real Estate, in which defendants said that they would repair or replace many defective conditions at the complex.

This cause of action is barred by the exclusion for damage "expected or intended by the insured."  Participation in a civil conspiracy is inherently an intentional act.  <u>Fibreboard Corp. v. Hartford Accident & Indem. Co.</u>, 16 Cal.App.4th 492, 510 (1993) (a defendant "cannot inadvertently become a member of a civil conspiracy").  And, fraud and intentional misrepresentation are uncovered intentional acts.  "[F]raudulent acts are deemed purposeful rather

than accidental and, therefore, are not covered under a CGL policy..." Chatton v. National Union Fire Ins. Co., 10 Cal.App.4th 846, 861 (1992).

### 3.    Breach of Contract

The third cause of action in the complaint is for breach of contract, based on the defendants' alleged failure to comply with a warranty in the CC&Rs that various parts of the project would be in "working condition." This cause of action would be barred by the exclusion in the "California Amendatory Endorsement," which applies to claims arising out of any breach of contract or warranty.

### 4.    Breach of Fiduciary Duty

The fourth cause of action in the complaint is for breach of fiduciary duty. It is alleged that "[p]ursuant to the CCRs, and common law obligations," defendants owed certain fiduciary duties to plaintiff, including a duty to avoid conflicts of interest, to provide and maintain adequate levels of insurance, to adequately fund a reserve account for contingencies, and to refrain from placing self-serving exculpatory clauses in the CC&Rs.

These claims would not be covered, as they would fall within the exclusions for "expected or intended" damage, and for claims arising out of the breach of a contract. Additionally, these claims do not allege any form of "property damage," but instead seek recovery for uncovered economic loss. See Continental Casualty Co. v. Superior Court, 92 Cal.App.4th 430, 439 (2001); McLauglin v. National Union Fire Ins. Co., 23 Cal.App.4th 1132, 1150 (1994). And, if this cause of action did involve a claim for damage to property, it would probably be barred by the "breach of fiduciary duty" exclusion.

### 5.    Alter Ego Liability

The fifth cause of action in the complaint is for "alter ego" liability. It is alleged that defendant 1800 South Maple Street LLC was formed for improper purposes, and that all of the defendants should be held liable for its acts. This cause of action does not in itself seek recovery for any covered injury or damage, and is based on intentional acts.

### 6.    Negligence Per Se

The sixth cause of action in the complaint is for negligence per se, and alleges that defendants violated California Civil Code section 1134. According to plaintiff, this section required defendants to perform a reasonable inspection of the premises, and to provide a written statement to the purchaser listing all substantial defects or malfunctions on the property. Plaintiff alleges that as a result of defendants' failure to comply with the statute, it suffered "damages to its property, loss of use of property, damages to common areas and budget."

The exclusion for intentional acts may apply, as it is questionable whether a statute imposing inspection and reporting duties can be accidentally violated. Also, the violation of section 1134 did not cause property damage – i.e., the failure to inspect the property and provide a written list of defects did not cause the defects. Instead, it caused uncovered economic damage, in that

Ms. Vekeno Kennedy
Page 12 of 13
March 3, 2006

the failure to provide written statements listing the problems with the condominium complex caused homeowners to purchase units that had problems which had to be repaired.

In any event, if it was assumed that this cause of action was seeking recovery for property damage, that property damage occurred while the premises were owned by defendants, or after it had been sold. Consequently, the "owned property" and "premises alienated" exclusions would bar coverage.

7.    <u>Violation of Business and Professions Code Section 17200</u>

The seventh cause of action in the complaint is for violation of California Business and Professions Code section 17200. Plaintiff alleges that defendants engaged in unfair and fraudulent business practices when committing the acts alleged in the foregoing causes of action, and in particular when they "submitted false and fraudulent documents" to the Department of Real Estate in violation of Business and Professions Code section 11020. These claims are clearly based on intentional acts, and they do not seek recovery for property damage.

IV
CONCLUSION

For the reasons discussed above, it is my opinion that the complaint filed by The Hidden Glen Maintenance Corporation does not allege any potentially covered claims against any of AMCO's insureds. AMCO has independently conducted its own evaluation, and has reached the same conclusion.

As discussed at the beginning of this letter, there are still uncertainties regarding the relationships between, and capacities of, AMCO's insureds and the defendants named in the complaint. To ensure that no basis for coverage of an AMCO insured has been overlooked, it would be appreciated if you would provide the information requested in the second section of this letter.

However, no facts of which AMCO is currently aware indicate that there is any potential for coverage of the claims against any of AMCO's insureds or any of the defendants named in the complaint. Consequently, if you choose not to respond to this letter, AMCO has requested me to inform you that the request for coverage of the <u>Hidden Glen</u> litigation can be considered denied.

It is my opinion that the policy provisions and exclusions discussed in this letter provide complete support for AMCO's coverage determinations. Nonetheless, AMCO reserves the right to rely upon other policy provisions and exclusions in the future, regardless whether they are discussed in this letter, and especially if AMCO is made aware of new facts regarding the claim for coverage.

Ms. Vekeno Kennedy
Page 13 of 13
March 3, 2006

    If an insured believes his or her claim has been wrongfully denied, he or she may have the matter reviewed by the California Department of Insurance, Claim Service Bureau, 300 South Spring Street, 11th Floor, Los Angeles, California, 90013; the phone number for the Claim Service Bureau is 213-897-5961.

                    Very Truly Yours,

                    MILLER LAW FIRM

                    Scott A. Johnson

SAJ:gp

# EXHIBIT "A-7"

Unknown

| From: | David M Everett |
|---|---|
| Sent: | Thursday, February 26, 2004 6:04 PM |
| To: | Charles L Foster |
| Subject: | Avocado Crest Policy - ACP 7801073037 - Prior policy ACP 7801001164 |

Chuck,

Per our phone discussion,    Here is a brief timeline of events. Allied wrote a Policy for ACDW Properties - Policy ACP 7801001164.  I have attached the Policies to this email for your information.    Avacado Crest Condominiums LLC is listed as a named insured on the CPAA and GLAO Policies but not on the BPH.     868 East Alvarado, Fallbrook, CA  is listed as  Location 3 on the BPH policy.  The Policy Period was 12/1/01 to 12/1/02.

The ACDW Properties account was quite large with many locations,  when originally presented.  Allied originally quoted a much larger premium with several other locations,  The agent moved coverage for some accounts to other carriers.  To the best of my knowledge, Sequoia did write some locations for that policy period.    The policy was issued late due to these changes and was not issued until 4/10/04.    Loss control reports in file showed that renovation work was being performed during the policy period at some locations.    Allied was aware that the insured was a rehabilitator of properties per the Large Account Write up in file.  I seem to recall that the insured had a seperate entity to do the renovation work but I can not locate documentation in the file.

On  6/11/02 I received a request to delete 868 East Alvarado from ACP 7801001164 effective 4/4/02.    Allied received the application for ACP 7801073037 on 4/9/04. There was a delay in issue due to incomplete rating information from the agent.  A comment on the Processing sheet indicates that I was aware the building was rehabbed.   I can not recollect for certain if we knew the rehabilitation process was ongoing or if we thought it was already completed.   I can find no firm documentation in the file.

I repeat my earlier assertion that Allied Insurance did not contemplate providing coverage for extensive renovation work on either of these policies.

You will find the Underwriting file information for ACP 7801001164 in AWD.   I note that in the claim file on 2/6/04, you mention an email to a Melissa.   I believe that email would have been sent to Melissa Addison,  who was Robyn Kettering's assistant.  Melissa is still employed by Michael Ehrenfeld Insurance although Robyn Kettering has left to start her own agency.

Please feel free to contact me if you need additional information.


David Everett

Allied Insurance
Commercial Underwriting
Phone: 1-800-552-2437, extension 4146
Fax: 1-877-807-9528
Email : EVERETD@Nationwide.com

1

AMCO 05706